IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

RIDGE BENEFIELD, on *
behalf of himself and *
all others similarly *
situated, *Case No:
Plaintiff, *1:25-cv-0009-JB-N
*
vs. *Formerly Baldwin
*County Circuit Court
THE CITY OF FAIRHOPE, *Case No.
ALABAMA, *05-CV-2024-901732.00
Defendant. *

DEPOSITION TESTIMONY OF
STEVEN E. CORTINAS,

was taken on the 11th day of September, 2025, from 8:54 a.m. to 11:28 a.m. before Susan Andrews, CCR, (ACCR 284), in and for the State of Alabama, reported by machine stenography at the offices of HAND, ARENDALL, HARRISON & SALE, LLC, 71 NORTH SECTION STREET FAIRHOPE, ALABAMA.



A P P E A R A N C E S

FOR THE PLAINTIFF:
BLACKBURN & CONNER P.C.
BY: GRANT BLACKBURN
POST OFFICE BOX 458
BAY MINETTE, ALABAMA 36507
251-401-4630
gblackburn@blackburnpc.com

FOR THE DEFENDANT:
HAND, ARENDALL, HARRISON & SALE, LLC
BY: CHRISTOPHER S. WILLIAMS
71 NORTH SECTION STREET
SUITE B
FAIRHOPE, ALABAMA 36532
251-694-6233
cwilliams@handfirm.com



I N D E X

WITNESS PAGE
STEVEN E. CORTINAS
Examination By Mr. Blackburn.......... 7

PLAINTIFF EXHIBIT LIST

NUMBER DESCRIPTION PAGE

Plaintiff's 1 - Notice of Taking 30(b)(6) Deposition(s) of Defendant City of Fairhope, Alabama........ 14

Plaintiff's 2 - Breakdown and Receipt for the Building and impact fees Assessed with Permit RES-24000297 (5/3/24), Bates labeled FAIRHOPE 0167........... 21



E X H I B I T S (cont.)

PLAINTIFF EXHIBIT LIST

NUMBER DESCRIPTION PAGE

Plaintiff's 3 - TischlerBise impact fee Study, Prepared for City of Fairhope, Alabama, July 2, 2018. Bates labeled FAIRHOPE 0019-0086................ 30

Page 5

S T I P U L A T I O N

It is stipulated by and amongst the parties hereto and their respective attorneys at law that the deposition of STEVEN E. CORTINAS, shall be taken before Susan Andrews, Certified Court Reporter, Notary Public for the State at Large, and that the said deposition shall be taken in accordance with the provisions of the applicable sections of the Alabama Rules of Civil Procedure.

It is further stipulated that all notices provided for by said applicable sections of the Alabama Rules of Civil Procedure are waived, as is the signing and certification of said Susan Andrews and all other requirements and technicalities of every sort regarding the taking and filing of the deposition, except as hereinafter set out:

All objections, save as to the form of questions asked, are reserved until the time of trial in accordance with the applicable provisions of the said Alabama Rules of Civil

Page 6

Procedure.

Further, that the original transcript will be delivered to GRANT BLACKBURN, ESQ., as custodian, for filing should the Court so direct.

It is further stipulated and agreed that the witness hereto does waive his right to read and sign said deposition as provided for by said Alabama Rules of Civil Procedure.

I, Susan Andrews, Commissioner and Certified Court Reporter, certify that on this date, as provided by the Alabama Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me at the offices of HAND, ARENDALL, HARRISON & SALE, LLC, 71 NORTH SECTION STREET , FAIRHOPE, ALABAMA, on September 11, 2025, commencing at 8:54 a.m., STEVEN E. CORTINAS, witness in the above cause, for oral examination, whereupon the following proceedings were had:

Page 7

(Whereupon,
STEVEN E. CORTINAS,
having been first duly sworn, was examined and testified as follows:)
THE COURT REPORTER: Usual stipulations?
MR. BLACKBURN: Yes, ma'am.
MR. WILLIAMS: Yes, ma'am.

EXAMINATION
BY MR. BLACKBURN:
Q. Good morning --
A. Good morning.
Q. -- Mr. Cortinas. My name is Grant Blackburn. We've met before. We met this again this morning. It's nice to see you.
I'm going to be asking you some questions today about the case, Ridge Benefield versus the City of Fairhope.
Have you given a deposition before?
A. I have.
Q. I would assume you've given many?
A. A few.

Page 8

Q. Okay. You know the ground rules. I will try to speak slowly and clearly. If I don't, please correct me.
A. Yes.
Q. If something I ask you isn't clear --
A. Uh-huh.
Q. -- let me know and I'll rephrase the question.
A. Okay.
MR. WILLIAMS: Try to let him complete the question, and also "uh-huhs" and "huh-uhs" are hard. So if I hear it, I might say is that a "yes" or is that a "no"?
THE WITNESS: Understood.
MR. BLACKBURN: Did y'all --
MR. WILLIAMS: I already saw that happening and she looked at me, so I could see it coming.
Q. (BY MR. BLACKBURN) Okay. I guess we'll start by telling me your full name and where you're employed.
A. Sure. My name is Steven Erik Cortinas. I go by Erik. And I am employed

Page 9

with the City of Fairhope.
Q. Okay. What is your title?
A. My title is building official and floodplain manager.
Q. How long have you been employed by the City of Fairhope?
A. A total of 16 years.
Q. Have you held any titles with the City, other than those titles you just told me about?
A. Initially, I was the building inspector, the only one for the City of Fairhope when I originally started.
Q. Well, let's start there and just briefly bring me up to the current time.
You started as the building inspector?
A. I did.
Q. What position did you hold after that?
A. I was then promoted to building official when we added additional inspectors in the early 2000s.

Page 10

Q. What year would that have been?
A. That would have been approximately 2002, possibly late, or early 2003.
Q. That's when you were promoted to -- I'm sorry.
Did you say building --
A. To the building official.
Q. Building official. And what, if any, title changes or job description changes did you have after that?
A. It's -- that's been my title for the remainder of the time that I've been employed with the City.
Q. Okay. You said earlier building official and floodplain manager?
A. Yeah, floodplain administrator.
Q. Administrator. I think I understand the building official.
But what does your job require when you're wearing your floodplain administrator hat?
A. Yes. My job there is to interpret and enforce the FEMA floodplain regulations

Page 11

for development and construction in designated flood zones that -- based on the national flood insurance maps that FEMA publishes.
Q. Okay. So do you work with other officials in the Planning & Zoning Department to determine, like, building regulations in floodplains and that type of thing?
A. We work together on different things. Their -- their area is kind of more focused. My area is focused more on constructions and regulatory oversight and governing construction.
Q. Okay. Describe for me your responsibilities as the building official.
A. I am responsible for administering the day-to-day of the Building Department, which consists of inspectors and -- and administrative personnel.
I am responsible for drafting and adopting ordinances related to building code enforcement. Some of the other responsibilities I have is, I enforce our

Page 12

nuisance and dangerous buildings ordinance.
I make the final determination on any building code interpretation that may come down in the course of an inspection. I enforce the floodplain regulations. I enforce the -- the impact fee ordinance in the course of issuing building permits.
There are other -- other certain things that I handle as well. I assist Planning & Zoning Department in the enforcement of certain environmental regulations.
I do administer the City's wetland protection ordinance. But I assist Planning & Zoning Department in the enforcement of erosion sediment controls and red clay enforcement ordinances.
Q. You've got a lot of watch after.
A. I do.
Q. This case, of course, is about the City's impact fee ordinance.
A. Uh-huh.
Q. And I know you're aware of that.

Is it fair to say that you're primarily responsible for collecting any fees that are associated with the development within the City, as far as building permit fees go?
And I know there are various types of fees that the City accesses when a new building permit is to be issued.
Is that all within your scope of responsibility, all those fees that are paid, and fees, in addition to impact fees, I mean?
A. Yes, anything related to construction projects. Planning & Zoning has some of their own fees they collect. But anything related to construction projects, my department is -- is responsible for collecting those fees.
Q. Okay. Mr. Cortinas, have you seen the notice of deposition that we served on your attorney? We can mark that as Exhibit 1.
A. Yes, I have.
Q. Let's mark yours, Mr. Cortinas. Mine



have notes on them. If it's okay with you guys, let's use these as the exhibits we'll give to you.
MR. WILLIAMS: Do you want to staple it? I wasn't sure --
MR. BLACKBURN: Yeah.
MR. WILLIAMS: -- how you wanted to organize that.
MR. BLACKBURN: I'm still not sure how it's organized.
(Plaintiff's Exhibit 1 was marked for identification, and a copy thereof is attached hereto.)
Q. (BY MR. BLACKBURN) Mr. Cortinas, have you seen this notice of deposition that's marked as Exhibit 1 before this morning?
A. Yes.
Q. Okay. What I would like to do is go through, if you start on the second page, you'll see some numbered paragraphs. Those are the different areas of inquiry that I'm gonna cover today.



I just want to make sure that we're on the same page about what are you qualified to testify about for the City of Fairhope.
A. Okay.
Q. Let's take them one by one and just read with me. Number 1, I have is an area of inquiry that you'll cover; okay?
I don't know how to want to do it?
MR. WILLIAMS: Yeah. Do you want me to read out the numbers?
MR. BLACKBURN: I just want to be efficient and have --
MR. WILLIAMS: Well, let's do this.
MR. BLACKBURN: We don't need to waste a bunch of time doing it. I've made notes --
MR. WILLIAMS: Yep.
MR. BLACKBURN: -- of what I think he's going to cover. If you want me to run through and just say the numbers, we can do it that way.
MR. WILLIAMS: Let's do that.
MR. BLACKBURN: Okay.



Q. (BY MR. BLACKBURN) Okay. Mr. Cortinas, I have testifying to the following of these numbered paragraphs: Number 1, Number 3, 4 and 5, Number 7, Number 8, Number 14, Number 15, Number 17, and Number 18.
MR. WILLIAMS: That's what I have.
A. Yeah.
Q. Okay. Mr. Cortinas, where did you work before you came to the City of Fairhope?
A. Prior to that, I was a senior engineering tech for Betz Converse & Murdoch Engineers from 1991 until 2000.
Q. Where was that?
A. That was based out of Mobile, but during my course there I lived in Baton Rouge, Shreveport, Albuquerque, El Paso, Atlanta, and into Mobile.
Q. Oh, wow. Is that the job you took out of school?
A. No. Yes, that's the job I took right after I got married. I -- I came out from the construction trades and they needed

Page 17

someone that had some experience.
Q. Okay. Well, I'm jumping around a little bit -- but --
A. Sure.
Q. -- did you graduate high school?
A. I did.
Q. Where did you graduate?
A. Jefferson Davis High School in Montgomery, Alabama.
Q. Did you go to college?
A. I did not.
Q. Okay. And you went into the construction trades?
A. I did.
Q. Got married and then took the job at --
A. Married young and had a family to take care of.
Q. All right. Mr. Cortinas, the City has produced a couple of hundred pages of documents in this case, and within those documents are TischlerBise studies.
A. Uh-huh.

Page 18

Q. Are you familiar with the TischlerBise studies that support the impact fee ordinance?
A. I am.
Q. Okay. Let me ask you a few questions about those. The first study was prepared in about 2006 or '07; is that right?
A. Roughly, yes.
Q. And then another study was prepared in 2018, if I recall correctly?
A. Yes. There's a date on -- on the front of a study that specifies when it was.
Q. Yeah. And there was another study prepared in 2024, if I recall correctly?
A. Yes.
Q. So you've had a total of -- the City of Fairhope has had a total of three studies prepared by TischlerBise?
A. Yes.
Q. Has the City consulted any other third party, other than TischlerBise, for information pertaining to the drafting of its impact fee ordinances?

Page 19

A. Not to my knowledge.
MR. BLACKBURN: Did you guys produce the 2024 study?
MR. WILLIAMS: I don't know if we did. I don't believe we did.
MR. BLACKBURN: Okay.
MR. WILLIAMS: It's on the website.
MR. BLACKBURN: Okay.
MR. WILLIAMS: And, I mean, I can get it to you. It's on the website, publicly available.
MR. BLACKBURN: Okay.
MR. WILLIAMS: I can certainly send it to you. You know, it's beyond the scope of his deposition. But, certainly, I can get it to you.
MR. BLACKBURN: Let's make sure, then, that we're talking about the correct study and the correct ordinance that were in effect at the time the plaintiff paid his impact fee in this case.
A. (BY MR. BLACKBURN) I'm going to show you, Mr. Cortinas --

Page 20

MR. BLACKBURN: Let's see. Do you have all the Fairhope production marked as one file?
MR. WILLIAMS: I tried to --
MR. BLACKBURN: Break it --
MR. WILLIAMS: -- break it down, but we can get it. I can give it to you all together, too.
MR. BLACKBURN: It may be easier just to lump it all together --
MR. WILLIAMS: Okay.
MR. BLACKBURN: -- and mark it as Exhibit 2. I'll kind of bounce around in there a little bit.
MR. WILLIAMS: I'm just looking for the final Bates label. It's Fairhope 1 through Fairhope 218, it appears based on what you sent me this morning.
MR. BLACKBURN: Yeah. That's it. Thank for printing that stuff, too, Chris.
MR. WILLIAMS: No problem.
MR. BLACKBURN: Oh. Is that all of it?

MR. WILLIAMS: You want a big clip on it.
MR. BLACKBURN: Yeah. That would be --
MR. WILLIAMS: Fairhope 1 through 218, I think.
MR. BLACKBURN: It's probably going to be easier just to leave it all clipped together.
MR. WILLIAMS: Okay.
MR. BLACKBURN: And we'll put exhibit stickers on individual pages. I'm sorry.
MR. WILLIAMS: Will I be flipping through this as we go possibly?
MR. BLACKBURN: Probably so. Not --
MR. WILLIAMS: Okay.
MR. BLACKBURN: Hopefully not too much.
Q. (BY MR. BLACKBURN) Flip over to Page 167. It'll be in the bottom right corner. Okay. Let's do this. I'm going to put this Exhibit 2.
(Plaintiff's Exhibit 2 was



marked for identification, and a copy thereof is attached hereto.)
Q. (BY MR. BLACKBURN) And Exhibit 2 is going to be Fairhope 167.
Can you tell me what this document is, Mr. Cortinas?
A. This is the breakdown and receipt for the building and impact fees that were assessed with Permit RES-24000297.
Q. And it's my understanding that that permit number corresponds to Ridge Benefield, who is the plaintiff in this case?
A. Yes.
Q. The date at the top of Exhibit 2 on Fairhope 167 is May 3, 2024.
A. Yes.
Q. Am I correct in concluding that that's the date that this amount was paid to the City by the plaintiff?
A. Correct.
Q. And at that time -- this isn't supposed to be quiz. I just don't know off



the top of my head.
Do you recall which impact fee ordinance was in effect on May 3, 2024?
MR. WILLIAMS: For a cheat sheet, I thing it's referenced in your declaration --
THE WITNESS: Yeah.
MR. WILLIAMS: -- which is the first part of that.
A. Yeah. It's gonna be Ordinance Number 1625.
Q. Okay. Ordinance 1625 was in effect then, and that ordinances was replaced eventually by Ordinance 1817; correct?
A. If that is the correct number of the new ordinance.
Q. That is.
A. Is it? I'm not tabbed. I'm not sure where to look.
MR. WILLIAMS: Is it Bates numbered?
MR. BLACKBURN: Yeah, it's 88.
A. Yes.
Q. Okay.
A. That is correct.



Q. And if you look at Fairhope 94, it says that this ordinance was adopted the 19th day of December, 2024?
A. Yes.
Q. As far as you know, is that the accurate date that Ordinance 1817 was adopted?
A. Yes. As far as I know, yes.
Q. Okay. So flipping back to Exhibit 2 on Fairhope 167, you've testified that this is Mr. Benefield's receipt for the fees that he paid, including impact fees --
A. Uh-huh.
Q. -- to get his building permit?
A. Yes.
Q. I just want to -- I want you to explain these to me because there's several fees that are listed here.
A. Uh-huh.
Q. I really just want a description of what each fee is and what it's for. So let's start with the Plan Review Fee.
A. Uh-huh.

Q. RES, am I correct that RES --
A. Yes.
Q. -- is an abbreviation for residential?
A. Correct.
Q. Okay. That one may be self-explanatory, but tell me what the plan review fee is.
A. That is the fee we charge for the review and comment or corrections that are required on a set of construction plans that an applicant submits.
Q. Okay. The same question for the next, the Gas Permit Fee.
A. Uh-huh.
Q. What is that fee?
A. That is the fee that is assessed to -- for the inspectors go out when there are gas inspections at the property during construction.
Q. Are those City gas inspectors?
A. Yes.
Q. Sewer Tap Inspection Fee is the next



one, same question.
A. Yes. It's the same. It's for the trip to the site to inspect the sewer cap -- tap connection to make sure it's correct.
Q. So is that fee used to pay the personnel who are required to go out and inspect the sewer tap?
A. It's -- it's paid to cover the time and -- and cost for that, for the inspection personnel to go out there.
Q. And then the word "new" next to that sewer tap inspection fee --
A. Uh-huh.
Q. -- does that just indicate that this is new construction, or does that indicate something else?
A. That indicates new construction.
Q. Okay. The same question, the next fee says Security/Structured Wire.
What is that?
A. That is for any security wiring, telecom, anything that is installed within the house because we'll inspect it to make



sure that the installation meets requirements.
Q. Okay. Plumbing permit fee, same question. What does that fee cover or go to pay for?
A. That is to cover the -- the time and expenses for the inspectors to go out and inspect the plumbing through the various stages of construction. There's multiple inspections performed.
Q. Same question for the Electrical Permit Fee?
A. Yes, it's the same. For the inspector to go out and inspect the electrical installation through the various stages of construction.
Q. Okay. And then, the next one is a little bit more extensive, the Permit Fee itself.
How is the permit fee itself calculated?
A. We have an ordinance that specifies based on cost of construction. It is



calculated at a value of $5 per 1,000 of value of the construction.
Q. Of the construction or the construction and the land?
A. Of the construction.
Q. Okay. Do you happen to know, off the top of your head, what ordinance number that is?
A. I do not, off the top of my head.
Q. That's a fair answer.
A. I don't know.
Q. Okay. And then, I won't ask you about the Impact Fee right now -- but I will ask you one question about it. We see the impact fee down below that.
And that's $5,427, are you with me?
A. Yes.
Q. And then the annotation "R-3." What does R-3 mean?
A. R-3 is the occupancy classification for a single-family residence that's defined in the International Residential or International Building Code.

Page 29

Q. Okay. So does R-3 correspond to a zoning classification within the City of Fairhope?
A. No.
Q. No, that just designates the type of structure?
A. The -- the building code classifies each type of use of a building as an occupancy classification. There are multiple classifications of residential from multifamily to hotels to transient.
R-3 is the designation that they use for one- and two-family dwellings.
Q. Thank you for that.
Mr. Cortinas, please flip over to Page 19, and this is going to be the first page of Fairhope's Impact Fee Study dated July 2, 2018.
Do you see that?
A. I do.
Q. Let me go ahead and mark this as Plaintiff's Exhibit 3, and that's going to be the entire July 2, 2018 study.

Page 30

(Plaintiff's Exhibit 3 was marked for identification, and a copy thereof is attached hereto.)
Q. (BY MR. BLACKBURN) Let me ask you a few questions about this. Let's start by flipping to -- let's start by flipping to the -- there's a schedule of suggested impact fees, and I'll find the page it's on. Okay.
It's on Fairhope 25, which is Page 3 of the study?
A. Okay.
Q. I'm not going to go through and ask you a bunch of tedious questions about the study. Let me start by asking you generally:
Why did the City commission this study?
A. The City commissioned the study to -- to determine what -- what fees may be necessary to help offset the impact to our infrastructure that's occurring at a very quick rate in Fairhope.

Page 31

Q. In looking here at Page 3 of the study, which is Fairhope 25, Figure 2 is titled, Proposed Impact Fee Schedule.
Do you see that?
A. I do.
Q. Is it accurate to say that this Figure 2, which is the -- I guess I should ask it this way, Mr. Cortinas:
Is this the product of the study that's depicted here on Figure 2?
MR. WILLIAMS: Object to the form.
Q. (BY MR. BLACKBURN) Let's ask it differently. The purpose of the study was, as you testified a moment ago, to determine the cost of this increased development in the City of Fairhope and fees that may be necessary to offset those costs; correct?
A. Yes.
Q. Okay. And these fees that are depicted on Figure 2, are the fees that TischlerBise suggested the City could adopt; correct?
A. Correct.

Page 32

Q. And if we look at Ordinance 1625 that begins at Fairhope 211 -- it's going to be in the back of that.
But, specifically, I'm going to ask you to look at Fairhope 218, which is Exhibit A to the ordinance?
A. Okay.
Q. Okay. Are you looking at Fairhope 218?
A. Yes.
Q. Okay. What is this Exhibit A?
A. That is the impact fee schedule that was adopted as part of the ordinance.
Q. And was this adopted from the TischlerBise study -- and, specifically, is this -- Strike that, and let me ask this question differently.
We were just looking at the table of proposed impact fees from the TischlerBise study on Page Fairhope 25. Yeah. Just kind of hold the page and flip back and forth.
A. Okay.
Q. Okay. Is Exhibit A to Ordinance

1625 -- did that Exhibit A -- are those figures in Exhibit A taken from this table of fees in the TischlerBise study?
A. Yes.
Q. What process, if any, did the City undertake between the time it received this study with these proposed fees that we're looking at --
A. Uh-huh.
Q. -- and the adoption of Ordinance 1625? And to be more specific, I'm curious if there was any process by which the City reviewed, discussed or modified any of these proposed fees from the time it got the TischlerBise study, to the time it adopted the ordinance that included those proposed fees as part of the ordinance?
A. Yes. There was -- I know it was discussed in a City Council work session. And I do not remember the date specifically, but it was presented to the City Council. And TischlerBise came and -- and explained the fees, the methodologies that they used to



determine those fees, and what the changes were that they calculated from the previous ordinance to this one.
Q. Okay. Let's go back to the ordinance itself. Yes, sir. Right there at Fairhope 218.
I want to get an understanding of how the City calculates fees on a case-by-case basis?
A. Okay.
Q. Beginning at the top of Exhibit A at Fairhope 218, we see -- the top gray bar is residential per housing unit occupancy classifications R-2, R-3, and R-4.
And below that in the first row that has text, we see single-family R-3. Now, I assume from your prior testimony that R-3 right there, designates a single-family home or a duplex; is that correct?
A. Yes. That's the building code classification of a one- or two-family dwelling is the terminology.
Q. Okay. Thanks for correcting me.



So in the case of a one- or two-family dwelling, we see that the impact fee is $5,830; is that correct?
A. That is correct.
Q. Is that the amount that would be charged to any applicant who had a one- or two-family dwelling who applied for a building permit with the City of Fairhope?
A. Could you clarify this question?
Q. Yeah. I'm just trying to determine if the City always charges $5,830, or if there is some other process by which the impact fees are calculated, on a case-by-case basis, for different single or two-family dwellings.
A. No. No, they do not always charge every residence $5,830.
Q. Okay. Walk me through that process. And I may ask you some more questions about the multiple family and commercial and these other categories later.
But we're primarily concerned with the plaintiff's house in this case, and it's



a single-family home.
A. Uh-huh.
Q. So you said that not every applicant for a building permit would pay a $5,830 impact fee.
Walk me through the process of how that calculation is done within the City; okay? And let's start with the timing, when are these fees paid?
A. These fees are -- are paid with the building -- at the issuance of the building permit. They're collected with the permit fees at the same time.
Q. And that will happen before land disturbing activity occurs on the lot at the very beginning of the process?
A. Typically not. We have a separate land disturbance permit where they will clear the lot, put up their environmental erosion sediment controls, have that inspected, and then we will release the building permit for them to begin vertical construction.
Q. And the City only releases the

Page 37

building permit after the list of fees we covered earlier are paid, the building permit fee is paid and the impact fee is paid; correct?
A. Correct.
Q. Okay. Now, let's talk about the calculation of the impact fee. The schedule, of course, only lists one number for single-family or R-3 classified buildings. It's $5,830.
Your testimony a moment ago was that that's not always necessarily the amount that an applicant would pay.
So how is that decision made and how are those calculations performed to determine what an individual applicant would pay on a case-by-case basis?
A. Okay. The enabling legislation has language that you -- that a -- I think they call this a political subdivision -- cannot charge more than a combined one percent of the combined construction and land costs.
So when an applicant submits a

Page 38

building permit, they submit the construction cost of the property and the purchase price or the cost of the land.
And we compare those two combined to the impact fee schedule amount, and if the one percent maximum is less than the $5,830, the applicant is charged the lesser of the two amounts.
Q. Okay. That makes sense. So then is it fair to say that TischlerBise has determined $5,830 is the amount that would offset future development for R-3 buildings, but the limitation is in place because the City is observing the enabling legislation's one percent cap?
A. That is correct.
Q. Okay. How does the City determine the value of the land and the value of the project?
I mean, there are, of course, different ways. You and I probably could have different opinions of any piece of land in the city.

Page 39

What are the processes in place for getting clarity on those values, as between the City and the applicant?
A. The -- at the application stage, the applicant submits their declared value of the construction, what it's going to cost, and the declared value of the purchase price of the land is typically what they do.
We also will compare that. The International Code Council publishes building valuation tables for various types of construction and occupancy classifications. And they assign a -- an estimated dollar amount per square foot of what that construction should cost.
And we compare the two to make sure that it's realistic. If an owner gives us something that's in excess of what the International Code Council table says, we take the greater of the two because they're declaring their actual construction cost.
Q. Sure. And as for the land values, you know, if I were an applicant, I'd be

Page 40

tempted to use Teddy Faust's valuation numbers, which are often low.
How does the City nail down the value of the land? You mentioned a moment ago that applicants will often use the purchase price.
A. Uh-huh.
Q. If it's not the purchase price, what other metrics will the City accept to establish the land value?
A. We -- we can compare it to the Revenue Department's estimation. Typically, if -- if it's what we look at and see as possibly an unrealistic number -- because we see enough permits, we kind of have a pretty good idea of what the land is going for.
If we see something that looks off, we will ask them for a purchase or a deed documentation to show us what they paid for the land.
Q. Okay. Is the City concerned with what they paid, or what the land's value is at the time?
I mean, somebody could've bought land

20 years ago and they got it for a song. You know, they show up -- does the City try to establish the current value of the land or not?
MR. WILLIAMS: Object to the form.
You can answer.
THE WITNESS: Okay.
A. Not unless there's a dispute. We typically go with the declared or the contract construction cost and the purchase price of the land.
Q. Is there an impact fee committee in Fairhope?
A. There is.
Q. Do you know who was on that committee at the time of Mr. Benefield's fee application -- let me ask you differently.
If it's been the same, how is the identity of that committee determined? Is it appointed?
A. It's -- it's -- there's a definition of the positions that serve on that committee in the ordinance.



Q. Has that committee been active, to your knowledge, since the impact fee ordinance was first adopted in 2007?
A. To my knowledge, yes.
Q. Okay. What does that committee do?
A. The -- the committee is charged with evaluating and reviewing components of the impact fee to determine if any adjustments may or may not be made -- and, yeah.
Q. So that committee would be responsible for suggesting, if they determine it to be necessary, another study by TischlerBise, for example?
A. Correct.
Q. Okay. So do you know how often they meet?
A. Well, as far as the committee members, I mean, they meet annually at least, because there are budget discussions. Impact fees and expenditures and collections are discussed with each of the department heads that serve on that impact fee committee, and the treasurer and the mayor. Because they --



they meet on that annually, at least, during budget considerations.
Q. Do you know if they keep minutes?
A. I do not.
Q. Mr. Cortinas, I've reviewed your affidavit that was filed in this case. And one of the things that you talked about was, you know, that every new project in the City of Fairhope is not assessed an impact fee; correct?
A. Correct.
Q. Okay. Only certain new projects are required to pay impact fees?
A. Correct.
Q. I want to talk a little bit about that.
Your declaration said that the Building Department is responsible for determining if an impact fee should be charged; correct?
A. Correct.
Q. Okay. Tell me how the Building Department makes that determination.



A. The impact fees, the -- the enabling legislation says it can only be charged once. I believe the term they use is "service unit."
Redevelopment does not necessarily -- is not necessarily charged an impact fee if there was an existing house there. Because if you're replacing a house with a house, they're not increasing the -- the impact that was there previously.
But there are prorated charges that may apply depending on if it's a redevelopment with an expansion or a change in occupancy classification, which can result in a change in intensity of the building or the use. And those are evaluated, you know, on a case-by-case.
Q. Okay. So let's make sure, let's just nail down the different criteria that would be evaluated.
A. Uh-huh.
Q. So is one of them square footage?
A. No.

Page 45

Q. Okay.
A. Well, clarify for what you're asking about.
Q. I'm asking about for R-3, which I understand to be single and two-family dwelling units.
A. Okay.
Q. I'll just let you answer because I don't want to misstate or mischaracterize your testimony.
A. Uh-huh.
Q. What I would like for you to tell me, are each of the criteria that the Building Department will consider when determining whether a particular project will be assessed an impact fee.
A. You're asking what are those criteria?
Q. Yeah, I want to know --
A. Okay.
Q. -- what all those criteria are.
A. Okay. So we're going to look at the property to see if there was a previous

Page 46

structure there, and we're talking residential.
Q. Yes, sir. We're talking about R-3.
A. R-3. So we're going to determine if there was a previous structure there.
If there was a demolition, when we issue a demolition permit, we instruct the -- the demolition contractor, call us to walk that structure before they demolish it. Because the impact fee, the prorated fees are based on number of bedrooms within the structure, and we try to predetermine that before the demolition is done.
That doesn't always happen and so the ordinance then defaults to a three, an automatic assumption that it was a three-bedroom, two-bath house.
If someone demolishes a three-bedroom, two-bath house, and they come back and they build a four-bedroom house, then the impact fee divided by three, which states the value or the cost of an individual bedroom, they are charged a prorated fee for

Page 47

the additional bedroom, which is the increased capacity of the structure.
Q. Okay. In addition to that, are there any other metrics the Building Department considers when determining whether a new construction project will be issued an impact fee?
A. We're going to look at if there was ever a structure there that's -- if -- if not, then it's a completely new development. That's new construction, so they're going to be subject to the full impact fee ordinance requirements, whether that be the fee schedule amount or the combination of the one-percent maximum.
Q. Okay. If you aren't able to determine the number of bedrooms before the demolition of the old structure is there, any mechanism by which the landowner could, you know, get away from that default rule of a three-two?
And I think your testimony earlier was that if you're not able to confirm the

Page 48

number the bedrooms before demolition --
A. Uh-huh.
Q. -- I think you said the ordinance defaults to a three-two, an assumption that the building was a three-bedroom, two-bath home; is that correct?
A. That is correct.
Q. If a property owner were to disagree with that, what would that process look like, and the process of them communicating with the City? Is there any room for them to prove otherwise, or are they just stuck with it?
A. No, they can prove otherwise, if they can produce construction drawings that showed the layout and the square -- or the layout and the number of bedrooms in a building before the demolition. If they have construction drawings of when the house was built, we will evaluate that and we will look at that.
Q. Okay.
A. But if they can't produce anything

like that showing anything on paper, in writing, that that is -- that they had more bedrooms than that, then it defaults to the three-bedroom, two-bath.
Q. Sure. In the case of a multiple family building --
A. Uh-huh.
Q. -- does the City undertake -- or does the City consider different metrics in determining whether a fee will be assessed to a multifamily construction project?
So down below single-family -- I'm looking at --
A. Uh-huh.
Q. -- Exhibit A again. This is the exhibit, the fee schedule to Ordinance 1625. You know we've been talking about the top line, single-family, R-3.
A. Uh-huh.
Q. I'm just curious about the way the City does it. If it's not an R-3 building, let's say it's R-2 or R-4.
A. Uh-huh.



Q. Okay. So that would be a multifamily building.
Are there other considerations that the City looks at when a new multifamily building is going to be assessed a fee?
A. It's going to be depending if it's an existing building. Is it an alteration from another use? If it's completely new construction, then it will follow the criteria as listed in the fee schedule and the -- the fees will be assessed per -- per the criteria of the fee schedule.
Q. Does the City still look at the number of bedrooms as a metric for determining whether there's an expansion of use for a multifamily?
A. Not the multifamily. Multifamily is done per unit, if it's multiple -- multiple residences within a structure.
Q. Okay. Does the City consider the number of bathrooms at all in determining whether to impose an impact fee on an R-3 construction project?



A. We do not.
Q. Another thing you talked about in your declaration was the number of impact fees that the City issued in recent years and the number of payers.
A. Uh-huh.
Q. And one of the things that I think was in your declaration was that in 2024, 2,060 total building permits were issued. But of those permits, only 154 were charged an impact fee by the Building Department.
I was a little surprised to see that there were only 154 fees charged in 2024, and it made me wonder about new subdivision development in the City.
A. Uh-huh.
Q. And I promise I'm going to come back to my question. But, I mean, are there new tract home developments that are being built or that were built in 2024 within the City of Fairhope -- in the civic corporate limits, I mean. I'm sorry.
A. Yeah. Coming out of 2024, we had had



a moratorium on new subdivision submittals. And so, typically, when there is a pause or a moratorium, you see a lag in new developments coming online. So -- and I've been through several of those in my time with the City.
So you generally see a lull coming out of the moratorium while the new developments are being proposed and going through the approval process.
And then, the development will pick up once those developments have been done and the roads are in and they're ready to start building.
Q. Was there a moratorium on new subdivisions within the city for a substantial part of year 2024?
A. Not -- I'd have to go back and reference what we did. I believe it was actually the year before, possibly.
Q. Okay.
A. I'd have to go look. I can't answer that definitively.
Q. Well, this is just a big

roundabout --
A. Sure.
Q. -- to come back to my question. And --
A. Sure.
Q. -- hypothetically --
A. Uh-huh.
Q. -- a builder is applying for final plat approval for a new subdivision within the corporate limits. And, hypothetically, the City approves the subdivision and issues final plat approval.
When it comes time for that developer to pay impact fees on that development, will he be assessed one fee globally to cover all of the construction within the development, or is each lot or each structure assessed a fee individually at the time it's built?
A. Yeah. The impact fees are assessed at the time of construction of the individual building.
Q. So in that hypothetical situation, the developer would apply for individual



building permits and would pay individual impact fees on each lot?
A. Potentially, yes.
Q. Okay.
A. Yes.
Q. Again, this is a hypothetical. Let's say that Mr. Benefield, the plaintiff in this case, instead of building on a vacant lot as he did, hypothetically, let's say, he constructed a residence on a piece of property that already had one house on it.
A. Uh-huh.
Q. Would his impact fee in that circumstance be calculated by looking at the number of bedrooms in the new house or -- I'm trying to figure -- that's a bad question. That's terrible. Let me strike that. Let me start over.
If a person is building a house on a parcel where another house already exists, how does the City determine the amount of the impact fee to assess?
A. Could you please repeat that



question?
Q. Yeah. Hypothetically, let's say we have a parcel of land that has a house on it.
A. Okay.
Q. An applicant comes to the City and wants to build a second house without tearing down the first house; okay?
A. Uh-huh.
Q. In that circumstance, how would the City calculate the impact fee, if any, to be paid on the construction of the second house?
A. That's going to actually fall first to the City's Zoning Department because in single-family zoning, you're not allowed to have two houses on a -- on a lot.
So that would have to be determined if that were to be allowed by Zoning in the first place.
So I -- theoretically, you would not have two residences on the same lot within the city limits. It would be entirely specific to the zoning of the property.
Q. Okay. Mr. Cortinas, do you know what



the various residential zoning districts are within the City of Fairhope?
A. There's multiple. There are common ones that typically -- when it comes to this that -- I couldn't tell. I know we have R-1, R-2, R-3, R-3 PDH or HP.
I -- I'm being -- not being a zoning person, I'm not going to be able to tell you which -- you know, I -- I speak the language, but I'm not fluent, so --
Q. That's fair. But the purpose of that was to get to this question, which is:
Of the numerous residential zoning classifications with the City --
A. Uh-huh.
Q. -- these first two lines on Exhibit A to Ordinance 1625, do those first two lines cover all the residential development within the City?
A. Yes. I mean, that's -- those are the designators for residences built as far as the building code because that's going to be R-2, R-3, R-4, will be the different

subcategories of residences built.
Q. Yes, sir. And you testified earlier that R-3 is single family and two-family dwelling?
A. Yes. That R-1, R-2, and R-3 are single-family, single-family zoning districts. That does not count a two-family. That does not count a duplex. There is another district --
Q. Oh, you mean --
MR. WILLIAMS: Hold on. You're confused. I think he was asking back to the International Building Classifications versus the zoning --
THE WITNESS: I thought he mentioned zoning.
MR. WILLIAMS: He did, and then he came back, I think.
Q. (BY MR. BLACKBURN) Yeah. Let me ask this question differently. I did talk about zoning and you answered that question to my satisfaction.
And then I came back to Exhibit A of



Ordinance 1625.
A. Okay.
Q. And we're, again, up at the top row of data --
A. Uh-huh.
Q. -- in this table.
A. Yes.
Q. And, you know, the top line says, single-family, R-3. And you've previously testified that that corresponds to the International Building Code. That's a building classification.
A. That's --
Q. Okay. That R-3. Sorry.
A. That's okay.
Q. I thought you meant zoning.
A. R-3.
Q. It gets convoluted, I guess.
A. Okay.
Q. That's the R-3 I was talking about.
A. Okay.
Q. And so, on the top row of this table --



A. Uh-huh.
Q. -- where we see R-3, that's referring to single-family and two-family buildings; right?
A. Correct.
Q. Down below that on the next row, we see multifamily, and out besides that, are the designators, R-2 and R-4.
A. Uh-huh.
Q. And I was going to ask you to explain to me what R-2 and R-4 designate. What do those mean?
A. Well, they are different. And -- and I'm going to -- they -- they -- each of those designate several different types of residential. You will have multifamily. You will have townhomes in some. You will have transient, greater than ten residents. You will transient, fewer than ten residents. So it -- there are a lot of different classifications, and they're split between those two.
Q. Okay. When I first saw that, I



assumed it was zoning.
A. Yeah.
Q. But I always think of R-1 as being single-family residential.
A. Sure.
Q. So that's clears it up.
MR. BLACKBURN: Off the record.
(Off-the-record discussion.)
Q. (BY MR. BLACKBURN) Do you determine any disputes that have arisen about the estimated fair and reasonable market value of either a lot or a building? We talked about that earlier with how the City determines valuations for purposes of calculating the fees.
I know the ordinance spells out some procedures --
A. Uh-huh.
Q. -- that applicants can avail themselves of in the event of a dispute.
Do you recall there being any in the last five years?
A. I do not recall anybody formally

Page 61

challenging or asking for it to be reevaluated.
Q. Looking back at Exhibit A to Ordinance 1625, I see that the total impact fee for an R-3 single-family home is $5,830. The total fee for a multifamily $3,713.
Why is there such a difference between the fee to be charged for a single-family home versus the fee to be charged for a multifamily building?
A. I -- in that, I would -- because the -- the multifamily is charged per unit. So how that was calculated and the methodology that got there, I'm going to defer to TischlerBise. They are -- they did the statistical analysis. They did all the calculations as to what went in determining that number.
And I -- I would really -- if you're asking for specifics about how they got to that number, it would be better addressed to them.
Q. I promise I'm not trying to quiz you

Page 62

on the --
A. Sure.
Q. -- intricacies of the study.
A. Yeah.
Q. Is it accurate to say that the City of Fairhope relied on the study to determine any distinction between those two fee amounts?
A. We did.
Q. Okay. And you did mention that that $3,713 fee in a multifamily project is charged, you said, per unit?
A. Correct.
Q. Questions about projects that have been funded with impact fee revenues, are those going to be questions for Ms. Creech?
A. Those are going to be from the treasurer, yes.
Q. Let's talk about credits to impact fees. I'm going to go back to the 2018 TischlerBise study. So go with me to -- let's see -- Fairhope 19, that's the first page.

Page 63

A. Okay.
Q. Okay. Go to Fairhope 29, please. That's going to be Page 7 of the TischlerBise survey.
A. Okay.
Q. This bottom paragraph titled, Credits --
A. Uh-huh.
Q. -- I'm looking at that, and the study says that there are two types of credits.
A. Uh-huh.
Q. It says: (Reading.)
The first is a revenue credit due to possible double payment situations, which could occur where other revenues may contribute to the capital costs of infrastructure covered by the impact fee.
The second type is a site-specific credit for a developer reimbursement for dedication of land or

Page 64

construction of system improvements.
You follow me there?
A. I do.
Q. Just tell me in your words, how does the Building Department determine whether or not to issue a credit in a particular circumstance?
A. Well, the credit would have to be requested by the developer, that they want to use the credit method. In my time with the City, I have never been asked to calculate a credit for a developer.
Q. Really?
A. Huh-uh.
Q. Maybe these people are missing out.
Have you discussed the process of how you would issue a -- well, within your department, does the Building Department have any type of process or procedure that it's determined that it would follow if someone did request a credit?
A. If someone were to request a credit,

Page 65

I would almost certainly consult with -- with TischlerBise and legal counsel as to the way -- the best way to interpret and -- and assess that fee since it's -- it doesn't necessarily give -- or I have not seen a specific formula by which you would do that.
So I would -- I would ask for help from the consultant and legal counsel to help determine what would be appropriate.
Q. But it's correct to say that, to your knowledge, the City has not issued a credit to any impact fee applicant in the time --
A. Not --
Q. -- that you've been with the City?
A. Certainly. No, not that I'm aware of. No.
Q. One of the allegations we've made in this case, Mr. Cortinas, that plaintiff has made in this case, is that the City's impact fees fail to offset the actual costs attributable to new development.
And I don't expect you to agree with that. I'm framing the issue because I want

Page 66

to ask you this:
What, if any, steps does the Building Department take to ensure that an impact fee charged to any particular project is in line with the actual impact of that project that are sought to be offset by the fee?
A. You're asking specifically for the Building Department?
Q. I'm asking, yes, sir, in your department, and there may not be a process. I'm asking if there is one beyond, of course, the study. And, you know, I understand you testified already that the City does rely on the study --
A. Uh-huh.
Q. -- for several things, including, I think you said, if there were to be a credit, you'd consult with TischlerBise, but I'm asking you about run-of-the-mill impact fees that the City assesses every year.
Is there any process that the Building Department undertakes, whereby it considers the particular project in question,

Page 67

the specific fee amount to be charged for that project, and considers whether the fee is appropriate for the level of demand that that project will put on the city infrastructure?
MR. WILLIAMS: Object to the form.
Q. (BY MR. BLACKBURN) Do you understand my question?
MR. WILLIAMS: You can answer.
THE WITNESS: Okay.
A. No. Because if you look at the fee schedule, there's a percentage allocation for each of the four components that are allocated from that impact fee. And that was part of the study that TischlerBise gave us, that a certain percentage of a single-family goes to Parks & Rec, a certain percentage goes to Road, Police and Fire, and it's broken up that way.
As far as, from the Building Department standpoint, our job is to determine the cost of what impact fee would be charged and collect that fee.

Page 68

In terms of the evaluation of what projects may or may not need to be funded by impact fees or how those expenses are done, that's not something that the Building Department is involved in.
Q. Okay. You have testified, though, that the Building Department will reduce a fee if it were to exceed the one-percent cap established by the enabling legislation.
A. Restate that question.
Q. You testified previously that the Building Department would reduce a fee in order to prevent that fee from exceeding the one-percent cap set by the enabling legislation.
A. That's correct.
Q. Other than that, does the City -- I'm sorry -- does the Building Department undertake any other type of inquiry or analysis or factfinding on a case-by-case basis to assure itself that the fee to be assessed, the impact fee to be assessed is appropriate?

MR. WILLIAMS: Object to the form.
A. No. We -- for internally, our job is to evaluate the fee to be collected and then collect the fee.
Q. Okay.
A. That's our responsibility.
Q. Do you still have Ordinance 1625 handy?
A. What's the number again?
Q. It's somewhere. It's going to be Fairhope -- we're going back to Exhibit A, Fairhope 2180.
A. The --
MR. WILLIAMS: Yeah, it's the very last. You're talking fee schedule?
MR. BLACKBURN: Yes, sir.
MR. WILLIAMS: Okay.
Q. (BY MR. BLACKBURN) I guess it's fair to say that any new single-family construction project valued at more than -- what would that be -- $583,000 is going to pay the full fee?
A. Correct. They will pay -- yes,



they'll pay the 5830.
Q. Okay. Regardless of the cost -- I'm sorry.
Regardless of the value? Well, I guess I should ask you this. Let's say, hypothetically, we have a $10 million single-family home and land --
A. Uh-huh.
Q. -- development that's somewhere south of the Grant Hotel.
Are they still assessed an impact fee of -- well, there's different ordinance in place now -- but I'm talking about Ordinance 1625.
Would that project have been assessed the $5,830 fee, or would they have been assessed more since it was a more valuable project?
MR. WILLIAMS: Object to the form.
A. No. You -- the -- the applicant would be charged the lesser of the $5,830 fee schedule amount or the one-percent combined, which is lesser.



Q. Okay.
A. So in that -- is that case, they're -- yes, they would pay. The 5830 would be the -- what they would be charged.
Q. Is that still the case now under the new ordinance?
MR. WILLIAMS: Object to the form. The dollar value or the --
MR. BLACKBURN: The --
MR. WILLIAMS: -- methodology?
MR. BLACKBURN: -- methodology.
A. That is correct.
Q. Yeah. So the new ordinance -- and I'm not even going to get you to flip to it -- but I think the fee for single-family construction is something like $9,000 plus a little bit.
Does that sound right?
A. That sounds right.
Q. Okay. So the same methodology would apply under the new ordinance as it applied under Ordinance 1625?
A. That is correct.



Q. The applicant would pay the lesser of the fee or one percent of their project cost?
A. That is correct.
Q. Mr. Cortinas, I don't want to know, of course, about any conversations you've had with your attorney.
But I do want to know about any conversations you may have had with people in your department.
A. Uh-huh.
Q. Conversations that wouldn't be subject to the attorney/client privilege.
Have you had any conversations about the City's or your department's fee calculation methodology in the course of preparing for today's deposition? That was a bad question.
I want to know if you've talked with anybody recently in the Building Department about how you guys calculate impact fees?
A. Well, in the course of just the normal conducting of business and evaluating fees between the permit text of evaluating

Page 73

or -- or determining those fees and me determining those fees, we -- before the permits are issued, that's -- there's a second check that goes through to verify that we're -- we feel we're accurate on the fee.
So just in the course of issuing permits every day, yes, we talk about our -- our fee schedule and our -- how we check and double check each other, any kind of quality control that we try to do internally to make sure that the fees assessed are accurate.
Q. Okay. One of the allegations in the case is that the inclusion of land value affects the validity of the City's fee calculation structure.
A. Uh-huh.
Q. You are aware that, of course, the enabling legislation applies a one-percent cap to the total amount of the fee that the City can assess to a developer or a builder. You've already testified about that.
But when the fee, which is otherwise calculated by TischlerBise to be $5,830;

Page 74

okay -- and I get that from Exhibit A on the impact fee schedule, the Ordinance --
A. Uh-huh.
Q. -- 1625. $5,830 is what TischlerBise believes a fair and defensible impact fee to be. But in practice, the City arrives at fee valuations by considering the land value and the building value and multiplying it by one percent.
And all I want to know is, have you ever discussed that aspect of the fee calculation procedure with anybody in the Building Department?
A. Yes. We -- we look at that when we evaluate every impact fee, that we -- you know, we compare the two. And, once again, we charge the lesser of the two amounts. So that question comes up as, what is the max of the one percent versus what does the impact fee schedule show?
And that's -- I mean, it's generally just handled when the -- it's handled when the permit is issued after the final review

Page 75

and verification.
Q. Do you recall anybody within the Building Department having discussions about changing the methodology that they use for calculating impact fees?
A. Not within the Building Department.
Q. What about outside of the Building Department?
A. The -- the methodologies, not that I recall. The methodologies are really determined by the TischlerBise study. And, you know, all of us rely very much on that, so --
Q. Sure.
A. -- we have not had any alterations that I am aware of at all from the methodology that TischlerBise has given us within their impact fee study.
Q. Have you talked with anybody at the City, either within or without the Building Department, about a possible change to the way you guys calculate impact fees?
MR. WILLIAMS: Object to the form to

Page 76

the extent it calls for attorney/client communications.
MR. BLACKBURN: Yeah.
Q. (BY MR. BLACKBURN) Of course, excluding any discussions with your attorneys.
A. So please restate the question.
Q. Yes, sir. Other than any privileged conversations with your lawyers, have you had any discussions with anybody ever about the possibility of changing the way that the City calculates impact fees?
A. I do not recall ever having that conversation because we're -- we are bound by what the enabling legislation limitations are. And we follow the recommendations from our consultant that they provide in their study.
Q. Yes, sir. And I'm not picking on you at all.
A. Sure.
Q. I just wanted to know. If you had had any conversations, I would want to know

Page 77

about them.
A. Right. If you're asking if I've had any conversations about wanting to make any changes that we would like to see to how we calculate those fees, no. I --
Q. Okay.
A. -- don't recall ever having any kind of conversation like that.
Q. That answered my question. Thank you.
MR. WILLIAMS: We've been going a little over an hour.
MR. BLACKBURN: Yeah. Let's --
MR. WILLIAMS: Are you at a good stopping point?
MR. BLACKBURN: -- take a break.

(The deposition of STEVEN E. CORTINAS was recessed at 10:07 a.m.)
(The deposition of STEVEN E. CORTINAS resumed at 10:27 a.m.)

Q. (BY MR. BLACKBURN) Mr. Cortinas, I'm

Page 78

going to go through and hit a few things that I missed on the first run through.
A. Sure.
Q. I don't want to hear, of course, about any conversations you may have had with your attorney.
A. Uh-huh.
Q. Aside from that, what did you do to prepare for your deposition today? Anything?
A. I reviewed some documents and tried to refresh my memory on -- on ordinance and reread the -- the impact fee study to kind of, you know, reacquaint myself with it. It's been a while since I read that study.
Q. Okay. Do you know if you reviewed any documents outside of what's been produced to us in this litigation, Fairhope 1 through Fairhope 218?
A. Not that I can think of. I think everything that I looked at pertaining to that are -- are part of what's in this.
Q. Okay.
MR. WILLIAMS: The discovery

Page 79

responses, you probably looked at those.
THE WITNESS: Would that be considered part of this?
MR. WILLIAMS: It is, but it's not 1 through 218.
MR. BLACKBURN: Okay. Gotcha. I'm sorry. Yes.
Q. (BY MR. BLACKBURN) I would have assumed you looked at that, too?
A. I'm sorry. Yes. Yes, I did read that.
Q. Okay. Thank you. I'm just asking this question based on your personal knowledge; okay, what you remember today. It's not a quiz.
Do you remember why the City decided to order the second TischlerBise study in 2018?
A. Well, to the best of my knowledge, we had a different administration at that time, and they had come in and started asking questions about procedures and things.
And it -- and it came up that the

Page 80

administration at that time asked and -- and said it -- and determined that it was probably time to try to reengage TischlerBise and let's look at the numbers of the impact fee study, so they'd see if they're accurate.
Q. Would that have been the time that Mayor Sullivan was elect and Mayor Kant --
A. No. That would've been --
Q. No?
A. -- the time during Mayor Wilson's administration.
Q. Right. Yeah. Forgive me. I don't live in Fairhope. My timeline is rusty.
A. Yes.
Q. Other than what you just said, was there any other reason that you recall as to why?
Beyond the change in administration and, perhaps, the general feeling that it was time to take a look at it, was there any other event or circumstance that stands out in your mind as being something that caused that review?

A. Nothing that specifically stands out. It was just a question of our policies and procedures and, you know, overall throughout the City and wanting to look at a bunch of them.
Q. Okay. Same question for the 2024 TischlerBise study.
A. Uh-huh.
Q. What, if anything, prompted the City to order that study?
A. Just within the timeframe and -- and the -- you know, the -- the rate at which development and growth was happening at that time to determine if -- if some of the values within that study had increased or decreased, and that the study was accurate based on 2024 estimated costs are calculated into the study.
Q. What did that 2024 study show in that regard?
A. All but -- memory serves, all but one of the different fees attributed to development increased. I believe there was



one on the multifamily that did decrease.
Q. Do you remember why it decreased?
A. The -- the TischlerBise representative explained it during the -- the council work session, and not being a statistician, I -- I can't tell you what all went into that.
Q. I won't ask you to try and --
A. Sure. No.
Q. -- relive that.
A. Sure.
Q. Okay. Same question about Ordinance 1817, was there any particular event or circumstance that you recall that caused the City to undertake to revise its impact fee ordinance in 2024, and ultimately adopt Ordinance 1817?
A. It would have been as a result of the most recent impact fee study that TischlerBise provided.
And if -- if the City decided they wanted to amend fees or follow the new recommended fees the ordinance has to be



updated because the fee schedule is part of the ordinance.
Q. Okay. So it's your testimony that, other than what I'll call a general desire for review, there was nothing in particular that caused the City to undertake that review in '24, order the study, and adopt the new ordinance?
A. Not that I'm aware of, no.
Q. Okay. How, if at all, have the Building Department procedures changed pertaining to impact fees between Ordinance 1625 and Ordinance 1817?
A. In terms of procedures, there hasn't been any procedural changes in how we go about assessing fees.
I believe there was some clarification in some of the increased capacity definitions and how those were done to kind of further clarify when you have renovations or changes or existing or alterations.
But other than that, it's -- as far



as I know, it's pretty much -- the wording is very similar to the original -- to the previous ordinance.
Q. And I ask that only because we've spent the bulk of our time so far on the ordinance that applied at the time my client paid his fee.
A. Uh-huh.
Q. And I'm primarily interested in, you know, a new method of calculation that may have arisen under the new ordinance or a new method of issuing credits under the ordinance or exemptions.
As far as those three things are concerned, is it your testimony that the new ordinance didn't change the Building Department's procedures for analyzing those three things?
A. Not in terms of the -- the fee schedule amount versus the one percent or the credits because that's something that, truthfully, has never come up.
And the only thing that I can recall

is, we did do some clarification on how expanded -- and I want to use the correct term -- "changes in size and use" is the term that some of that was clarified about how that would be evaluated.
Q. And those are clarified in the text of the new ordinance?
A. Correct.
Q. You testified earlier that the City adopted TischlerBise's proposed fee schedule directly out of the 2018 study and that schedule became a part of Ordinance 1625?
A. Correct.
Q. In the case of the other two ordinances, 1331 and 1817 -- I'm talking about those two ordinances now -- do you recall if there was any discussion, debate, back and forth or anything of the kind, pertaining to the fee schedules that TischlerBise proposed in either of the two supporting studies?
A. The one question that was brought up by previous administration were the



percentage allocations that the ordinance called for, wanting to adjust those. And TischlerBise made it clear that those are not able to be adjusted, that that is part of the analysis and the methodology that goes into the evaluation of those fees.
So the fees and the allocation percentages have to stay the same as they are in the ordinance. And that was the only question that I recall ever receiving about changing anything in how evaluations were done.
Q. Do you recall why that was important?
A. I -- I -- I would -- it was -- it was former Mayor Wilson that asked if that could be done. Her reasons for that, I can't really answer. I just know that it was stated very clearly that that could not be done, so it was not reflected in the ordinance that was adopted.
Q. So TischlerBise told the City at that time that the percentage allocations -- and let's flip, let me flip back over to that and



let's go back to -- well, okay. Hang on. Let me back up.
A. Okay.
Q. My mouth is moving faster than my brain and that's dangerous.
You said Mayor Wilson was the one who raised that question. What year would that have been?
A. It would have been just prior to the adoption of that ordinance, so it would've been sometime prior to August of 2018, after we received the review report from TischlerBise.
Q. Oh, okay. So what you're talking about is after you received the 2018 TischlerBise study and the City was contemplating adopting Ordinance 1625?
A. Yes.
Q. Okay. Then let's go back to Exhibit A, which I think is -- Exhibit A to 1625 is going to be --
MR. WILLIAMS: Isn't it 218, I think?
MR. BLACKBURN: Is it 218? Be



careful.
MR. WILLIAMS: No, I just didn't --
MR. BLACKBURN: The record can reflect I looked to Chris for help.
THE WITNESS: Here's the sticker he put on there. I'm sorry.
MR. BLACKBURN: Okay. Yeah.
Q. (BY MR. BLACKBURN) Okay. I just want to make sure we're clear. When you referred earlier to the percentage allocation --
A. Uh-huh.
Q. Let's look at the line -- or the row rather, that pertains to my client's fee.
A. Sure.
Q. Single-family R-3, it's broken down into Fire, Police, Parks & Rec and Transportation. Each of those categories has its own dollar amount. And below the dollar amount --
A. Uh-huh.
Q. -- on the next line is the percentage allocation, and that reflects the percentage allocation of each component of the impact

fee to the whole; correct?
A. Correct.
Q. And those percentage allocations that we're looking at here, the second line of data on Fairhope 218, that's what TischlerBise told Mayor Wilson, was sacrosanct and could not be modified?
A. That is correct.
Q. Okay. Other than that, though, I think it's your testimony -- and correct me if I'm wrong -- you don't recall any other conversation about modifying or changing TischlerBise's proposed fee schedules?
A. I do not, no.
Q. And that would be true for any of the three ordinances?
A. That is correct.
Q. Okay. Thank you. You testified earlier that there is an annual review of the impact fee ordinance.
There's language in the ordinance itself that requires it to be reviewed every three years.



A. Uh-huh.
Q. And my question is --
A. Okay.
Q. -- whether the City observes a different process for that or whether the City undertakes that annually during the review process that you've already testified about?
A. Yes. The -- the -- well, I know and I am not privy to the meeting regarding budgetary for the different departments, but I know that those things are discussed between -- I know the mayor, the treasurer are there for budget discussions with each department and expenditures of what impact fees would be expended and what potential expenditures for that year were eligible to be -- for impact fees to be used.
And those are done, you know, to my knowledge -- and I believe I'm accurate -- every year that there's budget discussions. So the impact fee or the impact fees collected and the impact fees expended are



discussed every single year.
Q. Okay. Are you aware of any process that occurs every three years pursuant to the ordinance, where the City undertakes a different procedure, other than the one you've just described, to review the ordinance itself?
A. I -- I don't know of any other specific procedure. And I -- I don't think -- I -- I -- I don't believe a -- a specific procedure is called out as to what they have to do, that I'm aware of.
Q. I'm just asking it to your knowledge.
A. Yeah, to my knowledge.
Q. Within the Building Department, there's no separate procedure, other than the annual review that you've told me about which is --
A. No.
Q. -- budgetary, primarily budgetary?
A. Correct.
Q. I asked a bad question earlier, so I'm going to re-ask it, and forgive me for



having to re-plow the same ground.
But other than TischlerBise, has the City retained or hired any person or business to consult, review or perform any other services in the nature of oversight over the City's impact fee program?
MR. WILLIAMS: Object to the form, just to the extent it could include legal counsel.
Q. (BY MR. BLACKBURN) Excluding legal counsel?
A. No. To my -- in my involvement with the impact fee ordinances, the only consultant or outside party I've ever talked about with were with TischlerBise.
Q. Other than what you've already testified to and the procedures that the Building Department undertakes, is there any other procedure that we have not discussed that the City uses to ensure that the impact fees are necessitated by and are attributable to new development?
A. Could you clarify that question,

Page 93

please?
Q. You've already testified to the procedures that your department observes in calculating impact fees. And you've also testified to the procedures your department undertakes in determining whether a fee shall be assessed at all.
Other than those things that you've already testified about, is there any other procedure that the Building Department or the City uses to analyze impact fees before they are assessed?
A. No, not that I'm aware of.
Q. And you've also testified -- I'm sorry -- that you do consult the study, and I would include that as well.
But other than those things -- that's what I'm asking -- if there's any other practice or procedure the City observes before it accesses a fee?
A. No.
Q. Okay. You used the phrase "service unit" earlier, and the ordinance and the

Page 94

enabling legislation, I believe, both require that impact fees are only levied once on a service unit.
A. Uh-huh.
Q. How does the City make sure that happens?
A. Well, that goes back to in the event of a redevelopment, was there a previous structure there? You would get credit for any prior structures that may be there.
If it is a new service unit which, you know, is -- in interpreted as new a construction, then the full impact fee ordinance requirements would -- would apply.
Q. Okay. And I'm bouncing around a little. I'm going back to the annual reviews --
A. Uh-huh.
Q. -- the budgetary reviews.
A. Uh-huh.
Q. Who is involved with that? Who is involved with those annual reviews?
A. Well, in terms of budget reviews,

Page 95

it's done with each department within the City. The four departments that have access to the use of impact fees are Parks & Rec, Fire, Police, and Transportation.
So when the -- in the budget reviews that would be -- and I'll -- every year I've done a budget review, the mayor and the treasurer are there to review what our requested budget expenditures are.
So that would be the same process for each of those departments. It would be mayor, treasurer, and the department head of whatever department is potentially wanting to use or expend impact fees.
Q. Okay. So those meetings are forward looking with the various department heads who might be entitled to receive impact fee revenues?
A. Yes.
Q. And at those meetings, are the department heads proposing various expenditures within their department to the mayor and the Council?

Page 96

A. I -- I would defer to the department heads as to what they request within their budget.
Q. I'm just asking if that's what they're doing?
A. I -- I'm -- I -- I would assume so, yes, because we do have projects in which impact fees are used in a budget for capital improvements, for expansion, for different things, so --
Q. So are you present at those annual meetings?
A. I am not.
Q. Okay. Tracking the expenditure of impact fee revenues is going to be -- that's going to be for Ms. Creech; right?
A. Yes.
Q. I'm going to ask you about a few different areas of conversations that you may have had within the last year.
And I don't want to know about any privileged communications with your lawyer, so just exclude any of that.

A. Okay.
Q. Do you recall having any communications over the last year about whether the City's impact fee is a tax or a fee?
A. I -- I have not had any discussions about that with anyone.
Q. And I think you've covered this, but any discussions about how the City computes its impact fees in the last year, that you can recall?
A. When you say "discussions," are you talking about evaluation of --
Q. No, sir, I don't mean evaluations of specific fees. I mean about conversations about the methodologies by which the fees are calculated.
A. No. No.
Q. Do you recall any conversations pertaining to any specific project, including my client's projects, perhaps, that involved questions of whether a certain city expense is directly attributable to a particular new



development?
So this could be, like, if you had a development -- and it could have been my client's house. It could be --
A. Uh-huh.
Q. -- you know, a tract housing development that required a significant expansion of city infrastructure for some reason.
I'm just curious if there's been a time in the last year, where you've had a conversation with anybody about whether a particular city cost is directly triggered by a particular new development?
MR. WILLIAMS: Object to the form. Go ahead. You can answer.
A. Yeah. I -- I don't have discussions about how things are spent or how things are allocated.
You know, in terms of my responsibility and the Building Department's responsibility, we're pretty focused on -- our -- our -- our responsibilities are



focused on determining if there's a fee, if a fee is required, evaluating what that fee may be, then charging and collecting those fees.
Outside of that, I really don't have any discussions really with how they're spent, what they can be spent on. I -- that's not something that's in my scope.
Q. Okay. Outside of the TischlerBise studies --
A. Uh-huh.
Q. -- which, of course, the City has procured three now -- is there any other process that your department is involved with where the City analyzes the impacts of new development and considers those impacts and how they affect the impact fee ordinance?
A. Could you clarify that question?
Q. Yeah. It's a broad question.
A. Yeah.
Q. Other than the TischlerBise studies --
A. Uh-huh.
Q. -- have you had any conversations



within or without your department about how new development within the city is affecting the impact fee program? It's a broad question.
A. Not that I can recall. I mean, as I mentioned, I have kind of a very specific scope in my involvement with it. That's not -- I do not recall ever having that kind of conversation.
Q. Fairhope charges a lodging tax, doesn't it?
A. I believe they do. I -- that's not really in my scope. I can't --
Q. Well, I think you've answered my question.
A. I can't answer that one.
MR. WILLIAMS: Don't speculate.
Q. (BY MR. BLACKBURN) Yeah. I don't --
A. I don't know.
Q. -- want you to speculate.
A. I don't know.
Q. But I'll ask the question I was heading toward anyway.

Have you had any conversations with anyone at the City about how the lodging tax affects the impact fee program in any way?
A. No.
Q. Did Fairhope get BP or Restore Act money?
A. Outside of my real scope of responsibilities.
MR. WILLIAMS: Yeah. And I would object to the extent it's beyond the topics he was noticed for and knowledgeable of.
Q. (BY MR. BLACKBURN) We've talked a little bit about credits, and your testimony was that you didn't recall a credit ever having been issued.
What about exemptions? Are aware of any project that has been exempt from paying an impact fee, other than projects that do not increase the demand on city services?
Okay. You've already testified that if a new home has four bedrooms and the old home has four bedroom, there would be no impact fee --



A. Right.
Q. -- because there wouldn't be an expansion of city services; right?
A. Correct.
Q. Okay. Other than that --
A. It would be no expansion in the use or previous use of the building.
Q. Okay. But aside from those situations --
A. Uh-huh.
Q. -- to your knowledge, have there been any situations where a developer has been exempt from paying an impact fee for any reason at all?
And let me add on to that, it could be because the developer made a contribution of land to the City, anything, you know. And I'm intending to be broad.
For any reason whatsoever, are you aware of any exemption for a party, who otherwise would have been required to pay an impact fee?
MR. WILLIAMS: Object to the form.



Go ahead.
A. Yeah. I -- I'm not aware of any. Yeah. I'm not aware of any at all, no.
Q. So you're not aware of any situation, for example, where the City might have taken a piece of land in lieu of paying an impact fee?
A. I have never -- the impact fees that I collect are almost always, in every instance I can think of, come from the homebuilder.
I have never really had impact fee discussions with a developer of a project. They almost always defer -- as far as I know, defer the paying of permit and impact fees to the homebuilder who builds the home because that's when fees are assessed, when the individual home is done.
So in terms of developer, I hear -- I see that definition as the person who builds the subdivision and then sells the lots.
They aren't the ones that -- that pay the impact fees. It's the individual. It's



the construction of each individual home and that's when they're evaluated and assessed.
Q. It may be more applicable in the context of multifamily development --
A. Uh-huh.
Q. -- or industrial development. So outside the context of, you know, new single-family home construction --
A. Uh-huh.
Q. -- are you aware of any exemptions to impact fees?
A. I cannot think of any new construction projects where I was instructed not to charge an impact fee because of other agreements or considerations.
Q. Are you aware of any circumstance where an impact fee wasn't paid where the building permit applicant, in your opinion, should have paid one?
A. Not that I'm aware of. And it's also -- impact fees are specific to the city limits. We had a lot of multifamily development in the county when we were in the

Page 105

extraterritorial jurisdiction. But they were not subject to impact fees because they were not in the Fairhope corporate limits.
Q. Are you aware of any impact fee being charged by the City of Fairhope beyond its corporate limits?
A. No.
MR. WILLIAMS: I want to say something there, but I'm refraining.
MR. BLACKBURN: You're doing good -- or maybe I'm not pushing hard enough.
MR. WILLIAMS: Off the record for a second.
(Off-the-record discussion.)
Q. (BY MR. BLACKBURN) Okay. We've talked about credits, of which you're not aware of any. We've talked about exemptions, of which you aren't aware of any.
How about refunds? You are aware of anyone who has been refunded an impact fee after they've paid it?
A. Yes.
Q. Who was that?

Page 106

A. We recently had one where a -- a builder paid for and obtained building permits for several houses and then decided not to build it. And so, they requested and were refunded the impact fees in accordance with guidelines in the ordinance.
Q. Were they also refunded their building permit fee?
A. In that instance, no. Because that -- it had specific requirements that it had to requested in writing within 180 days of the permit, and they -- they did not do that.
Q. When was that refund issued about roughly?
A. It -- it would've been --
MR. WILLIAMS: Object to the form.
If you know.
A. It -- it -- it would've been within 2025.
Q. Other than that instance, are you aware of any other refunds?
A. No.

Page 107

Q. Are you aware of any appeals that anyone has taken after your department assessed an impact fee?
A. I'm not aware of any formal appeals that have been filed.
Q. You testified before about the process that the City undertakes to determine whether an impact fee is going to be assessed in the first place, and that determination occurs within the Building Department; correct?
A. Correct.
Q. Who does that?
A. In terms of determines whether an impact fee is accessed at all?
Q. Yes, sir. Is that you, or is that someone under you?
A. Well, it -- it -- there's multiple levels. The process is an initial application comes in for a building permit. And it's determined if it's a new development or if it's a redevelopment.
If it's a new development, I -- I

Page 108

review initially the structure and determine if there's an impact fee that would be required. And then I delegate that assessment to one of our permit techs.
And then at the final review, before it goes out, if there are any questions or if it's anything that requires complicated evaluations, such a redevelopment or expansion, then I handle those reviews myself.
Q. You do that personally?
A. I do.
Q. Are there ever times when you are undertaking that review of whether a fee should be assessed where it's required that you exercise some amount of discretion?
MR. WILLIAMS: Object to the form.
Q. (BY MR. BLACKBURN) For example, what's a bedroom, you know? I mean, people could argue about whether it qualifies as a bedroom.
I'm just using that as an example, but I'm sure there are -- could be other

Page 109

circumstances that I'm not thinking of --
A. Sure.
Q. -- that could require you as a building official to exercise some discretion in determining how to analyze a potential new project.
A. Sure.
Q. And I want you to talk to me a little bit about to the extent you do exercise discretion, how do you do it and in what circumstances does that present itself in?
A. Yeah. I -- I -- I -- I wouldn't use the word "discretion." I would say "interpretation." And within -- to -- to try to clarify that we have a city building code amendment by which we define what is a bedroom or a sleeping room because we do have plans that come in that say "media room" or say "office" or say "bonus room."
And we have a definition as to whether or not those types of rooms, regardless of how they're labeled on the plans, are to be treated from a life safety

Page 110

standpoint and a impact fee assessment standpoint as a bedroom or not.
Q. What does a room have to have to be considered a bedroom?
A. Room has to have a -- it has to have a door and it has to have a closet and/or a bathroom within the room. Then it is considered a potential sleeping room.
And from a building code standpoint, it has to have smoke detectors. It has to have egress windows, like any other bedroom does. And we consider that a bedroom for the purposes of assessing the number of bedrooms in a structure.
Q. It doesn't sound like you're exercising any discretion at all there.
A. No, I -- it's an interpretation. That's what -- the best way probably to describe it.
Q. And because the number of bedrooms is the sole factor contributing to the City's decision of analyzing the redevelopment of a parcel, beyond the definition of a bedroom,

Page 111

it doesn't sound like there is any other specific issue that you would even be required to addresses, is there?
MR. WILLIAMS: Object to the form.
A. No.
Q. Did you understand my question?
A. State it one more time.
Q. Let me break it down.
A. Sure.
Q. Other than the number of bedrooms, there aren't any other factors the City considers in analyzing whether a redevelopment is going to be assessed an impact fee; is that correct?
A. For a one- and two-family dwelling?
Q. Yes, sir.
A. That is correct.
Q. And I understand for commercial, you look at the expansion of square footage and industrial --
A. And occupancy classification, yes, sir.
Q. Okay. And you've testified to that

Page 112

already. And the second half of the long question I asked a moment ago was:
Other than the analysis of the number of bedrooms, is there any other aspect of the review process that you undertake where you might be required to exercise your discretion?
MR. WILLIAMS: Object to the form.
A. No, not that I'm -- not that I can think of.
Q. Would you say the majority of impact fees are subject to the one-percent cap or not subject to the one-percent cap?
A. I wouldn't -- it's hard to put a percentage on what is and what's not. It all depends on the cost of the construction of the house, how nice they're gonna make the house, custom house versus a more track-style home.
So we have it really both ways. I see a lot of capped at one percent. We also see a lot that are underneath the -- the impact fee ordinance or -- or in excess of

Page 113

what would be the one percent for the impact -- the -- the fee schedule and so they're charged the fee schedule amount.
It's -- there's really no way to put a percentage. I see it both -- we see it both ways all the time.
Q. And that's been changed pretty dramatically by the most recent impact fee ordinance. I think now the residential impact fee is in excess of $9,000; isn't it?
A. Correct.
Q. So that would be a $900,000-plus home --
A. Right.
Q. -- before it would be assessed the full fee; right?
A. Yes.
Q. So let's just talk about Ordinance 1625, which was in effect at the time Mr. Benefield paid his fee.
Under this ordinance, would -- I mean, I'm not asking you to give me a number -- but do you have an opinion on

Page 114

whether a majority of the fees paid under that ordinance were subject to the one-percent cap?
MR. WILLIAMS: Object to the form. Asked and answered.
You can answer.
THE WITNESS: Okay. Okay.
A. I -- I'm not going to be able to say majority or fewer than. I mean, it -- it -- it's hard to say. It all depends on the cost of the structures that were built. I -- I can't really say. I can't put a percentage on it, whether it was more than half or less than half. I -- I don't know.
Q. But it's fair to say a substantial percent of the impact fees paid to the City of Fairhope under Ordinance 1625 were subject to a one-percent cap?
A. Yes.
Q. And another substantial portion of them were full fees calculated at the maximum supportable fee?
A. Depending on the cost of the

Page 115

construction of the building, yes.
Q. Yes, sir. When you're looking at a commercial or an industrial project or an office project --
A. Uh-huh.
Q. -- and you're considering whether to assess an impact fee, let's talk about redevelopment projects that fall under those three categories --
A. Okay.
Q. -- just for a moment.
You testified that an expansion in square footage could trigger the requirement for fee. You testified that building use classification could affect the necessity of charging an impact fee.
Other than those two things, what other considerations does the Building Department look at in determining whether a redevelopment for commercial or industrial or office would be subject to a fee?
A. Those are going to be the two primary -- the two primary guiding -- what

Page 116

would be the word -- the -- the two considerations that we would use in making that determination would be occupancy classification and size.
Q. You say "primary." Are there others?
A. Not that I can think of, off of any specific projects. Nothing that I can think of. Those are -- those are the things that determine what the fee would be is an evaluation of those two components.
Q. Is there any exercise of discretion when you're reviewing those types of projects that isn't necessary when you're looking at a residential project?
MR. WILLIAMS: Object to the form.
A. There may be some interpretations that have to be made, as far as what occupancy classifications are and if there are different occupancy classifications within a building, if you have a mixed-use building.
So you've got to evaluate it both ways, and so that's -- that's interpreting

how it's evaluated.
Q. And that would be interpretation with reference to the building code or something else?
A. The building code as the -- the -- and the fee schedule as how it classifies fees for each different occupancy level.
Q. Have you had an instance where a track homebuilder is developing a subdivision and also self-performing building the houses?
A. Not that I can think of. Most of the time the -- the people who develop the subdivisions are a certain type of contractor and they develop the subdivision. And then homebuilders come in and buy the lots individually.
That's -- I can't think of an instance where a homebuilder went in and actually developed the subdivision and then built all the houses themselves.
Q. Let's use that circumstance, where a track homebuilder buys a development from the primary developer who gets final plat



approval then.
A. Uh-huh.
Q. Would that track homebuilder apply for impact fees on a case-by-case basis for each lot, or would they come to your department and say, hey, we've got 50 lots in this subdivision. We're about to start building, assess an impact fee for all of it?
A. No. The impact fees would be paid with each individual house because the fees are assessed with cost of each individual house.
So it depends on what is the cost of construction? Is it the one percent, or is it the impact fee schedule? And that's evaluated with each individual house.
Q. So in other words, that's done on a case-by-case basis for each individual house, regardless of the identity of the developer or how they're proceeding with the development?
A. It's done individually with the construction of each home. That's when --



that's when the fees are assessed.
Q. Okay. So each home has an independent impact fee assessment at the time it receives a building permit?
A. That is correct.
MR. BLACKBURN: Okay. Mr. Cortinas, I think I'm done. If you give me two minutes, I'll make sure.
THE WITNESS: Yes, sir.

(The deposition of STEVEN E. CORTINAS was recessed at 11:10 a.m.)
(The deposition of STEVEN E. CORTINAS resumed at 11:19 a.m.)

Q. (BY MR. BLACKBURN) Okay. And we're almost done --
A. Sure.
Q. -- Mr. Cortinas. Thank you for your time.
A. Yes.
Q. I want to go back just to make sure I covered one thing thoroughly.



You testified to -- I think it was the only instance you could recall where the City discussed, maybe, changing the proposed fee schedule that TischlerBise came up with?
A. Uh-huh.
Q. And I think you testified that was during Karin Wilson's administration?
A. Correct.
Q. I didn't ask you about the specifics of that conversation, and I know it's been a while ago.
A. Uh-huh.
Q. And I don't expect you to have a perfect memory, but can you tell me anything else about that?
Let's start with, where did that conversation take place? Was that in chambers?
A. It would've been after -- it -- it would have been in sitting down and discussing the fees that came in or what the TischlerBise study said.
And what she asked was, if you look

Page 121

at the percentage allocations, she said she would be interested in lessening the percentage that is allocated for Parks & Rec and possibly increasing the percentage allocations for Police and Fire, and that was the gist of her question, wanting to change those percentages.

And TischlerBise made it very clear and said these are part of the statistical analysis we did, and it is hard numbers. And you cannot change these numbers without, you know, potentially causing problems within the ordinance.

And so, this was the extent of the discussion. That's the only time I think anybody has ever requested that we change anything or do something differently than what TischlerBise has recommended.

Q. It was a TischlerBise representative actually there when Mayor Wilson had that question, or is that something that you had to relay to TischlerBise and request an answer?

Page 122

A. I -- I don't recall. I probably -- that I -- I -- I -- I -- I don't recall if he did. I don't remember if Mr. Griffin was there or not.
Q. Who is Mr. Griffin?
A. He was the primary consultant that I have worked with at TischlerBise.
Q. He's a TischlerBise employee?
A. He's a TischlerBise employee.
Q. Are you aware of any instance where an impact fee was assessed in an amount, other than that required by the City's impact fee schedule?
A. No.
MR. WILLIAMS: The schedule or the cap?
MR. BLACKBURN: Or the cap.
THE WITNESS: Yes, sir. I --
MR. BLACKBURN: Sorry.
THE WITNESS: Yes, sir. I --
Q. (BY MR. BLACKBURN) Let me clarify. Other than the schedule or the cap?
A. Or the one percent max, the one

Page 123

percent.
Q. Yes, sir. You're --
A. Yes.
Q. -- not aware of any?
A. No.
Q. I know the answer to this, but I'm going to ask it anyway.
Does the City have any formulas or calculations or processes of any kind that they use to calculate impact fees, other than the impact fee schedule at the end of each ordinance and the one-percent cap?
A. No.
Q. There's not a separate process by which the City calculates fees independently, for example?
A. No. In relation to -- in relation to new construction, or are you including redevelopment or expansion of existing?
Q. Let's take those two issues separately. First --
(Noise interruption.)
THE WITNESS: Excuse me. Sorry.

Page 124

MR. BLACKBURN: You can answer it if you need to.
THE WITNESS: No. That's -- that's to remind to give my dog his meds.
MR. BLACKBURN: It's important.
Q. (BY MR. BLACKBURN) Okay. Let's take those one at a time. I'll ask first, with regard to new construction --
A. Uh-huh.
Q. -- other than the fee schedule appended to each of the City's impact fee ordinances and other than the application of the one-percent cap to the values that are shown on those schedules, does the City have any other methodology by which it calculates impact fees?
A. For single-family residential, one- and two-family?
Q. Yes, sir.
A. No, nothing. No.
Q. Next question pertaining to redevelopment.
A. Uh-huh.

Q. Okay. Other than the impact fee schedule, the one-percent cap, and your analysis of the number of bedrooms --
A. Uh-huh.
Q. -- you've already testified to that -- is there any other procedure that the City has ever used to calculate an impact fee on redevelopment single-family residential?
A. Not that I can remember, or that I'm aware of, no.
Q. Has TischlerBise ever revised any of the impact fee schedules that were presented to the City and incorporated into the City's ordinances?
MR. WILLIAMS: Object to the form.
Q. (BY MR. BLACKBURN) And I'll ask that differently.
A. Yeah. State that again.
Q. So each time the City obtained a TischlerBise study and then adopted an ordinance, it appeared to me that the City adopted the fee schedule directly as it was proposed by TischlerBise --



A. That's correct.
Q. -- for each ordinance?
I'm not asking about, for example, when Ordinance 1625 replaced Ordinance 1331?
A. Uh-huh.
Q. Obviously, there was a new fee schedule. When Ordinance 1817 replaced Ordinance 1625, there was obviously a new fee schedule.
A. Right.
Q. To your knowledge, have the fee schedules ever been changed, other than at the time the new ordinance was adopted with its new schedule?
A. No.
Q. For example, TischlerBise or Fairhope didn't have a conversation, you know, while Ordinance 1625 was active, along the lines of, hey, we need to revise the schedule without changing the ordinance?
You'd say that Fairhope never contacted TischlerBise and asked that they revise the numbers or anything like that?



A. Not in the middle of an ordinance without a new study.
Q. Yeah. That's a better way of saying it. I mean, when I say "in the middle of an ordinance" --
A. Uh-huh.
Q. -- after it's adopted without a new study --
A. Yeah.
Q. -- has there ever been a circumstance in which the fee schedule was changed?
A. No.
Q. No?
A. Not that I can recall at all.
Q. Okay. Has anybody ever complained to you about the way that the City calculates its impact fees, other than lawyers?
MR. WILLIAMS: Object to the form.
A. I mean, I get complaints about permit fees and impact fees and inspection processes all the time.
I mean, in terms a formal complaint registered, no. Do I get phone calls from



people saying, what in world? Yeah, that happens all at time.
Q. Well, let me be a little more specific. I'm sure you get a lot of complaints about the fee itself.
A. Uh-huh.
Q. I'm asking more specifically about the way the City calculates the fee.
Have you had anyone contact you to specifically complain about the way that the fee is calculated within the TischlerBise study?
A. I have had people call and ask for clarifications. And I -- like I said, I mean, I have conversations all the time. I have never had a formal request for a reevaluation that I can recall.
And I've never had anybody file a formal appeal of any of the assessment of any of the impact fees that we've done.
MR. BLACKBURN: That's all I have for you. Thank you.
THE WITNESS: Uh-huh.

MR. WILLIAMS: I don't have questions. But I think he wanted to clarify his timeline with the City.
MR. BLACKBURN: Sure.
A. In my declaration, I'd stated I've been the building official since 2012. I've actually worked for the City at two different times.
So I originally started with the City in 2000, and I was there until 2005. Then I left the City and went to the work in private contracting and for representing the Navy out at the Naval Air Station, Pensacola Naval Air Station, and came back to the City in 2012.
And I was building official shortly after I was with the City in 2000 to 2005. I was building official within that timeframe. And then I have been the building official from 2012 to present when I came back.
So I mentioned that I've been in this position for 16 years, but I know my declaration said I've -- I've been doing it for 12. I was counting both times together,



total service time with the City.
Q. (BY MR. BLACKBURN) Okay. So you worked with the City at the time Ordinance 1331 was adopted. That would have been 2007?
A. That is correct.
Q. Okay.
A. Yeah.
Q. Thank you for clarifying that.
A. Yeah.
MR. BLACKBURN: That's all I have.

(The deposition of STEVEN E. CORTINAS was concluded at 11:28 a.m.)



C E R T I F I C A T E

STATE OF ALABAMA)
BALDWIN COUNTY )

I hereby certify that the above and foregoing proceedings were taken down by me in stenotype, and the questions and answers thereto were reduced to computer print under my supervision, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said proceedings.

I further certify that I am neither of counsel nor of kind to the parties to the action, nor am I anywise interested in the result of said cause.

Signed the 26th day of September, 2025.

/s/ Susan C. Andrews
SUSAN C. ANDREWS,
Alabama ACCR #287
Expires 9/30/26

**A**
**a.m** 1:18,18 6:18 77:19 77:21 119:12,14 130:13
**abbreviation** 25:3
**able** 47:16 47:23 56:8 86:4 114:8
**accept** 40:8
**access** 95:2
**accessed** 107:15
**accesses** 13:7 93:20
**ACCR** 1:19 131:22
**accurate** 24:6 31:6 62:5 73:5 73:11 80:5 81:16 90:20
**Act** 101:5
**action** 131:16
**active** 42:1 126:18
**activity** 36:15
**actual** 39:21 65:20 66:5
**add** 102:15
**added** 9:22
**addition** 13:11 47:3
**additional** 9:22 47:1
**addressed** 61:21
**addresses** 111:3
**adjust** 86:2
**adjusted** 86:4
**adjustments** 42:8
**administer** 12:13
**administe...** 11:16
**administr...** 79:20 80:1 80:11,18 85:23 120:7
**administr...** 11:19
**administr...** 10:16,17 10:20
**adopt** 31:21 82:16 83:7
**adopted** 24:2 24:7 32:13 32:14 33:15 42:3 85:10 86:20 125:20,22 126:13 127:7 130:4
**adopting** 11:21 87:17
**adoption** 33:10 87:10
**affect** 99:16 115:15
**affidavit** 43:6
**ago** 31:14 37:11 40:4 41:1 112:2 120:11
**agree** 65:22
**agreed** 6:6
**agreements** 104:15
**ahead** 29:21 98:16 103:1
**Air** 129:13 129:13
**Alabama** 1:2 1:13,20,23 2:7,16 3:14 4:9 5:10,14,23 6:9,12,17 17:9 131:3 131:22
**Albuquerque** 16:17
**allegations** 65:17 73:12
**allocated** 67:14 98:19 121:3
**allocation** 67:12 86:7 88:10,22 88:23
**allocations** 86:1,22 89:3 121:1 121:5
**allowed** 55:14,17
**alteration** 50:7
**alterations** 75:15 83:22
**amend** 82:22
**amendment** 109:16
**amount** 22:19 35:5 37:12 38:5,11 39:14 47:14 54:21 67:1 70:22 73:19 84:20 88:18,19 108:16 113:3 122:11
**amounts** 38:8 62:8 74:17
**analysis** 61:16 68:20 86:5 112:3 121:10 125:3
**analyze** 93:11 109:5
**analyzes** 99:14
**analyzing** 84:17 110:22 111:12
**and/or** 110:6
**Andrews** 1:19 5:6,16 6:10 131:20,21
**annotation** 28:18
**annual** 89:19 91:17 94:16,22 96:11
**annually** 42:18 43:1 90:6
**answer** 28:10 41:6 45:8 52:21 67:9 86:17 98:16 100:16 114:6 121:23 123:6 124:1
**answered** 57:21 77:9 100:14 114:5
**answers** 131:9
**anybody** 60:23 72:19 74:12 75:2 75:19 76:10 98:12 121:16 127:15 128:18
**anyway** 100:23 123:7
**anywise** 131:16
**appeal** 128:19
**appeals** 107:1,4
**appeared** 125:21
**appears** 20:17
**appended** 124:11
**applicable** 5:9,13,22 104:3
**applicant** 25:12 35:6 36:3 37:13 37:16,23

38:7 39:3 39:5,23 55:5 65:12 70:20 72:1 104:18
**applicants** 40:5 60:19
**application** 39:4 41:17 107:20 124:12
**applied** 35:7 71:21 84:6
**applies** 73:18
**apply** 44:12 53:23 71:21 94:14 118:3
**applying** 53:8
**appointed** 41:20
**appropriate** 65:9 67:3 68:23
**approval** 52:9 53:9 53:12 118:1
**approves** 53:11
**approxima...** 10:2
**area** 11:10 11:11 15:6
**areas** 14:22 96:19
**ARENDALL** 1:21 2:12 6:15
**argue** 108:20
**arisen** 60:10 84:11
**arrives** 74:6
**aside** 78:8 102:8
**asked** 5:21 64:12 80:1 86:15 91:22 112:2 114:5 120:23 126:22
**asking** 7:17 30:16 45:2 45:4,17 57:12 61:1 61:20 66:7 66:9,11,19 77:2 79:12 79:21 91:13 93:18 96:4 113:22 126:3 128:7
**aspect** 74:11 112:4
**assess** 54:22 65:4 73:20 115:7 118:8
**assessed** 3:18 22:10 25:17 43:9 45:15 49:10 50:5 50:11 53:15,17 53:19 68:22,22 70:11,15 70:17 73:11 93:7 93:12 103:17 104:2 107:3,8 108:15 111:13 113:15 118:11 119:1 122:11
**assesses** 66:20
**assessing** 83:16 110:13
**assessment** 108:4 110:1 119:3 128:19
**assign** 39:13
**assist** 12:9 12:14
**associated** 13:3
**assume** 7:22 34:17 96:6
**assumed** 60:1 79:9
**assumption** 46:16 48:4
**assure** 68:21
**Atlanta** 16:18
**attached** 14:13 22:2 30:3
**attorney** 13:20 72:6 78:6
**attorney/...** 72:12 76:1
**attorneys** 5:3 76:6
**attributable** 65:21 92:21 97:23
**attributed** 81:22
**August** 87:11
**automatic** 46:16
**avail** 60:19
**available** 19:11
**aware** 12:23 65:15 73:17 75:16 83:9 91:2,12 93:13 101:16 102:20 103:2,3,4 104:10,16 104:20 105:4,17 105:18,19 106:22 107:1,4 122:10 123:4 125:10

**B**

**B** 2:15 4:1
**back** 24:9 32:3,21 34:4 46:20 51:17 52:17 53:3 57:12,18 57:23 61:3 62:20 69:11 85:18 86:23 87:1 87:2,19 94:7,16 119:22 129:14,19
**bad** 54:16 72:17 91:22
**Baldwin** 1:10 131:4
**bar** 34:12
**based** 11:2 16:15 20:17 27:23 46:11 79:13 81:16
**basis** 34:9 35:14 37:17 68:21 118:4,18
**Bates** 3:20 4:10 20:16 23:19
**bathroom** 110:7
**bathrooms** 50:21
**Baton** 16:16
**BAY** 2:7
**bedroom** 46:23 47:1 101:22 108:19,21 109:17 110:2,4,11 110:12,23
**bedrooms** 46:11 47:17 48:1 48:17 49:3 50:14 54:15 101:21 110:13,20 111:10 112:4 125:3
**beginning** 34:11

36:16
**begins** 32:2
**behalf** 1:5
**believe** 19:5 44:3 52:18 81:23 83:17 90:20 91:10 94:1 100:12
**believes** 74:5
**Benefield** 1:4 7:19 22:12 54:7 113:20
**Benefield's** 24:11 41:16
**best** 65:3 79:19 110:18
**better** 61:21 127:3
**Betz** 16:12
**beyond** 19:14 66:11 80:18 101:10 105:5 110:23
**big** 21:1 52:23
**bit** 17:3 20:14 27:18 43:15 71:17 101:13 109:9
**Blackburn** 2:4,5 3:5 6:4 7:7,11 7:15 8:15 8:19 14:6 14:9,15 15:11,14 15:18,23 16:1 19:2 19:6,8,12 19:17,22 20:1,5,9 20:12,19 20:22 21:3 21:7,11,15 21:17,19 22:4 23:20 30:5 31:12 57:19 60:7 60:9 67:7 69:16,18 71:9,11 76:3,4 77:13,16 77:23 79:6 79:8 87:23 88:3,7,8 92:10 100:18 101:12 105:10,15 108:18 119:6,16 122:17,19 122:21 124:1,5,6 125:16 128:21 129:4 130:2,10
**bonus** 109:19
**bottom** 21:20 63:6
**bought** 40:23
**bounce** 20:13
**bouncing** 94:15
**bound** 76:14
**BOX** 2:6
**BP** 101:5
**brain** 87:5
**break** 20:5,6 77:16 111:8
**breakdown** 3:16 22:8
**briefly** 9:15
**bring** 9:15
**broad** 99:18 100:3 102:18
**broken** 67:19 88:15
**brought** 85:22
**budget** 42:19 43:2 90:14 90:21 94:23 95:5 95:7,9 96:3,8
**budgetary** 90:11 91:20,20 94:19
**build** 46:20 55:6 106:4
**builder** 53:8 73:20 106:2
**building** 3:17 9:3 9:11,16,21 10:6,7,8 10:14,18 11:7,15,17 11:21 12:3 12:7 13:4 13:8 22:9 24:14 28:23 29:7 29:8 34:20 35:8 36:4 36:11,11 36:21 37:1 37:2 38:1 39:10 43:18,22 44:15 45:13 47:4 48:5,17 49:6,21 50:2,5,7 51:9,11 52:13 53:21 54:1 54:8,19 56:22 57:13 58:11,12 60:12 61:10 64:6 64:19 66:2 66:8,22 67:20 68:4 68:7,12,18 72:19 74:8 74:13 75:3 75:6,7,20 83:11 84:16 91:15 92:18 93:10 98:21 102:7 104:18 106:2,8 107:10,20 109:4,15 110:9 115:1,14 115:18 116:20,21 117:3,5,10 118:8 119:4 129:6,15 129:17,18
**buildings** 12:1 37:9 38:12 59:3
**builds** 103:16,20
**built** 48:20 51:19,20 53:18 56:21 57:1 114:11 117:20
**bulk** 84:5
**bunch** 15:15 30:15 81:4
**business** 72:22 92:3
**buy** 117:15
**buys** 117:22

C

**C** 2:1 131:1 131:1,20 131:21
**calculate** 55:10 64:12 72:20 75:22 77:5 123:10 125:7
**calculated** 27:21 28:1 34:2 35:13 54:14 61:13 73:23 81:17 97:17 114:21 128:11
**calculates** 34:8 76:12 123:15 124:15 127:16 128:8
**calculating**

60:14 75:5 93:4
**calculation** 36:7 37:7 72:15 73:15 74:12 84:10
**calculations** 37:15 61:17 123:9
**call** 37:20 46:8 83:4 128:13
**called** 86:2 91:11
**calls** 76:1 127:23
**cap** 26:3 38:15 68:8 68:14 73:19 112:12,13 114:3,18 122:16,17 122:22 123:12 124:13 125:2
**capacity** 47:2 83:19
**capital** 63:17 96:8
**capped** 112:21
**care** 17:18
**careful** 88:1
**case** 1:7,12 7:18 12:20 17:21 19:21 22:13 35:1 35:23 43:6 49:5 54:8 65:18,19 71:2,5 73:13 85:14
**case-by-case** 34:8 35:13 37:17 44:17 68:20 118:4,18
**categories** 35:21 88:17 115:9
**cause** 6:19 131:17
**caused** 80:22 82:14 83:6
**causing** 121:12
**CCR** 1:19
**certain** 12:8 12:11 43:12 67:16,17 97:22 117:13
**certainly** 19:13,15 65:1,15
**certifica...** 5:15
**Certified** 5:6 6:11
**certify** 6:11 131:6,14
**challenging** 61:1
**chambers** 120:18
**change** 44:13 44:15 75:21 80:18 84:16 121:6,11 121:16
**changed** 83:11 113:7 126:12 127:11
**changes** 10:9 10:9 34:1 77:4 83:15 83:21 85:3
**changing** 75:4 76:11 86:11 89:12 120:3 126:20
**charge** 25:9 35:16 37:21 74:17 104:14
**charged** 35:6 38:7 42:6 43:20 44:2 44:6 46:23 51:10,13 61:8,10,12 62:12 66:4 67:1,23 70:21 71:4 105:5 113:3
**charges** 35:11 44:11 100:10
**charging** 99:3 115:16
**cheat** 23:4
**check** 73:4,8 73:9
**Chris** 20:20 88:4
**CHRISTOPHER** 2:13
**Circuit** 1:11
**circumstance** 54:14 55:9 64:8 80:21 82:14 104:16 117:21 127:10
**circumsta...** 109:1,11
**city** 1:12 3:13 4:8 7:19 9:1,6 9:9,12 10:13 13:4 13:7 15:3 16:10 17:19 18:16,20 22:20 25:21 29:2 30:17,19 31:16,21 33:5,12,19 33:21 34:8 35:8,11 36:7,23 38:14,17 38:23 39:3 40:3,8,20 41:2 43:8 48:11 49:8 49:9,21 50:4,13,20 51:4,15,20 52:5,15 53:11 54:21 55:5 55:10,21 56:2,14,19 60:13 62:5 64:12 65:11,14 66:13,20 67:4 68:17 73:20 74:6 75:20 76:11 79:16 81:4 81:9 82:15 82:21 83:6 85:9 86:21 87:16 90:4 90:6 91:4 92:3,20 93:11,19 94:5 95:2 97:9,22 98:8,13 99:11,14 100:2 101:2,19 102:3,17 103:5 104:21 105:5 107:7 109:15 111:11 114:16 120:3 123:8,15 124:14 125:7,13 125:19,21 127:16 128:8 129:3,7,9 129:11,14 129:16 130:1,3
**City's** 12:13 12:21 55:13 65:19 72:14 73:14 92:6 97:4

122:12
124:11
125:13
civic 51:21
Civil 5:10
5:14,23
6:9,13
clarifica...
83:18 85:1
clarifica...
128:14
clarified
85:4,6
clarify 35:9
45:2 83:20
92:23
99:17
109:15
122:21
129:2
clarifying
130:8
clarity 39:2
classific...
28:20 29:2
29:9 34:21
44:14
58:12
111:21
115:15
116:4
classific...
29:10
34:14
39:12
56:14
57:13
59:21
116:18,19
classified
37:9
classifies
29:7 117:6
clay 12:16
clear 8:5
36:18 86:3
88:9 121:8
clearly 8:2
86:18
clears 60:6
client 84:6
client's
88:13
97:21 98:4
clip 21:1
clipped 21:8
closet 110:6
code 11:21
12:3 28:23
29:7 34:20
39:10,19
56:22
58:11
109:15
110:9
117:3,5
collect
13:14
67:23 69:4
103:9
collected
36:12 69:3
90:23
collecting
13:2,17
99:3
collections
42:20
college
17:10
combination
47:14
combined
37:21,22
38:4 70:22
come 12:3
46:19
51:17 53:3
79:21
84:22
103:10
109:18
117:15
118:5
comes 53:13
55:5 56:4
74:18
107:20
coming 8:18
51:23 52:4
52:6
commencing
6:18
comment
25:10
commercial
35:20
111:18
115:3,20
commission
30:17
commissioned
30:19
Commissioner
6:10
committee
41:12,15
41:19,22
42:1,5,6
42:10,17
42:22
common 56:3
communica...
48:10
communica...
76:2 96:22
97:3
compare 38:4
39:9,16
40:10
74:16
complain
128:10
complained
127:15
complaint
127:22
complaints
127:19
128:5
complete
8:11
completely
47:10 50:8
complicated
108:7
component
88:23
components
42:7 67:13
116:10
computer
131:9
computes
97:9
concerned
35:22
40:20
84:15
concluded
130:13
concluding
22:18
conducting
72:22
confirm
47:23
confused
57:12
connection
26:4
CONNER 2:4
consider
45:14 49:9
50:20
110:12
considera...
43:2 50:3
104:15
115:18
116:2
considered
79:3 110:4
110:8
considering
74:7 115:6
considers
47:5 66:23
67:2 99:15
111:12
consists
11:18
constructed
54:10
construction
11:1,13
13:12,15
16:23
17:13
25:11,20
26:15,17
27:9,16,23
28:2,3,4,5
36:22
37:22 38:1
39:6,12,15
39:21
41:10 47:6
47:11
48:15,19
49:11 50:9
50:23
53:16,20
55:11 64:1
69:20
71:16
94:13
104:1,8,13
112:16
115:1
118:14,23
123:18
124:8
construct...
11:11

**consult** 65:1 66:18 92:4 93:15
**consultant** 65:8 76:17 92:14 122:6
**consulted** 18:20
**cont** 4:1
**contact** 128:9
**contacted** 126:22
**contempla...** 87:17
**context** 104:4,7
**contract** 41:10
**contracting** 129:12
**contractor** 46:8 117:13
**contribute** 63:17
**contributing** 110:21
**contribution** 102:16
**control** 73:10
**controls** 12:16 36:20
**conversation** 76:14 77:8 89:12 98:12 100:9 120:10,17 126:17
**conversat...** 72:5,8,11 72:13 76:9 76:23 77:3 78:5 96:19 97:15,19 99:23 101:1 128:15
**Converse** 16:12
**convoluted** 58:18
**copy** 14:13 22:2 30:3
**corner** 21:20
**corporate** 51:21 53:10 105:3,6
**correct** 8:3 19:18,19 22:18,21 23:13,14 23:23 25:1 25:5 26:4 31:17,22 31:23 34:19 35:3 35:4 37:4 37:5 38:16 42:14 43:10,11 43:14,20 43:21 48:6 48:7 59:5 62:13 65:10 68:16 69:23 71:12,23 72:3 85:2 85:8,13 89:1,2,8 89:10,17 91:21 102:4 107:11,12 111:14,17 113:11 119:5 120:8 126:1 130:5 131:11
**correcting** 34:23
**corrections** 25:10
**correctly** 18:10,14
**correspond** 29:1
**corresponds** 22:12 58:10
**Cortinas** 1:16 3:4 5:5 6:18 7:2,14 8:23 13:18 13:23 14:15 16:2 16:9 17:19 19:23 22:7 29:15 31:8 43:5 55:23 65:18 72:4 77:18,20 77:23 119:6,11 119:13,19 130:12
**cost** 26:9 27:23 31:15 38:2 38:3 39:6 39:15,21 41:10 46:22 67:22 70:2 72:2 98:13 112:16 114:10,23 118:11,13
**costs** 31:17 37:22 63:17 65:20 81:17
**could've** 40:23
**council** 33:19,21 39:10,19 82:5 95:23
**counsel** 6:14 65:2,8 92:9,11 131:15
**count** 57:7,8
**counting** 129:23
**county** 1:11 104:23 131:4
**couple** 17:20
**course** 12:4 12:7,20 16:16 37:8 38:20 66:11 72:5 72:15,21 73:6,17 76:4 78:4 99:11
**Court** 1:1,11 5:6 6:5,11 7:5
**cover** 14:23 15:7,19 26:8 27:4 27:6 53:15 56:18
**covered** 37:2 63:18 97:8 119:23
**credit** 63:13 63:21 64:7 64:9,11,13 64:22,23 65:11 66:17 94:9 101:14
**credits** 62:19 63:7 63:10 84:12,21 101:13 105:16
**Creech** 62:16 96:16
**criteria** 44:19 45:13,18 45:21 50:10,12
**curious** 33:11 49:20 98:10
**current** 9:15 41:3
**custodian** 6:4
**custom** 112:18
**cwilliams...** 2:18

**D**

**D** 3:1
**dangerous** 12:1 87:5
**data** 58:4 89:5
**date** 6:12 18:11 22:15,19 24:6 33:20
**dated** 29:17
**Davis** 17:8
**day** 1:17

24:3 73:7 131:18
**day-to-day** 11:17
**days** 106:11
**debate** 85:17
**December** 24:3
**decided** 79:16 82:21 106:3
**decision** 37:14 110:22
**declaration** 23:5 43:17 51:3,8 129:5,22
**declared** 39:5,7 41:9
**declaring** 39:21
**decrease** 82:1
**decreased** 81:15 82:2
**dedication** 63:23
**deed** 40:17
**default** 47:20
**defaults** 46:15 48:4 49:3
**Defendant** 1:14 2:11 3:13
**defensible** 74:5
**defer** 61:15 96:1 103:14,15
**define** 109:16
**defined** 28:21
**definition** 41:21 103:20 109:20 110:23
**definitions** 83:19
**definitively** 52:22
**delegate** 108:3
**delivered** 6:3
**demand** 67:3 101:19
**demolish** 46:9
**demolishes** 46:18
**demolition** 46:6,7,8 46:13 47:18 48:1 48:18
**department** 11:6,17 12:10,15 13:16 42:21 43:18,23 45:14 47:4 51:11 55:13 64:6 64:19,19 66:3,8,10 66:22 67:21 68:5 68:7,12,18 72:9,19 74:13 75:3 75:6,8,21 83:11 90:15 91:15 92:18 93:3 93:5,10 95:1,12,13 95:16,21 95:22 96:1 99:13 100:1 107:2,10 115:19 118:6
**department's** 40:11 72:14 84:17 98:21
**departments** 90:11 95:2 95:11
**depending** 44:12 50:6 114:23
**depends** 112:16 114:10 118:13
**depicted** 31:10,20
**deposition** 1:15 5:4,8 5:19 6:8 7:20 13:19 14:16 19:15 72:16 77:18,20 78:9 119:11,13 130:12
**Depositio...** 3:12
**describe** 11:14 110:19
**described** 91:6
**description** 3:9 4:5 10:9 24:20
**designate** 59:11,15
**designated** 11:2
**designates** 29:5 34:18
**designation** 29:12
**designators** 56:21 59:8
**desire** 83:4
**detectors** 110:10
**determina...** 12:2 43:23 107:9 116:3
**determine** 11:7 30:20 31:14 34:1 35:10 37:15 38:17 42:8 42:11 46:4 47:17 54:21 60:9 62:6 64:6 65:9 67:22 81:14 107:7 108:1 116:9
**determined** 38:11 41:19 55:16 64:21 75:11 80:2 107:21
**determines** 60:13 107:14
**determining** 43:19 45:14 47:5 49:10 50:15,21 61:17 73:1 73:2 93:6 99:1 109:5 115:19
**develop** 117:12,14
**developed** 117:19
**developer** 53:13,23 63:22 64:10,13 73:20 102:12,16 103:13,19 117:23 118:19
**developing** 117:9
**development** 11:1 13:3 31:15 38:12 47:10 51:15 52:10 53:14,16 56:18 65:21 70:9 81:13,23 92:22 98:1 98:3,7,14 99:15 100:2 104:4,6,23 107:21,23 117:22 118:21

developments 51:19 52:3 52:8,11
difference 61:7
different 11:9 14:22 35:14 38:21,22 44:19 49:9 56:23 59:13,15 59:20 70:12 79:20 81:22 90:5 90:11 91:5 96:9,19 116:19 117:7 129:7
differently 31:13 32:17 41:17 57:20 121:17 125:17
direct 6:5
directly 85:11 97:23 98:13 125:22
disagree 48:8
discovery 78:23
discretion 108:16 109:4,10 109:13 110:16 112:7 116:11
discussed 33:13,19 42:21 64:17 74:11 90:12 91:1 92:19 120:3
discussing 120:21
discussion 60:8 85:17 105:14 121:15
discussions 42:19 75:3 76:5,10 90:14,21 97:6,9,12 98:17 99:5 103:13
dispute 41:8 60:20
disputes 60:10
distinction 62:7
district 1:1 1:2 57:9
districts 56:1 57:7
disturbance 36:18
disturbing 36:15
divided 46:21
DIVISION 1:3
document 22:6
documenta... 40:18
documents 17:21,22 78:10,16
dog 124:4
doing 15:15 96:5 105:10 129:22
dollar 39:13 71:8 88:18 88:18
door 110:6
double 63:14 73:9
drafting 11:20 18:22
dramatically 113:8
drawings 48:15,19
due 63:14
duly 7:3
duplex 34:19 57:8
dwelling 34:22 35:2 35:7 45:6 57:4 111:15
dwellings 29:13 35:15

E

E 1:16 2:1,1 3:1,4 4:1 5:4 6:18 7:2 77:18 77:20 119:11,13 130:12 131:1,1
earlier 10:14 37:2 47:22 57:2 60:13 85:9 88:10 89:19 91:22 93:23
early 9:23 10:3
easier 20:9 21:8
effect 19:20 23:3,11 113:19
efficient 15:12
egress 110:11
either 60:12 75:20 85:20
El 16:17
elect 80:7
electrical 27:11,15
eligible 90:17
employed 8:21,23 9:5 10:12
employee 122:8,9
enabling 37:18 38:14 44:1 68:9,14 73:18 76:15 94:1
enforce 10:23 11:23 12:5 12:6
enforcement 11:22 12:11,15 12:17
engineering 16:12
Engineers 16:13
ensure 66:3 92:20
entire 29:23
entirely 55:21
entitled 95:17
environme... 12:11 36:19
Erik 8:22,23
erosion 12:16 36:19
ESQ 6:4
establish 40:9 41:3
established 68:9
estimated 39:13 60:11 81:17
estimation 40:11
evaluate 48:20 69:3 74:15 116:22
evaluated 44:16,20 85:5 104:2 117:1 118:16
evaluating 42:7 72:22 72:23 99:2
evaluation 68:1 86:6 97:13 116:10
evaluations 86:11 97:14 108:8

**event** 60:20 80:21 82:13 94:7
**eventually** 23:13
**examination** 3:5 6:20 7:10
**examined** 7:3
**example** 42:13 103:5 108:18,22 123:16 126:3,16
**exceed** 68:8
**exceeding** 68:13
**excess** 39:18 112:23 113:10
**exclude** 96:23
**excluding** 76:5 92:10
**Excuse** 123:23
**exempt** 101:17 102:13
**exemption** 102:20
**exemptions** 84:13 101:16 104:10 105:17
**exercise** 108:16 109:4,9 112:6 116:11
**exercising** 110:16
**exhibit** 3:7 4:3 13:21 14:11,17 20:13 21:11,22 21:23 22:4 22:15 24:9 29:22 30:1 32:5,11,23 33:1,2 34:11 49:15,16 56:16 57:23 61:3 69:11 74:1 87:19,20
**exhibits** 14:2
**existing** 44:7 50:7 83:21 123:19
**exists** 54:20
**expanded** 85:2
**expansion** 44:13 50:15 96:9 98:8 102:3 102:6 108:9 111:19 115:12 123:19
**expect** 65:22 120:13
**expend** 95:14
**expended** 90:16,23
**expenditure** 96:14
**expenditures** 42:20 90:15,17 95:9,22
**expense** 97:22
**expenses** 27:7 68:3
**experience** 17:1
**Expires** 131:23
**explain** 24:17 59:10
**explained** 33:22 82:4
**extensive** 27:18
**extent** 76:1 92:8 101:10 109:9 121:14
**extraterr...** 105:1

**F**

**F** 131:1
**factfinding** 68:20
**factor** 110:21
**factors** 111:11
**fail** 65:20
**fair** 13:1 28:10 38:10 56:11 60:11 69:18 74:5 114:15
**Fairhope** 1:12,23 2:16 3:14 3:21 4:9 4:11 6:17 7:19 9:1,6 9:13 15:3 16:10 18:17 20:2 20:16,17 21:5 22:5 22:16 24:1 24:10 29:3 30:11,23 31:2,16 32:2,5,8 32:20 34:5 34:12 35:8 41:13 43:9 51:21 56:2 62:6,22 63:2 69:11 69:12 78:17,18 80:13 89:5 100:10 101:5 105:3,5 114:17 126:16,21
**Fairhope's** 29:17
**fall** 55:12 115:8
**familiar** 18:1
**family** 17:17 35:20 49:6 57:3
**far** 13:4 24:5,8 42:17 56:21 67:20 83:23 84:5 84:14 103:14 116:17
**faster** 87:4
**Faust's** 40:1
**fee** 4:7 12:6 12:21 18:3 18:23 19:21 23:2 24:21,22 25:8,9,14 25:16,17 25:23 26:5 26:12,19 27:3,4,12 27:18,20 28:13,15 29:17 31:3 32:12 35:3 36:5 37:3 37:3,7 38:5 41:12 41:16 42:2 42:8,22 43:9,19 44:6 45:16 46:10,21 46:23 47:7 47:12,13 49:10,16 50:5,10,12 50:22 51:11 53:15,18 54:13,22 55:10 61:5 61:6,8,9 62:7,11,15 63:19 65:4 65:12 66:3 66:6 67:1 67:2,11,14 67:22,23 68:8,12,13 68:21,22 69:3,4,15 69:22 70:11,16 70:21 71:15 72:2 72:14 73:5 73:8,14,19 73:22 74:2

74:5,6,11
74:15,20
75:18
78:12 80:5
82:15,19
83:1 84:7
84:19
85:10,19
88:13 89:1
89:13,20
90:22 92:6
92:13 93:6
93:20
94:13
95:17
96:15 97:4
97:5 99:1
99:2,2,16
100:3
101:3,18
101:23
102:13,22
103:7,12
104:14,17
105:4,20
106:8
107:3,8,15
108:2,14
110:1
111:14
112:23
113:2,3,8
113:10,16
113:20
114:22
115:7,14
115:16,21
116:9
117:6
118:8,15
119:3
120:4
122:11,13
123:11
124:10,11
125:1,7,12
125:22
126:6,8,11
127:11
128:5,8,11
**feel** 73:5
**feeling**
80:19
**fees** 3:18
13:2,5,7
13:10,11
13:11,14
13:17 22:9
24:11,12
24:18 30:9
30:20
31:16,19
31:20
32:19 33:3
33:7,14,17
33:23 34:1
34:8 35:13
36:9,10,13
37:1 42:20
43:13 44:1
46:10
50:11 51:4
51:13
53:14,19
54:2 60:15
62:20
65:20
66:19 68:3
72:20,23
73:1,2,11
75:5,22
76:12 77:5
81:22
82:22,23
83:12,16
86:6,7
90:16,18
90:22,23
92:21 93:4
93:11 94:2
95:3,14
96:8 97:10
97:15,16
99:3 103:8
103:15,17
103:23
104:11,21
105:2
106:5
112:12
114:1,16
114:21
117:7
118:4,9,10
119:1
120:21
123:10,15
124:16
127:17,20
127:20
128:20
**FEMA** 10:23
11:3
**fewer** 59:19
114:9
**figure** 31:2
31:7,10,20
54:16
**figures** 33:2
**file** 20:3
128:18
**filed** 43:6
107:5
**filing** 5:18
6:4
**final** 12:2
20:16 53:8
53:12
74:23
108:5
117:23
**find** 30:9
**Fire** 67:18
88:16 95:4
121:5
**first** 7:3
18:6 23:7
29:16
34:15 42:3
55:7,12,18
56:16,17
59:23
62:22
63:13 78:2
107:9
123:21
124:7
**five** 60:22
**flip** 21:19
29:15
32:21
71:14
86:23,23
**flipping**
21:13 24:9
30:7,7
**flood** 11:2,3
**floodplain**
9:4 10:15
10:16,20
10:23 12:5
**floodplains**
11:8
**fluent** 56:10
**focused**
11:10,11
98:22 99:1
**follow** 50:9
64:3,21
76:16
82:22
**following**
6:20 16:3
**follows** 7:4
**foot** 39:14
**footage**
44:22
111:19
115:13
**foregoing**
6:13 131:7
131:11
**forgive**
80:12
91:23
**form** 5:20
31:11 41:5
67:6 69:1
70:19 71:7
75:23 92:7
98:15
102:23
106:17
108:17
111:4
112:8
114:4
116:15
125:15
127:18
**formal** 107:4
127:22
128:16,19
**formally**
60:23
**former** 86:15
**Formerly**
1:10
**formula** 65:6
**formulas**
123:8
**forth** 32:21
85:18
**forward**
95:15
**four** 67:13
95:2
101:21,22
**four-bedroom**
46:20
**framing**
65:23
**front** 18:12
**full** 8:20
47:12

69:22 94:13 113:16 114:21
**funded** 62:15 68:2
**further** 5:12 6:2,6 83:20 131:14
**future** 38:12

G

**gas** 25:14,19 25:21
**gblackbur...** 2:9
**general** 80:19 83:4
**generally** 30:16 52:6 74:21
**getting** 39:2
**gist** 121:6
**give** 14:3 20:7 65:5 113:22 119:7 124:4
**given** 7:20 7:22 75:17 131:12
**gives** 39:17
**globally** 53:15
**go** 8:23 13:5 14:19 17:10 21:14 25:18 26:6 26:10 27:4 27:7,14 29:21 30:14 34:4 41:9 52:17 52:21 62:20,21 63:2 78:1 83:15 87:1 87:19 98:16 103:1 119:22
**goes** 67:17 67:18 73:4 86:5 94:7 108:6
**going** 7:17 15:19 19:22 21:7 21:21 22:5 29:16,22 30:14 32:2 32:4 39:6 40:15 45:22 46:4 47:8,11 50:5,6 51:17 52:8 55:12 56:8 56:22 59:10,14 61:14 62:16,17 62:20 63:3 69:10,11 69:21 71:14 77:11 78:1 87:21 91:23 94:16 96:15,16 96:18 107:8 111:13 114:8 115:22 123:7
**gonna** 14:23 23:9 112:17
**good** 7:12,13 40:15 77:14 105:10
**Gotcha** 79:6
**governing** 11:12
**graduate** 17:5,7
**Grant** 2:5 6:3 7:14 70:10
**gray** 34:12
**greater** 39:20 59:18
**Griffin** 122:3,5
**ground** 8:1 92:1
**growth** 81:13
**guess** 8:19 31:7 58:18 69:18 70:5
**guidelines** 106:6
**guiding** 115:23
**guys** 14:2 19:2 72:20 75:22

H

**H** 4:1
**half** 112:1 114:13,14
**HAND** 1:21 2:12 6:15
**handle** 12:9 108:9
**handled** 74:22,22
**handy** 69:8
**Hang** 87:1
**happen** 28:6 36:14 46:14
**happening** 8:17 81:13
**happens** 94:6 128:2
**hard** 8:12 105:11 112:14 114:10 121:10
**HARRISON** 1:22 2:12 6:15
**hat** 10:21
**head** 23:1 28:7,9 95:12
**heading** 100:23
**heads** 42:21 95:16,21 96:2
**hear** 8:12 78:4 103:19
**held** 9:8
**help** 30:21 65:7,8 88:4
**hereinafter** 5:19
**hereto** 5:3 6:7 14:14 22:3 30:4
**hey** 118:6 126:19
**high** 17:5,8
**hired** 92:3
**hit** 78:1
**hold** 9:19 32:21 57:11
**home** 34:18 36:1 48:6 51:19 61:5 61:9 70:7 101:21,22 103:16,18 104:1,8 112:19 113:13 118:23 119:2
**homebuilder** 103:11,16 117:9,18 117:22 118:3
**homebuilders** 117:15
**Hopefully** 21:17
**Hotel** 70:10
**hotels** 29:11
**hour** 77:12
**house** 26:23 35:23 44:7 44:8,8 46:17,19 46:20 48:19 54:11,15 54:19,20 55:3,6,7 55:11 98:4 112:17,18 112:18 118:10,12 118:16,18
**houses** 55:15 106:3 117:10,20
**housing** 34:13 98:6
**HP** 56:6
**Huh-uh** 64:15
**huh-uhs** 8:12
**hundred** 17:20

hypothetical 53:22 54:6
hypotheti... 53:6,10 54:9 55:2 70:6

I

idea 40:15
identific... 14:12 22:1 30:2
identity 41:19 118:19
impact 3:18 4:7 12:6 12:21 13:11 18:2 18:23 19:21 22:9 23:2 24:12 28:13,15 29:17 30:9 30:21 31:3 32:12,19 35:2,13 36:5 37:3 37:7 38:5 41:12 42:2 42:8,19,22 43:9,13,19 44:1,6,9 45:16 46:10,21 47:6,12 50:22 51:3 51:11 53:14,19 54:2,13,22 55:10 61:4 62:15,19 63:19 65:12,19 66:3,5,19 67:14,22 68:3,22 70:11 72:20 74:2 74:5,15,19 75:5,18,22 76:12 78:12 80:4 82:15,19 83:12 88:23 89:20 90:15,18 90:22,22 90:23 92:6 92:13,20 93:4,11 94:2,13 95:3,14,17 96:8,15 97:4,10 99:16 100:3 101:3,18 101:23 102:13,22 103:6,8,12 103:15,23 104:11,14 104:17,21 105:2,4,20 106:5 107:3,8,15 108:2 110:1 111:14 112:11,23 113:2,8,10 114:16 115:7,16 118:4,8,9 118:15 119:3 122:11,12 123:10,11 124:11,16 125:1,7,12 127:17,20 128:20
impacts 99:14,15
important 86:13 124:5
impose 50:22
improvements 64:2 96:9
include 92:8 93:16
included 33:16
including 24:12 66:16 97:20 123:18
inclusion 73:13
incorporated 125:13
increase 101:19
increased 31:15 47:2 81:15,23 83:18
increasing 44:9 121:4
independent 119:3
independe... 123:15
indicate 26:14,15
indicates 26:17
individual 21:12 37:16 46:22 53:20,23 54:1 103:18,23 104:1 118:10,11 118:16,18
individually 53:18 117:16 118:22
industrial 104:6 111:20 115:3,20
information 18:22
infrastru... 30:22 63:18 67:5 98:8
initial 107:19
initially 9:11 108:1
inquiry 14:22 15:7 68:19
inspect 26:3 26:7,23 27:8,14
inspected 36:20
inspection 12:4 25:23 26:9,12 127:20
inspections 25:19 27:10
inspector 9:12,17 27:14
inspectors 9:22 11:18 25:18,21 27:7
installation 27:1,15
installed 26:22
instance 103:10 106:9,21 117:8,18 120:2 122:10
instruct 46:7
instructed 104:13
insurance 11:3
intending 102:18
intensity 44:15
interested 84:9 121:2 131:16
internally 69:2 73:10
Internati... 28:22,23 39:10,19 57:13 58:11
interpret 10:22 65:3
interpret... 12:3 109:14 110:17 117:2
interpret... 116:16
interpreted 94:12
interpreting 116:23
interruption 123:22

intricacies 62:3
involved 68:5 94:21 94:22 97:21 99:13
involvement 92:12 100:7
issuance 36:11
issue 46:7 64:7,18 65:23 111:2
issued 13:8 47:6 51:4 51:9 65:11 73:3 74:23 101:15 106:14
issues 53:11 123:20
issuing 12:7 73:6 84:12
It'll 21:20

J

Jefferson 17:8
job 10:9,19 10:22 16:19,21 17:15 67:21 69:2
July 4:10 29:18,23
jumping 17:2
jurisdiction 105:1

K

Kant 80:7
Karin 120:7
keep 43:3
kind 11:10 20:13 32:20 40:14 73:9 77:7 78:12 83:20 85:18 100:6,8 123:9 131:15
know 8:1,7 12:23 13:6 15:8 19:4 19:14 22:23 24:5 24:8 28:6 28:11 33:18 39:23 41:2 41:15 42:15 43:3 43:8 44:16 45:19 47:20 49:17 55:23 56:5 56:9 58:8 60:16 66:12 72:4 72:7,18 74:10,16 75:12 76:22,23 78:13,15 81:3,12 84:1,10 86:17 90:9 90:12,13 90:19 91:8 94:12 96:21 98:6 98:20 100:19,21 102:17 103:14 104:7 106:18 108:19 114:14 120:10 121:12 123:6 126:17 129:21
knowledge 19:1 42:2 42:4 65:11 79:14,19 90:20 91:13,14 102:11 126:11
knowledge... 101:11

L

L 5:1
label 20:16
labeled 3:20 4:11 109:22
lag 52:3
land 28:4 36:14,18 37:22 38:3 38:18,22 39:8,22 40:4,9,15 40:19,23 41:3,11 55:3 63:23 70:7 73:13 74:7 102:17 103:6
land's 40:21
landowner 47:19
language 37:19 56:9 89:21
Large 5:7
late 10:3
law 5:4
lawyer 96:22
lawyers 76:9 127:17
layout 48:16 48:16
leave 21:8
left 129:11
legal 65:2,8 92:8,10
legislation 37:18 44:2 68:9,15 73:18 76:15 94:1
legislati... 38:14
lessening 121:2
lesser 38:7 70:21,23 72:1 74:17
let's 9:14 13:23 14:2 15:5,13,22 19:17 20:1 21:21 24:21 30:6 30:7 31:12 34:4 36:8 37:6 44:18 44:18 49:22 54:6 54:9 55:2 62:19,22 70:5 77:13 80:4 86:23 87:1,19 88:12 113:18 115:7 117:21 120:16 123:20 124:6
level 67:3 117:7
levels 107:19
levied 94:2
lieu 103:6
life 109:23
limitation 38:13
limitations 76:15
limits 51:21 53:10 55:21 104:22 105:3,6
line 49:18 58:8 66:4 88:12,21 89:4
lines 56:16 56:17 126:18
list 3:7 4:3 37:1
listed 24:18 50:10
lists 37:8
litigation 78:17
little 17:3 20:14 27:18 43:15 51:12 71:17 77:12 94:16 101:13 109:8 128:3
live 80:13
lived 16:16

**LLC** 1:22 2:12 6:16
**lodging** 100:10 101:2
**long** 9:5 112:1
**look** 23:18 24:1 32:1 32:5 40:12 45:22 47:8 48:9,20 50:13 52:21 67:11 74:14 80:4 80:20 81:4 88:12 111:19 115:19 120:23
**looked** 8:17 78:20 79:1 79:9 88:4
**looking** 20:15 31:1 32:8,18 33:8 49:13 54:14 61:3 63:9 89:4 95:16 115:2 116:13
**looks** 40:16 50:4
**lot** 12:18 36:15,19 53:17 54:2 54:8 55:15 55:20 59:20 60:12 104:22 112:21,22 118:5 128:4
**lots** 103:21 117:15 118:6
**low** 40:2
**lull** 52:6
**lump** 20:10

**M**

**ma'am** 7:7,8
**machine** 1:20
**majority** 112:11 114:1,9
**making** 116:2
**manager** 9:4 10:15
**maps** 11:3
**mark** 13:20 13:23 20:12 29:21
**marked** 14:12 14:17 20:2 22:1 30:2
**market** 60:11
**married** 16:22 17:15,17
**max** 74:18 122:23
**maximum** 38:6 47:15 114:21
**mayor** 42:23 80:7,7,10 86:15 87:6 89:6 90:13 95:7,12,23 121:20
**mean** 13:11 19:9 28:19 38:20 40:23 42:18 51:18,22 56:20 57:10 59:12 74:21 97:14,15 100:5 108:19 113:22 114:9 127:4,19 127:22 128:15
**meant** 58:16
**mechanism** 47:19
**media** 109:18
**meds** 124:4
**meet** 42:16 42:18 43:1
**meeting** 90:10
**meetings** 95:15,20 96:12
**meets** 27:1
**members** 42:18
**memory** 78:11 81:21 120:14
**mention** 62:10
**mentioned** 40:4 57:15 100:6 129:20
**met** 7:15,15
**method** 64:11 84:10,12
**methodolo...** 33:23 75:9 75:10 97:16
**methodology** 61:14 71:10,11 71:20 72:15 75:4 75:17 86:5 124:15
**metric** 50:14
**metrics** 40:8 47:4 49:9
**middle** 127:1 127:4
**million** 70:6
**mind** 80:22
**Mine** 13:23
**MINETTE** 2:7
**minutes** 43:3 119:8
**mischarac...** 45:9
**missed** 78:2
**missing** 64:16
**misstate** 45:9
**mixed-use** 116:20
**Mobile** 16:15 16:18
**modified** 33:13 89:7
**modifying** 89:12
**moment** 31:14 37:11 40:4 112:2 115:11
**money** 101:6
**Montgomery** 17:9
**moratorium** 52:1,3,7 52:14
**morning** 7:12 7:13,16 14:17 20:18
**mouth** 87:4
**moving** 87:4
**multifamily** 29:11 49:11 50:1 50:4,16,17 50:17 59:7 59:16 61:6 61:10,12 62:11 82:1 104:4,22
**multiple** 27:9 29:9 35:20 49:5 50:18,18 56:3 107:18
**multiplying** 74:8
**Murdoch** 16:12

**N**

**N** 2:1 3:1 5:1
**nail** 40:3 44:19
**name** 7:14 8:20,22
**national** 11:3
**nature** 92:5
**Naval** 129:13 129:13
**Navy** 129:12
**necessarily** 37:12 44:5 44:6 65:5
**necessary** 30:21 31:17 42:12 116:13
**necessitated** 92:21
**necessity**

115:15
**need** 15:14 68:2 124:2 126:19
**needed** 16:23
**neither** 131:15
**never** 64:12 84:22 103:8,12 126:21 128:16,18
**new** 13:7 23:15 26:11,15 26:17 43:8 43:12 47:5 47:10,11 50:4,8 51:14,18 52:1,3,7 52:14 53:9 54:15 65:21 69:19 71:6 71:13,21 82:22 83:7 84:10,11 84:11,15 85:7 92:22 94:11,12 97:23 98:14 99:14 100:2 101:21 104:7,12 107:21,23 109:5 123:18 124:8 126:6,8,13 126:14 127:2,7
**nice** 7:16 112:17
**Noise** 123:22
**normal** 72:22
**NORTH** 1:22 2:14 6:16
**Notary** 5:6
**notes** 14:1 15:16
**notice** 3:11 13:19 14:16
**noticed** 101:11
**notices** 5:12
**nuisance** 12:1
**number** 3:9 4:5 15:6 16:4,4,4,4 16:5,5,5,6 22:12 23:9 23:14 28:7 37:8 40:13 46:11 47:17 48:1 48:17 50:14,21 51:3,5 54:15 61:18,21 69:9 110:13,20 111:10 112:3 113:23 125:3
**numbered** 14:21 16:3 23:19
**numbers** 15:10,20 40:2 80:4 121:10,11 126:23
**numerous** 56:13

**O**

**O** 5:1
**object** 31:11 41:5 67:6 69:1 70:19 71:7 75:23 92:7 98:15 101:10 102:23 106:17 108:17 111:4 112:8 114:4 116:15 125:15 127:18
**objections** 5:20
**observes** 90:4 93:3 93:19
**observing** 38:14
**obtained** 106:2 125:19
**obviously** 126:6,8
**occupancy** 28:20 29:9 34:13 39:12 44:14 111:21 116:3,18 116:19 117:7
**occur** 63:15
**occurring** 30:22
**occurs** 36:15 91:3 107:10
**Off-the-r...** 60:8 105:14
**office** 2:6 109:19 115:4,21
**offices** 1:21 6:15
**official** 9:3 9:22 10:7 10:8,15,18 11:15 109:4 129:6,15 129:17,18
**officials** 11:6
**offset** 30:21 31:17 38:12 65:20 66:6
**Oh** 16:19 20:22 57:10 87:14
**okay** 8:1,9 8:19 9:2 10:14 11:5 11:14 13:18 14:1 14:19 15:4 15:7,23 16:1,9 17:2,12 18:5 19:6 19:8,12 20:11 21:10,16 21:21 23:11,22 24:9 25:6 25:13 26:18 27:3 27:17 28:6 28:12 29:1 30:10,13 31:19 32:7 32:8,11,22 32:23 34:4 34:10,23 35:18 36:8 37:6,18 38:9,17 40:20 41:7 42:5,15 43:12,22 44:18 45:1 45:7,20,22 47:3,16 48:22 50:1 50:20 52:20 54:4 55:4,7,23 58:2,14,15 58:19,21 59:23 62:10 63:1 63:2,5 67:10 68:6 69:5,17 70:2 71:1 71:20 73:12 74:1 77:6 78:15 78:22 79:6 79:12,14 81:6 82:12 83:3,10 87:1,3,14 87:19 88:7 88:8 89:9 89:18 90:3 91:2 93:22 94:15 95:15 96:14 97:1 99:8 101:20 102:5,8 105:15

111:23 114:7,7 115:10 119:2,6,16 124:6 125:1 127:15 130:2,6
**old** 47:18 101:21
**once** 44:2 52:11 74:16 94:2
**one-** 29:13 34:21 35:1 35:6 111:15 124:17
**one-percent** 47:15 68:8 68:14 70:22 73:18 112:12,13 114:3,18 123:12 124:13 125:2
**ones** 56:4 103:22
**online** 52:4
**opinion** 104:18 113:23
**opinions** 38:22
**oral** 6:19
**order** 68:13 79:17 81:10 83:7
**ordinance** 12:1,6,14 12:21 18:3 19:19 23:3 23:9,11,13 23:15 24:2 24:6 27:22 28:7 32:1 32:6,13,23 33:10,16 33:17 34:3 34:4 41:23 42:3 46:15 47:12 48:3 49:16 56:17 58:1 60:16 61:4 69:7 70:12 70:13 71:6 71:13,21 71:22 74:2 78:11 82:12,16 82:17,23 83:2,8,12 83:13 84:3 84:6,11,12 84:16 85:7 85:12 86:1 86:9,20 87:10,17 89:20,21 91:4,7 93:23 94:14 99:16 106:6 112:23 113:9,18 113:21 114:2,17 121:13 123:12 125:21 126:2,4,4 126:7,8,13 126:18,20 127:1,5 130:3
**ordinances** 11:21 12:17 18:23 23:12 85:15,16 89:16 92:13 124:12 125:14
**organize** 14:8
**organized** 14:10
**original** 6:2 84:2
**originally** 9:13 129:9
**outside** 75:7 78:16 92:14 99:4 99:8 101:7 104:7
**overall** 81:3
**oversight** 11:12 92:5
**owner** 39:17 48:8

**P**

**P** 2:1,1 5:1
**P.C** 2:4
**page** 3:3,9 4:5 14:20 15:2 21:19 29:16,17 30:9,11 31:1 32:20 32:21 62:23 63:3
**pages** 17:20 21:12
**paid** 13:10 19:20 22:19 24:12 26:8 36:9,10 37:2,3,3 40:18,21 55:11 84:7 104:17,19 105:21 106:2 113:20 114:1,16 118:9
**paper** 49:1
**paragraph** 63:6
**paragraphs** 14:21 16:3
**parcel** 54:20 55:3 110:23
**Parks** 67:17 88:16 95:3 121:3
**part** 23:8 32:13 33:17 52:16 67:15 78:21 79:3 83:1 85:12 86:4 121:9
**particular** 45:15 64:7 66:4,23 82:13 83:5 97:23 98:13,14
**parties** 5:3 131:15
**party** 18:21 92:14 102:20
**Paso** 16:17
**pause** 52:2
**pay** 26:5 27:5 36:4 37:13,16 43:13 53:14 54:1 69:22,23 70:1 71:3 72:1 102:21 103:22
**payers** 51:5
**paying** 101:17 102:13 103:6,15
**payment** 63:14
**PDH** 56:6
**Pensacola** 129:13
**people** 64:16 72:8 108:19 117:12 128:1,13
**percent** 37:21 38:6 38:15 72:2 74:9,19 84:20 112:21 113:1 114:16 118:14 122:23 123:1
**percentage** 67:12,16 67:17 86:1 86:22 88:10,21 88:22 89:3 112:15 113:5 114:12 121:1,3,4
**percentages** 86:8 121:7
**perfect**

120:14
**perform** 92:4
**performed** 27:10 37:15
**permit** 3:19 13:4,8 22:10,12 24:14 25:14 27:3 27:12,18 27:20 35:8 36:4,12,12 36:18,21 37:1,2 38:1 46:7 72:23 74:23 103:15 104:18 106:8,12 107:20 108:4 119:4 127:19
**permits** 12:7 40:14 51:9 51:10 54:1 73:3,7 106:3
**person** 54:19 56:8 92:3 103:20
**personal** 79:13
**personally** 108:11
**personnel** 11:19 26:6 26:10
**pertaining** 18:22 78:20 83:12 85:19
97:20 124:21
**pertains** 88:13
**phone** 127:23
**phrase** 93:22
**pick** 52:10
**picking** 76:19
**piece** 38:22 54:10 103:6
**place** 38:13 39:1 55:18 70:13 107:9 120:17
**plaintiff** 1:8 2:3 3:7 4:3 19:20 22:13,20 54:7 65:18
**plaintiff's** 3:11,16 4:7 14:11 21:23 29:22 30:1 35:23
**plan** 24:22 25:7
**Planning** 11:6 12:10 12:14 13:13
**plans** 25:11 109:18,23
**plat** 53:9,12 117:23
**please** 8:3 29:15 54:23 63:2 76:7 93:1
**plumbing** 27:3,8
**plus** 71:16
**point** 77:15
**Police** 67:18 88:16 95:4 121:5
**policies** 81:2
**political** 37:20
**portion** 114:20
**position** 9:19 129:21
**positions** 41:22
**possibility** 76:11
**possible** 63:14 75:21
**possibly** 10:3 21:14 40:13 52:19 121:4
**POST** 2:6
**potential** 90:16 109:5 110:8
**potentially** 54:3 95:13 121:12
**practice** 74:6 93:19
**predetermine** 46:12
**prepare** 78:9
**prepared** 4:8 18:6,9,14 18:18
**preparing** 72:16
**present**
96:11 109:11 129:19
**presented** 33:21 125:12
**pretty** 40:14 84:1 98:22 113:7
**prevent** 68:13
**previous** 34:2 45:23 46:5 84:3 85:23 94:8 102:7
**previously** 44:10 58:9 68:11
**price** 38:2 39:7 40:5 40:7 41:11
**primarily** 13:2 35:22 84:9 91:20
**primary** 115:23,23 116:5 117:23 122:6
**print** 131:10
**printing** 20:20
**prior** 16:11 34:17 87:9 87:11 94:10
**private** 129:11
**privilege** 72:12
**privileged** 76:8 96:22
**privy** 90:10
**probably**
21:7,15 38:21 79:1 80:3 110:18 122:1
**problem** 20:21
**problems** 121:12
**procedural** 83:15
**procedure** 5:11,14 6:1,9,13 64:20 74:12 91:5 91:9,11,16 92:19 93:10,19 125:6
**procedures** 60:17 79:22 81:3 83:11,14 84:17 92:17 93:3 93:5
**proceeding** 118:20
**proceedings** 6:21 131:7 131:13
**process** 33:5 33:12 35:12,18 36:6,16 48:9,10 52:9 64:17 64:20 66:10,21 90:5,7 91:2 95:10 99:13 107:7,19 112:5

123:14
**processes** 39:1 123:9 127:20
**procured** 99:12
**produce** 19:2 48:15,23
**produced** 17:20 78:16
**product** 31:9
**production** 20:2
**program** 92:6 100:3 101:3
**project** 38:19 43:8 45:15 47:6 49:11 50:23 62:11 66:4 66:5,23 67:2,4 69:20 70:15,18 72:2 97:20 101:17 103:13 109:6 115:3,4 116:14
**projects** 13:13,15 43:12 62:14 68:2 96:7 97:21 101:18 104:13 115:8 116:7,12
**promise** 51:17 61:23
**promoted** 9:21 10:4
**prompted** 81:9
**property** 25:19 38:2 45:23 48:8 54:11 55:22
**proposed** 31:3 32:19 33:7,14,16 52:8 85:10 85:20 89:13 120:3 125:23
**proposing** 95:21
**prorated** 44:11 46:10,23
**protection** 12:14
**prove** 48:12 48:14
**provide** 76:17
**provided** 5:13 6:8 6:12 82:20
**provisions** 5:9,23
**Public** 5:7
**publicly** 19:10
**publishes** 11:4 39:10
**purchase** 38:2 39:7 40:5,7,17 41:10
**purpose** 31:13 56:11
**purposes** 60:14 110:13
**pursuant** 91:3
**pushing** 105:11
**put** 21:11,21 36:19 67:4 88:6 112:14 113:4 114:12

**Q**

**qualified** 15:2
**qualifies** 108:20
**quality** 73:9
**question** 8:8 8:11 25:13 26:1,18 27:4,11 28:14 32:17 35:9 51:18 53:3 54:16 55:1 56:12 57:20,21 66:23 67:8 68:10 72:17 74:18 76:7 77:9 79:13 81:2,6 82:12 85:22 86:10 87:7 90:2 91:22 92:23 99:17,18 100:4,15 100:22 111:6 112:2
121:6,21 124:21
**questions** 5:21 7:18 18:5 30:6 30:15 35:19 62:14,16 79:22 97:22 108:6 129:2 131:8
**quick** 30:23
**quiz** 22:23 61:23 79:15

**R**

**R** 2:1 131:1
**R-1** 56:5 57:5 60:3
**R-2** 34:14 49:22 56:6 56:23 57:5 59:8,11
**R-3** 28:18,19 28:20 29:1 29:12 34:14,16 34:17 37:9 38:12 45:4 46:3,4 49:18,21 50:22 56:6 56:6,23 57:3,5 58:9,14,17 58:20 59:2 61:5 88:15
**R-4** 34:14 49:22 56:23 59:8 59:11
**raised** 87:7
**rate** 30:23
81:12
**re-ask** 91:23
**re-plow** 92:1
**reacquaint** 78:13
**read** 6:8 15:6,10 78:14 79:10
**Reading** 63:12
**ready** 52:12
**real** 101:7
**realistic** 39:17
**really** 24:20 61:19 64:14 75:10 86:17 99:4 99:5 100:13 103:12 112:20 113:4 114:12
**reason** 80:16 98:9 102:14,19
**reasonable** 60:11
**reasons** 86:16
**Rec** 67:17 88:16 95:3 121:3
**recall** 18:10 18:14 23:2 60:21,23 75:2,10 76:13 77:7 80:16 82:14 84:23 85:17

86:10,13 89:11 97:2 97:11,19 100:5,8 101:14 120:2 122:1,2 127:14 128:17
**receipt** 3:16 22:8 24:11
**receive** 95:17
**received** 33:6 87:12 87:15
**receives** 119:4
**receiving** 86:10
**recessed** 77:19 119:12
**recommend...** 76:16
**recommended** 82:23 121:18
**record** 60:7 88:3 105:12
**red** 12:16
**redevelop...** 44:5,13 94:8 107:22 108:8 110:22 111:13 115:8,20 123:19 124:22 125:8
**reduce** 68:7 68:12
**reduced** 131:9
**reengage** 80:3
**reevaluated** 61:2
**reevaluation** 128:17
**reference** 52:18 117:3
**referenced** 23:5
**referred** 88:9
**referring** 59:2
**reflect** 88:4
**reflected** 86:19
**reflects** 88:22
**refraining** 105:9
**refresh** 78:11
**refund** 106:14
**refunded** 105:20 106:5,7
**refunds** 105:19 106:22
**regard** 81:20 124:8
**regarding** 5:18 90:10
**regardless** 70:2,4 109:22 118:19
**registered** 127:23
**regulations** 10:23 11:7 12:5,12
**regulatory** 11:12
**reimburse...** 63:22
**related** 11:21 13:12,15
**relation** 123:17,17
**relay** 121:22
**release** 36:21
**releases** 36:23
**relied** 62:6
**relive** 82:10
**rely** 66:13 75:12
**remainder** 10:12
**remember** 33:20 79:14,16 82:2 122:3 125:9
**remind** 124:4
**renovations** 83:21
**repeat** 54:23
**rephrase** 8:7
**replaced** 23:12 126:4,7
**replacing** 44:8
**report** 87:12
**reported** 1:20
**Reporter** 5:6 6:11 7:5
**represent...** 82:4 121:19
**representing** 129:12
**represents** 131:11
**request** 64:22,23 96:2 121:22 128:16
**requested** 64:10 95:9 106:4,11 121:16
**require** 10:19 94:1 109:3
**required** 25:11 26:6 43:13 98:7 99:2 102:21 108:3,15 111:3 112:6 122:12
**requirement** 115:13
**requirements** 5:17 27:2 47:13 94:14 106:10
**requires** 89:22 108:7
**reread** 78:12
**RES** 25:1,1
**RES-24000297** 3:19 22:10
**reserved** 5:21
**residence** 28:21 35:17 54:10
**residences** 50:19 55:20 56:21 57:1
**residential** 25:4 28:22 29:10 34:13 46:2 56:1,13,18 59:16 60:4 113:9 116:14 124:17 125:8
**residents** 59:18,19
**respective** 5:3
**responses** 79:1
**responsib...** 11:15,23 98:23 101:8
**responsib...** 13:10 69:6 98:21,22
**responsible** 11:16,20 13:2,16 42:11 43:18
**restate** 68:10 76:7
**Restore** 101:5
**result** 44:14 82:18 131:17
**resumed** 77:20 119:13
**retained** 92:3
**revenue**

40:11
63:13
**revenues**
62:15
63:16
95:18
96:15
**review** 24:22
25:8,10
74:23
80:23 83:5
83:6 87:12
89:19 90:7
91:6,17
92:4 95:7
95:8 108:1
108:5,14
112:5
**reviewed**
33:13 43:5
78:10,15
89:22
**reviewing**
42:7
116:12
**reviews**
94:17,19
94:22,23
95:5 108:9
**revise** 82:15
126:19,23
**revised**
125:11
**Ridge** 1:4
7:18 22:12
**right** 6:7
16:21
17:19 18:7
21:20
28:13 34:5
34:18 59:4
71:18,19
77:2 80:12
96:16
102:1,3
113:14,16
126:10
**Road** 67:18
**roads** 52:12
**room** 48:11
109:17,18
109:19
110:3,5,7
110:8
**rooms** 109:21
**Rouge** 16:17
**roughly** 18:8
106:15
**roundabout**
53:1
**row** 34:15
58:3,22
59:6 88:12
**rule** 47:20
**rules** 5:10
5:14,23
6:9,12 8:1
**run** 15:19
78:2
**run-of-th...**
66:19
**rusty** 80:13

**S**

**S** 2:1,13 4:1
5:1
**s/** 131:20
**sacrosanct**
89:7
**safety**
109:23
**SALE** 1:22
2:12 6:16
**satisfaction**
57:22
**save** 5:20
**saw** 8:16
59:23
**saying** 127:3
128:1
**says** 24:2
26:19
39:19 44:2
58:8 63:10
63:12
**schedule**
30:8 31:3
32:12 37:7
38:5 47:14
49:16
50:10,12
67:12
69:15
70:22 73:8
74:2,20
83:1 84:20
85:10,12
113:2,3
117:6
118:15
120:4
122:13,15
122:22
123:11
124:10
125:2,22
126:7,9,14
126:19
127:11
**schedules**
85:19
89:13
124:14
125:12
126:12
**school** 16:20
17:5,8
**scope** 13:9
19:14 99:7
100:7,13
101:7
**second** 14:20
55:6,11
63:20 73:4
79:17 89:4
105:13
112:1
**SECTION** 1:22
2:14 6:16
**sections**
5:10,13
**security**
26:21
**Security/...**
26:19
**sediment**
12:16
36:20
**see** 7:16
8:18 14:21
20:1 28:14
29:19 31:4
34:12,16
35:2 40:12
40:14,16
45:23
51:12 52:3
52:6 59:2
59:7 61:4
62:22 77:4
80:5
103:20
112:21,22
113:5,5
**seen** 13:18
14:16 65:5
**self-expl...**
25:7
**self-perf...**
117:10
**sells** 103:21
**send** 19:13
**senior** 16:11
**sense** 38:9
**sent** 20:18
**separate**
36:17
91:16
123:14
**separately**
123:21
**September**
1:17 6:17
131:19
**serve** 41:22
42:22
**served** 13:19
**serves** 81:21
**service** 44:3
93:22 94:3
94:11
130:1
**services**
92:5
101:19
102:3
**session**
33:19 82:5
**set** 5:19
25:11
68:14
**sewer** 25:23
26:3,7,12
**sheet** 23:4
**shortly**
129:15
**show** 19:22
40:18 41:2
74:20
81:19
**showed** 48:15
**showing** 49:1
**shown** 124:14
**Shreveport**
16:17
**sign** 6:8
**Signed**
131:18
**significant**
98:7
**signing** 5:15
**similar** 84:2
**similarly**
1:6
**single** 35:14
45:5 57:3

single-fa... 28:21 34:16,18 36:1 37:9 49:12,18 55:14 57:6 57:6 58:9 59:3 60:4 61:5,9 67:16 69:19 70:7 71:15 88:15 104:8 124:17 125:8
sir 34:5 46:3 57:2 66:9 69:16 76:8,19 97:14 107:16 111:16,22 115:2 119:9 122:18,20 123:2 124:19
site 26:3
site-spec... 63:21
sitting 120:20
situated 1:7
situation 53:22 103:4
situations 63:15 102:9,12
size 85:3 116:4
sleeping 109:17 110:8
slowly 8:2
smoke 110:10
sole 110:21
somebody 40:23
song 41:1
sorry 10:5 21:12 51:22 58:14 68:18 70:3 79:7,10 88:6 93:15 122:19 123:23
sort 5:17
sought 66:6
sound 71:18 110:15 111:1
sounds 71:19
south 70:9
SOUTHERN 1:2 1:3
speak 8:2 56:9
specific 33:11 55:22 65:6 67:1 91:9 91:11 97:15,20 100:6 104:21 106:10 111:2 116:7 128:4
specifically 32:4,15 33:20 66:7 81:1 128:7 128:10
specifics 61:20 120:9
specifies 18:12 27:22
speculate 100:17,20
spells 60:16
spent 84:5 98:18 99:6 99:6
split 59:21
square 39:14 44:22 48:16 111:19 115:13
stage 39:4
stages 27:9 27:16
standpoint 67:21 110:1,2,9
stands 80:21 81:1
staple 14:4
start 8:20 9:14 14:20 24:22 30:6 30:7,16 36:8 52:12 54:18 118:7 120:16
started 9:13 9:16 79:21 129:9
State 1:20 5:7 111:7 125:18 131:3
stated 86:18 129:5
states 1:1 46:22
Station 129:13,14
statistical 61:16 121:9
statistician 82:6
stay 86:8
stenography 1:21
stenotype 131:8
steps 66:2
Steven 1:16 3:4 5:4 6:18 7:2 8:22 77:18 77:20 119:11,13 130:12
sticker 88:5
stickers 21:12
stipulated 5:2,12 6:6
stipulation 6:14
stipulations 7:6
stopping 77:15
STREET 1:22 2:14 6:16
strike 32:16 54:17
structure 29:6 46:1 46:5,9,12 47:2,9,18 50:19 53:17 73:15 94:9 108:1 110:14
structures 94:10 114:11
stuck 48:12
studies 17:22 18:2 18:17 85:21 99:9 99:21
study 4:8 18:6,9,12 18:13 19:3 19:19 29:17,23 30:12,16 30:18,19 31:2,9,13 32:15,20 33:3,7,15 42:12 62:3 62:6,21 63:9 66:12 66:14 67:15 75:11,18 76:18 78:12,14 79:17 80:5 81:7,10,15 81:16,18 81:19 82:19 83:7 85:11 87:16 93:15 120:22 125:20 127:2,8 128:12
stuff 20:20
subcatego... 57:1
subdivision 37:20 51:14 52:1 53:9,11 103:21

117:9,14 117:19 118:7
**subdivisions** 52:15 117:13
**subject** 47:12 72:12 105:2 112:12,13 114:2,17 115:21
**submit** 38:1
**submits** 25:12 37:23 39:5
**submittals** 52:1
**substantial** 52:16 114:15,20
**suggested** 30:8 31:21
**suggesting** 42:11
**SUITE** 2:15
**Sullivan** 80:7
**supervision** 131:10
**support** 18:2
**supportable** 114:22
**supporting** 85:21
**supposed** 22:23
**sure** 8:22 14:5,9 15:1 17:4 19:17 23:17 26:4 27:1 39:16 39:22 44:18 49:5 53:2,5 60:5 62:2 73:11 75:14 76:21 78:3 82:9,11 88:9,14 94:5 108:23 109:2,7 111:9 119:8,18 119:22 128:4 129:4
**surprised** 51:12
**survey** 63:4
**Susan** 1:18 5:5,16 6:10 131:20,21
**sworn** 7:3
**system** 64:1

**T**

**T** 4:1 5:1,1 131:1,1
**tabbed** 23:17
**table** 32:18 33:2 39:19 58:6,23
**tables** 39:11
**take** 15:5 17:18 39:20 66:3 77:16 80:20 120:17 123:20 124:6
**taken** 1:17 5:5,8 33:2 103:5 107:2 131:7
**talk** 37:6 43:15 57:20 62:19 73:7 109:8 113:18 115:7
**talked** 43:7 51:2 60:12 72:18 75:19 92:14 101:12 105:16,17
**talking** 19:18 46:1 46:3 49:17 58:20 69:15 70:13 85:15 87:14 97:13
**tap** 25:23 26:4,7,12
**tax** 97:4 100:10 101:2
**tearing** 55:6
**tech** 16:12
**technical...** 5:17
**techs** 108:4
**Teddy** 40:1
**tedious** 30:15
**telecom** 26:22
**tell** 22:6 25:7 43:22 45:12 56:5 56:8 64:5 82:6 120:14
**telling** 8:20
**tempted** 40:1
**ten** 59:18,19
**term** 44:3 85:3,3
**terminology** 34:22
**terms** 68:1 83:14 84:19 94:23 98:20 103:19 107:14 127:22
**terrible** 54:17
**testified** 7:4 24:10 31:14 57:2 58:10 66:13 68:6 68:11 73:21 85:9 89:18 90:7 92:17 93:2 93:5,9,14 101:20 107:6 111:23 115:12,14 120:1,6 125:5
**testify** 15:3
**testifying** 16:2
**testimony** 1:15 34:17 37:11 45:10 47:22 83:3 84:15 89:10 101:13 131:12
**text** 34:16 72:23 85:6
**Thank** 20:20 29:14 77:9 79:12 89:18 119:19 128:22 130:8
**Thanks** 34:23
**theoretic...** 55:19
**thereof** 14:13 22:2 30:3
**thereto** 131:9
**they'd** 80:5
**thing** 11:8 23:5 51:2 84:23 119:23
**things** 11:9 12:9 43:7 51:7 66:16 78:1 79:22 84:14,18 90:12 93:8 93:17 96:10 98:18,18 115:17 116:8
**think** 10:17 15:18 21:6 37:19 47:22 48:3 51:7 57:12 57:18 60:3 66:17 71:15 78:19,19 87:20,22 89:10 91:10 97:8

100:14 103:10 104:12 112:10 113:9 116:6,7 117:11,17 119:7 120:1,6 121:15 129:2
**thinking** 109:1
**third** 18:21
**thoroughly** 119:23
**thought** 57:15 58:16
**three** 18:17 46:15,21 84:14,18 89:16,23 91:3 99:12 115:9
**three-bed...** 46:17,19 48:5 49:4
**three-two** 47:21 48:4
**time** 5:21 9:15 10:12 15:15 19:20 22:22 26:8 27:6 33:6 33:14,15 36:13 40:22 41:16 52:5 53:13,18 53:20 64:11 65:12 79:20 80:1 80:3,6,10 80:20 81:14 84:5 84:6 86:22 98:11 111:7 113:6,19 117:12 119:3,20 121:15 124:7 125:19 126:13 127:21 128:2,15 130:1,3
**timeframe** 81:11 129:17
**timeline** 80:13 129:3
**times** 108:13 129:8,23
**timing** 36:8
**TischlerBise** 4:7 17:22 18:2,18,21 31:21 32:15,19 33:3,15,22 38:10 42:13 61:15 62:21 63:3 65:2 66:18 67:15 73:23 74:4 75:11,17 79:17 80:3 81:7 82:3 82:20 85:20 86:3 86:21 87:13,16 89:6 92:2 92:15 99:8 99:20 120:4,22 121:8,18 121:19,22 122:7,8,9 125:11,20 125:23 126:16,22 128:11
**TischlerB...** 85:10 89:13
**title** 9:2,3 10:9,11
**titled** 31:3 63:6
**titles** 9:8,9
**today** 7:18 14:23 78:9 79:14
**today's** 72:16
**told** 9:9 86:21 89:6 91:17
**top** 22:15 23:1 28:7 28:9 34:11 34:12 49:17 58:3 58:8,22
**topics** 101:10
**total** 9:7 18:16,17 51:9 61:4 61:6 73:19 130:1
**townhomes** 59:17
**track** 117:9 117:22 118:3
**track-style** 112:18
**Tracking** 96:14
**tract** 51:19 98:6
**trades** 16:23 17:13
**transcript** 6:3 131:12
**transient** 29:11 59:18,19
**Transport...** 88:17 95:4
**treasurer** 42:23 62:18 90:13 95:8 95:12
**treated** 109:23
**trial** 5:22
**tried** 20:4 78:10
**trigger** 115:13
**triggered** 98:13
**trip** 26:3
**true** 89:15 131:11
**truthfully** 84:22
**try** 8:2,10 41:2 46:12 73:10 80:3 82:8 109:14
**trying** 35:10 54:16 61:23
**two** 38:4,8 39:16,20 55:15,20 56:16,17 59:22 62:7 63:10 74:16,17 85:14,16 85:20 115:17,22 115:23 116:1,10 119:7 123:20 129:7
**two-bath** 46:17,19 48:5 49:4
**two-family** 29:13 34:21 35:2 35:7,14 45:5 57:3 57:7 59:3 111:15 124:18
**type** 11:8 29:5,8 63:20 64:20 68:19 117:13
**types** 13:6 39:11 59:15 63:10 109:21 116:12
**typically** 36:17 39:8 40:11 41:9 52:2 56:4

U

**U** 5:1
**Uh-huh** 8:6 12:22 17:23 24:13,19

24:23 25:15 26:13 33:9 36:2 40:6 44:21 45:11 48:2 49:7,14,19 49:23 51:6 51:16 53:7 54:12 55:8 56:15 58:5 59:1,9 60:18 63:8 63:11 66:15 70:8 72:10 73:16 74:3 78:7 81:8 84:8 88:11 88:20 90:1 94:4,18,20 98:5 99:10 99:22 102:10 104:5,9 115:5 118:2 120:5,12 124:9,23 125:4 126:5 127:6 128:6,23
**uh-huhs** 8:11
**ultimately** 82:16
**underneath** 112:22
**understand** 10:17 45:5 66:12 67:7 111:6,18
**understan...** 22:11 34:7
**Understood** 8:14
**undertake** 33:6 49:8 68:19 82:15 83:6 112:5
**undertakes** 66:22 90:6 91:4 92:18 93:6 107:7
**undertaking** 108:14
**unit** 34:13 44:4 50:18 61:12 62:12 93:23 94:3 94:11
**UNITED** 1:1
**units** 45:6
**unrealistic** 40:13
**updated** 83:1
**use** 14:2 29:8,12 40:1,5 44:3,16 50:8,16 64:11 75:4 85:2,3 95:3,14 102:6,7 109:12 115:14 116:2 117:21 123:10
**uses** 92:20 93:11
**Usual** 7:5

**V**

**vacant** 54:8
**validity** 73:14
**valuable** 70:17
**valuation** 39:11 40:1
**valuations** 60:14 74:7
**value** 28:1,2 38:18,18 39:5,7 40:3,9,21 41:3 46:22 60:11 70:4 71:8 73:13 74:7,8
**valued** 69:20
**values** 39:2 39:22 81:14 124:13
**various** 13:6 27:8,15 39:11 56:1 95:16,21
**verification** 75:1
**verify** 73:4
**versus** 7:19 57:13 61:9 74:19 84:20 112:18
**vertical** 36:22
**vs** 1:10

**W**

**waive** 6:7
**waived** 5:15
**walk** 35:18 36:6 46:8
**want** 14:4 15:1,8,9 15:11,19 21:1 24:16 24:16,20 34:7 43:15 45:9,19 64:10 65:23 72:4 72:7,18 74:10 76:23 78:4 85:2 88:8 96:21 100:20 105:8 109:8 119:22
**wanted** 14:7 76:22 82:22 129:2
**wanting** 77:3 81:4 86:2 95:13 121:6
**wants** 55:6
**wasn't** 14:5 104:17
**waste** 15:15
**watch** 12:18
**way** 15:21 31:8 49:20 65:3,3 67:19 75:22 76:11 101:3 110:18 113:4 127:3,16 128:8,10
**ways** 38:21 112:20 113:6 116:23
**we'll** 8:20 14:2 21:11 26:23
**we're** 15:1 19:18 33:7 35:22 45:22 46:1 46:3,4 47:8 58:3 69:11 73:5 73:5 76:14 88:9 89:4 98:22 118:7 119:16
**we've** 7:15 49:17 65:17 77:11 84:4 101:12 105:15,17 118:6 128:20
**wearing** 10:20
**website** 19:7 19:10
**went** 17:12 61:17 82:7 117:18 129:11
**wetland** 12:13
**whatsoever** 102:19
**WILLIAMS** 2:13 7:8 8:10,16 14:4,7 15:9,13,17 15:22 16:7 19:4,7,9 19:13 20:4 20:6,11,15 20:21 21:1 21:5,10,13 21:16 23:4 23:7,19 31:11 41:5 57:11,17 67:6,9

69:1,14,17 70:19 71:7 71:10 75:23 77:11,14 78:23 79:4 87:22 88:2 92:7 98:15 100:17 101:9 102:23 105:8,12 106:17 108:17 111:4 112:8 114:4 116:15 122:15 125:15 127:18 129:1
**Wilson** 86:15 87:6 89:6 121:20
**Wilson's** 80:10 120:7
**windows** 110:11
**Wire** 26:19
**wiring** 26:21
**witness** 3:3 6:7,19 8:14 23:6 41:7 57:15 67:10 79:2 88:5 114:7 119:9 122:18,20 123:23 124:3 128:23 131:13
**wonder** 51:14
**word** 26:11 109:13 116:1
**wording** 84:1
**words** 64:5 118:17
**work** 11:5,9 16:10 33:19 82:5 129:11
**worked** 122:7 129:7 130:3
**world** 128:1
**would've** 80:8 87:10 106:16,19 120:19
**wouldn't** 72:11 102:2 109:12 112:14
**wow** 16:19
**writing** 49:2 106:11
**wrong** 89:11

**X**

**X** 3:1 4:1

**Y**

**y'all** 8:15
**yeah** 10:16 14:6 15:9 16:8 18:13 20:19 21:3 23:6,9,20 32:20 35:10 42:9 45:19 51:23 53:19 55:2 57:19 60:2 62:4 69:14 71:13 76:3 77:13 80:12 88:7 91:14 98:17 99:18,19 100:18 101:9 103:2,3 109:12 125:18 127:3,9 128:1 130:7,9
**year** 10:1 52:16,19 66:20 87:7 90:17,21 91:1 95:6 96:20 97:3 97:10 98:11
**years** 9:7 41:1 51:4 60:22 89:23 91:3 129:21
**Yep** 15:17
**young** 17:17

**Z**

**zones** 11:2
**zoning** 11:6 12:10,15 13:13 29:2 55:13,14 55:17,22 56:1,7,13 57:6,14,16 57:21 58:16 60:1

**0**

**0019-0086** 4:12
**0167** 3:21
**05-CV-202...** 1:13
**07** 18:7

**1**

**1** 3:11 13:21 14:11,17 15:6 16:4 20:16 21:5 78:17 79:4
**1,000** 28:1
**1:25-cv-0...** 1:8
**10** 70:6
**10:07** 77:19
**10:27** 77:21
**11** 6:17
**11:10** 119:12
**11:19** 119:14
**11:28** 1:18 130:13
**11th** 1:17
**12** 129:23
**1331** 85:15 126:4 130:4
**14** 3:14 16:5
**15** 16:5
**154** 51:10,13
**16** 9:7 129:21
**1625** 23:10 23:11 32:1 33:1,11 49:16 56:17 58:1 61:4 69:7 70:14 71:22 74:4 83:13 85:12 87:17,20 113:19 114:17 126:4,8,18
**167** 21:20 22:5,16 24:10
**17** 16:5
**18** 16:6
**180** 106:11
**1817** 23:13 24:6 82:13 82:17 83:13 85:15 126:7
**19** 29:16 62:22
**1991** 16:13
**19th** 24:2

**2**

**2** 3:16 4:10 20:13 21:22,23 22:4,15 24:9 29:18 29:23 31:2 31:7,10,20
**2,060** 51:9
**20** 41:1
**2000** 16:13 129:10,16
**2000s** 9:23
**2002** 10:3
**2003** 10:3
**2005** 129:10 129:16
**2006** 18:7
**2007** 42:3 130:4
**2012** 129:6 129:14,19
**2018** 4:10 18:10 29:18,23 62:20 79:18 85:11 87:11,15
**2024** 18:14 19:3 22:16

23:3 24:3 51:8,13,20 51:23 52:16 81:6 81:16,19 82:16
**2025** 1:17 6:17 106:20 131:19
**21** 3:21
**211** 32:2
**218** 20:17 21:6 32:5 32:9 34:6 34:12 78:18 79:5 87:22,23 89:5
**2180** 69:12
**24** 83:7
**25** 30:11 31:2 32:20
**251-401-4630** 2:8
**251-694-6233** 2:17
**26th** 131:18
**284** 1:19
**287** 131:22
**29** 63:2

**3**

**3** 4:7 16:4 22:16 23:3 29:22 30:1 30:11 31:1
**3,713** 61:6 62:11
**30** 4:12
**30(b)(6)** 3:12
**36507** 2:7
**36532** 2:16

**4**

**4** 16:4
**458** 2:6

**5**

**5** 16:4 28:1
**5,427** 28:16
**5,830** 35:3 35:11,17 36:4 37:10 38:6,11 61:5 70:16 70:21 73:23 74:4
**5/3/24** 3:20
**50** 118:6
**583,000** 69:21
**5830** 70:1 71:3

**6**

**7**

**7** 3:5 16:4 63:3
**71** 1:22 2:14 6:16

**8**

**8** 16:5
**8:54** 1:18 6:18
**88** 23:20

**9**

**9,000** 71:16 113:10
**9/30/26** 131:23
**900,000-plus** 113:12
**94** 24:1