IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

RIDGE BENEFIELD, on *
behalf of himself and *
all others similarly *
situated, *Case No:
Plaintiff, *1:25-cv-0009-JB-N
vs. *Formerly Baldwin
*County Circuit Court
THE CITY OF FAIRHOPE, *Case No.
ALABAMA, *05-CV-2024-901732.00
Defendant. *

DEPOSITION TESTIMONY OF
KIM CREECH,

was taken on the 11th day of September, 2025, from 11:45 a.m. to 1:47 p.m. before Susan Andrews, CCR, (ACCR 284), in and for the State of Alabama, reported by machine stenography at the offices of HAND, ARENDALL, HARRISON & SALE, LLC, 71 NORTH SECTION STREET FAIRHOPE, ALABAMA.



A P P E A R A N C E S

FOR THE PLAINTIFF:
BLACKBURN & CONNER P.C.
BY: GRANT BLACKBURN
POST OFFICE BOX 458
BAY MINETTE, ALABAMA 36507
251-401-4630
gblackburn@blackburnpc.com

FOR THE DEFENDANT:
HAND, ARENDALL, HARRISON & SALE, LLC
BY: CHRISTOPHER S. WILLIAMS
71 NORTH SECTION STREET
SUITE B
FAIRHOPE, ALABAMA 36532
251-694-6233
cwilliams@handfirm.com



I N D E X

| WITNESS | PAGE |
|---|---|
| KIM CREECH | |
| Examination By Mr. Blackburn.......... | 6 |

PLAINTIFF EXHIBIT LIST

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Plaintiff's 4 - | City of Fairhope Ordinance No. 1817 (Ordinance Repealing & Replacing Ordinance No. 1625), Bates labeled FAIRHOPE 0088-0095....... | 48 |
| Plaintiff's 5- | PNC Bank Statement / Period: 9/1/23-9/30/23: City of Fairhope impact fees Fund, Bates labeled FAIRHOPE 0105-0106 ........................ | 92 |



S T I P U L A T I O N

It is stipulated by and amongst the parties hereto and their respective attorneys at law that the deposition of KIM CREECH, shall be taken before Susan Andrews, Certified Court Reporter, Notary Public for the State at Large, and that the said deposition shall be taken in accordance with the provisions of the applicable sections of the Alabama Rules of Civil Procedure.

It is further stipulated that all notices provided for by said applicable sections of the Alabama Rules of Civil Procedure are waived, as is the signing and certification of said Susan Andrews and all other requirements and technicalities of every sort regarding the taking and filing of the deposition, except as hereinafter set out:

All objections, save as to the form of questions asked, are reserved until the time of trial in accordance with the applicable provisions of the said Alabama Rules of Civil Procedure.

Page 5

Further, that the original transcript will be delivered to GRANT BLACKBURN, ESQ., as custodian, for filing should the Court so direct.

It is further stipulated and agreed that the witness hereto does waive her right to read and sign said deposition as provided for by said Alabama Rules of Civil Procedure.

I, Susan Andrews, Commissioner and Certified Court Reporter, certify that on this date, as provided by the Alabama Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me at the offices of HAND, ARENDALL, HARRISON & SALE, LLC, 71 NORTH SECTION STREET , FAIRHOPE, ALABAMA, on September 11, 2025, commencing at 11:45 a.m., KIM CREECH, witness in the above cause, for oral examination, whereupon the following proceedings were had:

Page 6

(Whereupon,
KIM CREECH,
having been first duly sworn, was examined and testified as follows:)

THE COURT REPORTER: Usual stipulations?
MR. BLACKBURN: Yes, ma'am.
MR. WILLIAMS: Yes, ma'am.

EXAMINATION

BY MR. BLACKBURN:
Q. Good morning, Ms. Creech.
A. Hey.
Q. My name is Grant Blackburn. I am representing the plaintiff, Ridge Benefield, in this case that we're here about today.
Have you given a deposition before?
A. No, I do not think so.
Q. Really? First one?
A. Uh-huh.
Q. Okay. I'll go over some ground rules. The most important thing is just clear communication. So if you would please,

Page 7

even though you might know what I'm gonna say, let me finish my question before you answer it. And I will not intentionally interrupt you while you're answering a question.
If I say anything that's not clear or if you don't understand my question, just tell me and I will ask it again and try to do a better job.
Even though I can see you, everything here is, you know, not videotaped, so it's a verbal transcript. So instead of saying "uh-huh" or "huh-uh," please give me a verbal "yes" or "no" instead of the head shake or "uh-huh." And I think that's it.
Let me start by asking you about your employment with the City of Fairhope.
How long have you worked for Fairhope?
A. For six years.
Q. Six years?
A. (Witness nods head.)
Q. Well, I guess, let's start at the

Page 8

beginning.
Did you graduate from high school?
A. I -- yes.
Q. You did.
Where did you graduate from?
A. Fairhope High School.
Q. All right. Did you go to college?
A. Yes.
Q. Where?
A. Auburn at Montgomery.
Q. Did you go to graduate school after that?
A. No, I did not.
Q. Where did you work after college?
A. I worked for a company called Reliance Healthcare and then, Delta Healthcare. And then I worked for the Baldwin County Commission.
Q. Okay.
A. And now, for the City of Fairhope.
Q. Let's take them just quickly one at a time.
What did you do for the two

Page 9

healthcare companies?
A. I was just a corporate accountant.
Q. Is that what background is in, accounting?
A. Yes.
Q. Okay. How long did you work for the healthcare companies?
A. Right at 12, 13 years.
Q. And from --
A. Uh-huh.
Q. -- there you said you went to the County, Baldwin County Commission?
A. Baldwin County Commission.
Q. In what capacity were you employed by the Baldwin County Commission?
A. I was, first, the chief accountant and then the treasurer.
Q. Okay. What years were those?
A. From 2006 to 2010, was the chief accountant. And then from '10 until '19, was the treasurer.
Q. Okay. So then, you were there when -- I guess when my partner, David

Page 10

Conner, was county attorney, you were --
A. Yes.
Q. -- with the County during that whole period of time?
A. Yes.
Q. That's why I recognized your name. I was thinking I've met her before somewhere.
A. Yeah.
Q. At least I was familiar with you. So with the County, you were first -- I'm sorry. Say that again. I'm --
A. Chief accountant.
Q. Okay. How many years?
A. For almost four, right at four years as chief accountant. And then from 2010 until 2019, was the treasurer.
Q. Okay. Tell me just briefly, what are the job descriptions and the differences between chief accountant and treasurer for the County?
A. Difference was, as chief accountant, I was over all the expenditures, so I was over accounts payable department, and then

Page 11

would review expenditures that's approved through the Commission, any of the capital that's coming through, do reconciliations on projects.
And then as -- as treasurer, you're just kind of a -- a step above all of it over -- you know, overseeing everything with money for the -- the County, so it's at a higher level of financing, banking.
Q. I guess it would be safe to say you had more responsibility and more oversight when you were promoted to treasurer?
A. Yes.
Q. I guess that's --
A. Yes. Because as the chief accountant I was just, like, over a division.
Q. Okay.
A. Uh-huh.
Q. And I suppose when you finished with the County, you went from the County to work with Fairhope?
A. Yes.
Q. What year was that again?

Page 12

A. 2019.
Q. Okay. What did you do for Fairhope when you accepted employment in 2019?
A. Like --
Q. Yeah. Like, what position did you hold with the City at that time?
A. As treasurer.
Q. You started as treasurer?
A. Uh-huh.
Q. Is that the position you still hold today?
A. Yes.
Q. Okay. Tell me, just in your own words, what your job as the City of Fairhope treasurer requires of you on a day-to-day basis.
What do you do?
A. On a day-to-day?
Q. Yeah.
A. Answer a lot of questions. I manage -- manage the money. I -- I'm -- I'm over about 40 employees here. So it's from purchasing questions to -- it could be

Page 13

questions in the warehouse, something is going on in the warehouse, from payroll that somebody's check is -- may have, maybe, asked to look and make sure there's a calculation.
I would say the difference between the County and the -- and the City, I'm -- there's -- there's a lot of hands-on more here. You have less people -- less people, less staff that do about the same work.
Q. Oh, wow.
A. Uh-huh.
Q. So you're over 40 people. Effectively, does that make you the head of the finance department, basically, or is that --
A. Yes.
MR. BLACKBURN: Okay. Off the record for a second.
(Off-the-record discussion.)
Q. (BY MR. BLACKBURN) What, if anything, Ms. Creech, did you do to prepare for your deposition today?
And for purposes of this question,

Page 14

don't tell me about any conversations you may have had with Mr. Williams or any of your attorneys.
I just want to know if you reviewed anything. You know, if there was any type of -- I don't know -- document review or anything like that, that you did in anticipation of giving testimony today.
A. I reviewed the law, just went back and -- and reviewed the law and went back and reviewed the ordinance that this would cover because we have it now in the ordinance.
Q. Yes, ma'am. And you say "reviewed the law."
Would that be the City's ordinances?
A. The -- yeah, the City ordinance and the Code of Alabama.
Q. Okay. And that --
A. That act.
Q. So that would be the enabling legislation that authorizes the City to impose impact fees?
A. Yes.

Page 15

Q. Okay. Did you have any conversations with anyone, again, other than your attorney, about your testimony today?
A. No, just -- just, hey, I'm -- I'm reviewing over this. Close my door for a minute.
Q. And there's nothing wrong with it, if you did it.
A. No.
Q. I'm just asking so that I know.
A. Uh-huh.
Q. Did you also look at your notice of deposition that is --
MR. BLACKBURN: Let's see. Where is your copy, Chris?
A. Yes. Yes, I looked through the deposition -- the notice.
Q. Okay. I just want to make sure that we are in agreement about the areas that you're here to testify --
A. Okay.
Q. -- about today.
So if you look, beginning on the

Page 16

second page of the Notice of Deposition, you're correct there.
A. Yeah.
Q. You'll see some numbered paragraphs.
A. Uh-huh.
MR. BLACKBURN: Do you just want to do it the same way, Chris --
MR. WILLIAMS: Yes.
MR. BLACKBURN: -- as we did last time?
MR. WILLIAMS: Sure.
Q. (BY MR. BLACKBURN) We're just going to read off the paragraph numbers, that it's my understanding, that you're here to testify on. And then you can confirm that that's accurate, and if it's not accurate, let me know.
But the areas of inquiry that you're here to talk about are Number 2, Number 6, Number 9, Number 10, 11, 12, 13, and 16?
MR. WILLIAMS: That's what I have.
A. Yes.
Q. Okay. Very good. Are you familiar

Page 17

with -- well, I guess I'll just ask you this, have you read the complaint in this case?
A. Yes.
Q. Benefield versus the City of Fairhope. Do you have a general understanding about what the case is about?
A. Yes.
Q. Okay. So, generally, we're talking about the City's Impact Fee program today, and the questions that I'm going to have for you all pertain to the financing side of the City's Impact Fee program.
It's my understanding that as the head of the finance department as the City Treasurer, you're responsible for all of the accounting for impact fee revenues and tracking those revenues, accounting for them while the City holds the fund and, ultimately, tracking the expenses of those revenues; is that correct?
A. Yes.
Q. Let's talk just, generally, about the flow of funds through the City when an impact

Page 18

fee is assessed.
Mr. Cortinas testified this morning that in certain new developments, the City will impose an impact fee as a condition to issuing a building permit.
When those funds are paid, where do they go? I'm assuming the check is written to the Building Department.
A. Yes.
Q. Okay. Help me understand because I understand that, for example, my client's payment for all the fees that he had to pay when he applied for a building permit, it included impact fees, but it also included some other things, like a building permit fee, some other miscellaneous fees.
Walk me through the flow of funds and help me understand how, ultimately, the impact fees are held in their own account, and I know that from the documents you've produced.
How do they get there? Just walk through the flow of funds, and I want you to

Page 19

tell me, once that impact fee is paid, where does it go and how does it get to that account?
A. Okay. So it's when they cut one check. So the check is cut and then, you know, it's paying for permit fees, which belong to general fund. And then impact fees, we have one account that's called our "depository account." And that's where utility bills -- same thing, a utility bill is split in multiple funds, too.
And so, through that Citizenserve software that they pay the fees through, that system, when it knows that that's impact fees, is calculating based on the fee schedule. And so that software is determining, based on the fee schedule, of what percentage belongs to police, fire, transportation, parks.
And so that system will create the journal entry. Then we import the journal entries from there to our general ledger. And so, in our general ledger, it determines

Page 20

how much is owed to impact fees -- tells us how much is owed for impact fees. And then I have an accountant that reviews that weekly.
And then, on a weekly basis, we turn around, you know, if -- if it's available, you know, we don't have impact fees paid every week -- then I transfer the monies from the depository account to the PNC Impact Fee account. So we just do an ACH from one account to another account, since they're in two different banks, to the other account. So that's how the money is getting into the impact fee.
And then the system, based on those fee schedules, when it comes into -- you know, from the Citizenserve over to our Munis system, our general ledger system, it records the revenue, what belongs to police, fire, you know, transportation.
And so then, that's where -- and we're showing a separate revenue account and a separate, you know, bank -- you know, we're showing a bank account that's one account,

but we can -- we allocate how much goes to each one.
So it's that fee of the 5,000, it's being transferred from this bank to this bank. And then -- and then we have, at the end of the month, the accountant is reviewing that and reconciling that bank account. Then --
Q. Okay.
A. -- the manager is reviewing it. I'm reviewing it.
Q. So the funds go into the City's -- did you call it "the deposit account"?
A. It's a depository --
Q. Yeah.
A. -- account.
Q. Okay. The depository account. And you mentioned that the software calculates the fees -- or something you said was along those lines?
A. Yeah.
Q. And I just want to clarify, the Building Department is responsible for



determining the overall amount of the fee; right?
A. Yes.
Q. Okay. That's --
A. Yes. Yes.
Q. Okay. And when you say "the software calculates the fees," it's really referring to the percentage of allocation?
A. That's correct.
Q. Let's say, hypothetically, an impact fee is $5,000.
A. Uh-huh.
Q. A certain percentage of that goes to fire; a certain percentage goes to parks & rec --
A. Yeah.
Q. -- et cetera?
A. Yes.
Q. Your software automatically allocates that, and does a fair amount of the bookkeeping subject to review by you or your staff --
A. Yes.



Q. -- once a week or whenever --
A. Yes.
Q. -- it's necessary to look specifically at the impact fee accounts?
A. Yes.
Q. Okay. And you guys manually make that transfer from the depository account to the Impact Fee account?
A. Yes.
Q. Okay. All right.
A. Uh-huh.
MR. WILLIAMS: And you're doing fine, just let him complete his whole question and then you can respond.
MR. BLACKBURN: Yeah. Off the record.
(Off-the-record discussion.)
Q. (BY MR. BLACKBURN) Well, Paragraph Number 2, it's the first area of inquiry on your notice of deposition that you're here to testify about.
And that area is all policies, practices, and procedures the City uses to



ensure that impact fee revenues are used to pay for governmental infrastructure and costs directly related to the property for which an impact fee was assessed.
And I know that's a mouthful, but let me just start by asking you this:
Does the City have processes in place to ensure that specific impact fee revenues are used to pay for costs that are directly related to that project for which the fee was assessed?
A. Yes.
Q. Okay. Tell me a little bit about that.
A. So were you talking about on the expenditure side?
Q. Yes, ma'am, on the expenditure side.
A. The expenditure side, so --
Q. Well, I'm sorry. Let me interrupt you.
Let's talk about on the income side first and to the extent the City does track that.

Does the City track individual income -- I'm sorry -- individual impact fee revenues and somehow tie that to the payer?
A. On the accounting side, when I'm looking at it, I'm taking it as a whole. As a whole, I'm not tracking and it's not --
Q. So you're not --
A. -- individual.
Q. Yeah. You're not tracking the individual. Like, for example, my client, Mr. Benefield, he paid his impact fee. You're not tracking that, you know, specific dollar amount being tied to that individual person. You're looking at the cumulative deposits at a given time?
A. That's -- I'm looking at it as a -- as a whole, a benefit as a whole.
Q. Okay. Well, then let's talk about on the expense side.
A. Okay.
Q. What processes does the finance department use to ensure that impact fee revenues go to pay for infrastructure and



costs that are caused by new development?
A. So on a -- on an annual basis, we have departments that submit, you know, requests in for -- for capital or capital equipment or, you know, it could be infrastructure.
So those requests are reviewed by me, mayor, and in that department. Let's -- and -- and Parks & Recs is -- is one that does -- you know, has a lot.
And so, it's -- it's a meeting, and it may have the Public Works Director, you know, in that meeting also. So we're going through and -- and looking at these -- these requests.
And then -- then I'm -- I'm taking those requests, looking at it. Do they meet the criteria of the -- the law to determine if those -- those type of projects -- we're gonna to add a track. You know, does this -- does this is track meet that criteria?
And then -- and from there, we meet with council members, go over these projects



with the council members, go over that this is impact -- that it can be used for impact fees.
And then our next -- our next step is we discuss that in work session. It's put on a resolution, and the council votes on that and, you know, votes on just impact fees, on this is how we're gonna use the impact fees. And then --
Q. Okay.
A. -- you know, from there, that's the approval process.
Q. Okay. Yeah. Mr. Cortinas testified a bit about the process, the annual review that the City --
A. Uh-huh, yeah.
Q. -- undertakes. And he was aware that there was some discussion among departments as to how that money was allocated, so that's what I thought you guys generally did.
Let's hone in for a second on what you said about reviewing the law and making sure that, you know -- you testified that



there would be a meeting with the department heads, mayor, and yourself.
A. Uh-huh.
Q. When you say you're reviewing the law to determine whether those expenditures qualify, what are you looking at?
A. I'm looking at what the growth has done -- what the growth has done, and when you have, you know -- so, you know, they have -- four -- four baseball fields. And now they've got, what I'm told is, you know, another 500 kids and they don't have enough -- they don't have enough parks, so here's -- okay, well, then we need to add additional baseball parks.
So we're adding additional to the park system, and that's due to the growth that has come in to the city based on development. So that -- that would -- would -- would -- would have a need. And so from that need, the impact fees would -- would meet that.
Q. Does anybody else work with you to

analyze those various requests to determine whether or not they qualify for income -- that's the second time I've done that. Let me strike that.

You testified earlier that you analyze these various expense requests to determine if they qualify to be funded with impact fee revenues.

Is there anyone else who works with you to make that determination?

A. It's -- it's that group effort when we're in those meetings because I'll -- I'll just -- you know, a request that's coming from the, you know, Public Works or the -- the Parks Director, you know, he'll put on his request, you know, potentially could be impact fees.

Okay. So -- so from there, that's when we're going back and we're looking to see if that meets that. Is this an additional piece of equipment that's needed? Is this additional, you know, infrastructure that needs to be built?



Q. Do you have, like, a specific checklist or a rubric or anything that you use to, like, make sure that those proposed expenses will qualify?

A. No, I do not.

Q. Okay.

A. Huh-uh.

Q. Do you make any distinction between new infrastructure needs, as opposed to improvements to existing or dated infrastructure?

A. Yes. I mean, because -- because we're not gonna use it to -- for maintenance on that building, you know, because that's not -- that's not gonna meet it.

And there's a lot of needs, and this impact fee is not a lot of money, you know. So, I mean, it's not -- it's not a hard process just because of the -- when you look at our overall general fund budget and this amount of money, it's like a small grant.

Q. So when you said earlier that -- I think I understood you to say that the City



does not typically use income [sic] fee revenues to pay for updates to old infrastructure?

A. That's -- that's correct.

Q. Can you think of a time where that's ever happened?

A. Not that I'm aware of.

Q. Okay.

A. Uh-huh.

Q. I think you answered this already, Ms. Creech, but you testified that you look at the income account as a whole, like a whole balance. You don't break that down and track, you know, where each individual fee came from.

And, like, let's say that Mr. Benefield paid a $5,000 impact fee -- which that's not what he paid, but just to use a round --

A. Yeah.

Q. -- number -- I mean, does the finance department track the individual payments in any way after they're transferred from the



depository account into the impact fee account?

A. If you're -- if you're asking, you know, each -- each payment is gonna go into a police, fire -- all of those are done separately and I look at those separately.

Q. Okay.

A. So I'm gonna look at, you know, what's available for fire. How can we use fire? How can we use, you know -- and I'm gonna look at police, if that's what you're asking, separate.

But trying to -- for me to pinpoint this one taxpayer's or this one builder's payment --

Q. Y'all don't do that?

A. Huh-uh.

Q. Okay. And I asked and I'm trying to find the right number of years, I think it's five years. I want to say that the enabling legislation requires that impact fee funds be expended within five years.

Is that something you're familiar

with?
A. Yes.
Q. Do you track that at all?
A. I do.
Q. How do you track that?
A. I'm just looking at year by year.
Q. Okay.
A. Uh-huh.
Q. You're looking at the total amount in versus the total amount out over a course of years?
A. Yes.
Q. Has there ever been a time where you have failed to expend all of the impact fee revenues within a five-year period?
A. Not that I'm aware, but I've only been there six years.
Q. That's a fair question. Are you aware of any circumstance where --
A. I'm not --
Q. -- you haven't spent it? Okay.
How many accounts does the City maintain to hold impact fee revenues? Just



one?
A. One bank account.
Q. Okay. Do you do line item accounting within that account?
A. Uh-huh.
Q. Okay. Tell me a little about how this works.
MR. WILLIAMS: You've got to speak your answers. You did a head shake.
THE WITNESS: I'm sorry.
A. We have one bank account at PNC. But on our ledger, we're showing four separate accounts, four separate bank accounts on our ledger instead of -- instead of four different bank at the bank, you know, so that way we're able to reconcile what is police, what is fire.
Q. So the four separate accounts that appear on your ledger, correspond to four accounts for each of the four subcategories of impact fee payment?
A. That is correct.
Q. Okay. Are you aware of any time



where impact fee revenues were deposited into the general fund?
A. Not that I'm aware of.
Q. Has there ever been more bank accounts, other than just the one PNC account, or has that been the arrangement since you came to work at the City?
A. That's been the arrangement since I've been here.
MR. WILLIAMS: For impact fees --
THE WITNESS: For impact fees --
MR. WILLIAMS: -- just to clarify.
A. Just to clarify --
Q. Thank you.
A. -- just impact fees.
Q. Does that PNC account bear interest?
A. Yes, it does.
Q. Do any other funds from any other sources get deposited into that PNC account?
A. No.
Q. How many accounts does the City maintain in total?
A. A good 25.



Q. Is a depository account, basically, like a clearing account for all the receipts that come in to the City of Fairhope?
A. Yes. So -- so in that one account, we're -- we're gonna have the building permits along with the utility accounts. So -- and that's set up for when you have -- that it's paying for multiple things in one check.
Q. Sure.
A. Uh-huh.
Q. Yeah. And then so, I guess, a similar process is a distribution takes place with other payments that are made --
A. Yes.
Q. -- to the depository account.
They get sent out to other accounts as the case may require?
A. (Witness nods head.)
Q. Okay.
A. Exact same way.
Q. Are there certain individuals within your department who are responsible for the

accounting of the City's impact fee funds?
Is it just you or is there -- you know, is it a team of people, or does everybody pitch in?
A. I -- I would say there is me and another accountant. And which the accountant, she's -- she's reviewing on a weekly basis, that if there was an impact fees in there, and then she's writing up any transfers that need to be done and bring them to me.
Q. Okay.
A. So then, I'm reviewing also with it. But it's -- I just have another accountant assisting.
Q. What's that person's name?
A. Tracy Redwine.
Q. Redwine?
A. Uh-huh.
Q. You mentioned that your ledger provided four different accounts for the various subcategories of impact fee receipts.
I am not an accountant, so I do not



have a lot of experience with it. So I would like to understand what that process actually looks like.
Is that something that's performed within accounting software, like QuickBooks?
A. Yes, similar.
Q. Okay. I mean, do you guys use a software-like program that's similar to QuickBooks to do your --
A. We use a government-based software that's fund account software, so --
Q. Okay.
A. -- I've worked in QuickBooks, but it's a general ledger software.
Q. Okay. It's a general ledger software.
A. Uh-huh.
Q. And it's within that general ledger software that your department identifies the four accounts within --
A. Yeah.
Q. -- the overarching, I'll say, PNC Bank account that actually holds all the



funds?
A. Yes. Just -- just think about it as we treat it as a separate company. So if you're on -- on corporate side, it's a separate company, separate fund. So it has its own general ledger, so it's -- it's Company Number 105.
Q. Okay. That's impact fees.
A. That's impact fees.
Q. Okay. And then, I like this hypothetical because --
A. Yeah.
Q. -- it's helping me understand it.
Within 105, which is impact fees, you have four sub-accounts therein?
A. Yes.
Q. Okay.
A. And the cash -- cash account has four, a listing of four different cash accounts --
Q. Okay.
A. -- in the ledger. And we have four different revenue accounts and then we have



the separate expense accounts for each type.
Q. Okay. And all that --
A. Uh-huh.
Q. -- accounting is performed within --
A. In --
Q. -- the governmental accounting software you referenced?
A. Yes.
Q. Okay. And all of those funds are held within the one PNC Bank account?
A. Yes.
Q. Okay. Got it. Tell me a little bit about the automated process when -- I'm backing up some -- but somebody pays an impact fee to the City through Citizenserve, that money is deposited in the City's depository account.
What process actually happens whereby the impact fee is segregated out on a percentage basis to the four different subcategories?
I mean, I would imagine it's like a rule that somebody had to create within that

depository account so that it happens automatically?
I don't know. I'm trying to get a little bit technical just so that I understand how it actually works.
A. So it is -- it was programmed that we give the -- we gave the programmer a list that this is impact, and the impact fee has different categories that can be calculated.
And so based on each category, it's -- it has the calculation percentage, and it's based on that fee schedule.
So it -- it has a general ledger code to know that general ledger code that's gonna imported into. Our other software has that code that knows that -- you know, it's gonna make sure it's coded to the police's revenue account code, park's revenue account code.
So -- you know, so when those entries are imported into our ledger, that's where it's -- you know, it's already -- it's already been written and defined --
Q. Okay.



A. -- into the software.
Q. Do you happen to know if -- this is another general rule of depositions. I'm not here to test your memory because there are a lot of things we can't remember, so I'll just ask you:
Do you know, sitting here, what those percentages are for the four subcomponents of the --
A. I do not know those percentages.
Q. Okay. Well, let's look at these documents in front of you.
A. This one here?
Q. Yes, ma'am. I'm going to give you a number. If you look at the bottom, we're going to Fairhope 211. That's going to be Ordinance 1625.
MR. WILLIAMS: It should be the last couple.
THE WITNESS: Yeah.
MR. BLACKBURN: Yeah. I keep forgetting it's the last page. I could have made that a lot easier.



MR. WILLIAMS: The fee schedule is the last page.
MR. BLACKBURN: Yeah. We're going to the fee schedule. It's the last page. I'm sorry, Ms. Creech. Go all the way to the end.
THE WITNESS: Oh. The last page.
MR. BLACKBURN: Okay.
THE WITNESS: Yeah. 218.
Q. (BY MR. BLACKBURN) Mr. Cortinas testified earlier that this Fairhope 218, this Exhibit A to the impact fees schedule, he testified that this is an accurate representation of the various impact fees that were charged within the City during the life of Ordinance 1625.
And you'll see on the second row of data, there's a percentage allocation beneath --
A. Uh-huh.
Q. -- single-family R-3.
A. Uh-huh.
Q. So for fire, there's a 15 percentage



allocation. Do you see that?
A. Yes.
Q. And there 12.8 percent for police, do you see that?
A. Uh-huh.
Q. Okay.
A. Yes.
Q. And then 51.4 percent for parks & rec, and 20.8 percent for transportation. And my question is this:
When each impact fee is transferred from the depository account to the impact fees PNC account, are you saying that automatically those fees are broken out and distributed according to those percentage allocations?
A. Yes. We --
Q. Okay.
A. -- programmed the system for these fee schedules.
Q. Has the department always accurately allocated the fees to the PNC account in accordance with whatever percentage

Page 45

allocation may be in effect at the time?
A. Yes. We don't go and change the -- you know, once the programming is set, we're -- we're not just going in there and -- and changing -- changing those allocations.
Q. Yes, ma'am, and I'm not picking on you. But part of my job is to make sure there hasn't been a mistake.
So are you aware of any --
A. I'm not aware of any -- any mistakes or --
Q. So you've been at the City for six years?
A. Yes.
Q. Okay. I guess I'll ask this then:
In 2024, end of 2024, the City repealed this ordinance that we're looking at right now, Ordinance 1625. And they replaced it with Ordinance 1817, which is -- if you would please go to Fairhope 95.
Fairhope 95, this depicts the fee schedule to the ordinance that succeeded Ordinance 1625. And if you'll notice up at

Page 46

the top, the percentage allocations are different.
A. Uh-huh. Yes.
Q. Okay. So I'm assuming that at some point during the course of your employment, this ordinance was adopted.
The percentage allocations changed; right?
A. That's correct.
Q. Tell me about how that transfer took place in your department to update the proper percentage allocations.
A. Those -- we would -- we had to get with the programmer and the programmer to change those allocations.
Q. Okay.
A. And --
Q. Do you happen to remember when y'all did that?
A. I -- I want to say that this come in effective in January 1. It was, like, at the beginning of a year. After this was approved, that was an effective date. But it

Page 47

was based on the effective date.
Q. You do recall that? That the change in percentage allocation was made to be as of some effective date?
A. Yes.
Q. Okay.
A. And the fees -- the fees changed.
Q. Right.
A. Uh-huh.
Q. If you back up to Fairhope 94, one page back, Section 19, the very last part of the ordinance says: (Reading.)
The effective date is from and after it's adoption by the Council, adopted December 19, 2024.
Do you know if the accounting software was reprogrammed on December 19, 2024, or would you have to guess?
MR. WILLIAMS: Object to the form.
Go ahead if you know.
A. I just knew about what time of year it was. I mean, I don't remember the --

Page 48

Q. That's okay.
A. I don't know what date it was.
Q. That's a fair answer. Like I said, it's not a test of your memory. But I do want to know if you know.
MR. BLACKBURN: Let's see. I'm going to mark Ordinance 1817 as Exhibit 4.
(Plaintiff's Exhibit 4 was marked for identification, and a copy thereof is attached hereto.)
Q. (BY MR. BLACKBURN) Are you aware of -- I'm sorry.
Are you aware of ever having to process a refund of any impact fee payment, where you had to basically, I guess, reverse a charge out of the PNC account back to a payer?
A. Yes.
Q. When was that?
A. I don't remember the exact date.
Q. Can you ballpark it? Like, was it last week or a couple of years ago?

A. There was one this past month, a refund that was done early this last month.
Q. Do you know why it was issued?
A. I do not know why it's issued, but when it is issued, it's where they're issuing -- refunding the whole permit back where somebody is not going to either build or submitted an application and then changed their mind.
Q. I think Mr. Cortinas might have explained that to me --
A. Uh-huh.
Q. -- that one that was recent.
A. Uh-huh.
Q. Other than that one, are you aware of any other circumstance in the last six years, while you've been employed by Fairhope, that you had to reverse a payment?
A. Yes, for the -- for the same situation.
Q. So there have been multiple times that's occurred?
A. Yes. Not -- not a lot.



Q. Okay.
A. Uh-huh.
Q. And I don't know if you know this, but if you know, has there ever been a payment out of that account due back to the payer for a reason other than they decided not to build?
A. Huh-uh. No. It's -- that's the only way you're gonna issue a refund on a permit.
Q. Okay. Let's talk about tracking the expenses. You've already told me about how that discussion gets started. I think you testified that department heads, yourself, and the mayor will generally discuss potential expenditures and then revenues.
Your testimony was then that you reviewed the law and determined the propriety of certain expenses.
And when I say "propriety," I mean whether it's proper to pay for those things with impact fee revenues. Okay. We've already covered that.
A. Uh-huh.



Q. Is there any type of formal process or a vote? I guess it has to go to council --
A. Uh-huh.
Q. -- to determine and finalize what those expenditures are going to be?
A. Yes. There's a resolution done for any expenditures that we're gonna use impact fees for.
Q. Okay. And that's a resolution by the City Council?
A. Yes.
Q. And I've seen some of those in your production.
Are you aware of any circumstance where impact fees funds were expended without a corresponding resolution?
A. Not that I'm aware of.
Q. Do you keep records of all impact fee expenditures, showing what those fees are spent on, how much, and when?
A. Yes.
Q. Okay. Is that a document that you



prepare on your computer in your office?
A. Yes.
Q. Okay. I think this is an obvious question, but I need to ask it anyway.
Obviously, you keep these funds in their own bank account separately and separately accounted for -- well, strike that. You've already answered that. Sorry.
Do you know if impact fee revenues have ever been deposited into another account, other than the PNC, perhaps by accident?
A. Not that I'm aware of.
Q. Mr. Cortinas testified about annual reviews of the City's impact fee program. And Ordinance 1625 requires, I believe, a review of the impact fee ordinance every three years.
Is that something that you're familiar with?
A. I am.
Q. Okay. Are you a part of that review? I guess, is there a review committee that

undertakes that work every three years?
A. Yes, according to that ordinance.
Q. Okay. Are you on that committee?
A. Yes.
Q. Who else is on it?
A. Mayor, Public Works, Planning --
Q. Okay.
A. -- and Parks.
Q. The department heads, I would assume, for each of the departments who receive impact fee revenues?
A. Yes.
Q. Tell me, do you know when the last of those reviews took place?
A. I can't -- I -- I really can't remember the exact -- the exact time.
Q. And you've only been here for six years, so it's a little tricky.
But do you know if the City has conducted those reviews every three years?
A. I believe so. I mean, that's when we discuss about having the consultant come in.
Q. So they'll bring in TischlerBise as



well?
A. Well, that's when we discuss to have that, to hire them to come in and do another study.
Q. Got it.
A. Uh-huh.
Q. Is there a separate process by which the impact fee program is reviewed annually, as opposed to every three years?
I think there was some -- I'm not sure that I was completely clear with Mr. Cortinas about that. He testified that there was an annual process by which department heads and the mayor would get together, and he testified that he wasn't part of that.
A. Uh-huh.
Q. But he knew that it happened.
A. That's -- that's part of our budget process.
Q. That's what he said.
A. Yeah.
Q. It was budgetary.



A. Uh-huh.
Q. And so what I'm asking about with every three-year review, that would be something different.
So aside from the budgetary review that I'm sure --
A. Uh-huh.
Q. -- you are a part of, is there another, like, global review of the whole impact fee program that the City undertakes every three years?
A. Well, that's when we're discussing it, at the annual. When we're discussing expenditures, we're really discussing the, you know, the impact fees.
Q. Okay. So you guys generally do that annually when you convene to discuss the annual, I guess, position of the impact fee program within the City?
A. Yes.
Q. Okay.
A. Uh-huh.
Q. And that's primarily a budgetary



discussion when y'all do that?
A. Yes.
Q. Okay. Y'all aren't talking about -- for example, TischlerBise, the consultant doesn't attend those meetings, do they?
A. No. Huh-uh.
Q. Do you have any procedure in place to ensure that impact fees are spent within five years of their collection, or is that something that you don't have to worry about because it all gets spent?
A. I -- I do review it, just -- just to make sure, you know, on an annual -- annual basis when we're doing budget and looking at the balances, I look at the balances.
And I review the bank -- the bank reconciliation monthly. So we're -- I'm looking at those balances.
Q. So that's a review that you perform as the head of the finance department --
A. Yes.
Q. -- or somebody under you will just watch the account, the income and

expenditures --
A. Yes.
Q. -- to ensure that the totality of the receipts are expended in five years?
A. Yes.
Q. Okay.
A. Yes. And -- and I'm -- I'm -- I'm reviewing annually. Like, this is what was approved this year. Where are we? Where are these projects?
Q. Okay. And I think you already testified but --
A. Uh-huh.
Q. -- I'll ask again because I'm bouncing around.
Are you aware of any circumstance in which fees were not expended within that five-year period?
A. Not that I'm aware of.
Q. Okay. Does the City maintain a list of individual impact fee receipts and a separate list of all impact fee expenditures --



MR. WILLIAMS: Object to the form.
You can answer.
Q. (BY MR. BLACKBURN) -- if you know?
A. On the expenditure side, yes, I mean, I have a list and I keep documentation of all the expenditures.
Now, if you wanted a list of impact fee payments, we could be able to run a report.
Q. That would probably be Mr. Cortinas's --
A. Yes.
Q. -- department?
A. Yeah.
Q. And one of the filings with the Court said that the Treasury Department can specifically identify each and every expenditure funded by impact fee funds. And you just testified to the same thing, that you keep records.
What do those look like? I mean, is it a Word file that you keep? Is it a more sophisticated --



A. So what you --
Q. -- kind of program that --
A. I know in your documentation, you have an sample of when we purchased police cars.
Q. Sure.
A. So I have that one for every one of the expenditures that is a copy -- you know, it may be a resolution authorizing, along with invoices, you know, for each -- each time I transfer money, that documentation, and then I keep a separate spreadsheet of very expenditure that's done by year.
Q. I guess this gets difficult, especially for me, you know, a guy who doesn't have any accounting and finance, but what I want to ask is:
Can you tell me everything that my client's impact fee went to pay for, of course, partially?
And I know sitting here right now, I would assume you probably can't remember off the top of your head what all those expenses



were, but that is information that I would like to know.
A. Just he -- he paid in '24?
Q. He paid May of 2024.
A. I could look at some of the things that was done this past year. A pickle -- pickle ball court added, added additional tennis -- tennis and the Tennis Center. And that's an example of one.
Q. Would that be something that you could easily generate with reference to your files? A list of projects that his fee was used to pay for?
A. I would say that all the -- what the impact fees paid for. I can't specifically say his paid for because it's -- it's -- you know, it takes all -- it takes all the impact fees to do a project. $5,000 isn't gonna --
Q. Right.
A. -- build a --
Q. Right.
A. -- tennis court.
Q. I guess I'm thinking fractionally,

Page 61

you know, and he pays a fee in May of 2024.
A. Uh-huh.
Q. You know, I'm assuming it would be possible to determine when all the fees in the account, as May 2024, were expended.
A. Uh-huh.
Q. Okay. And I don't know if I'm thinking about it the right way, and I might not be. But I guess I would think that his fee would partially pay or could be partially allocated or be said to have compensated for those expenditures that were made from the date he paid the fee through the date that --
A. Uh-huh.
Q. I guess through the date that that balance in the income, that the impact fee account was spent looking at a forward date.
I mean, you know, I'm just going back to what was stated in the motion that says, you know, you guys can track all the expenses and can show where all the fee revenues go.
You didn't happen to bring a list of expenditures with you today, did you?

Page 62

A. I did not.
Q. That's all right. I didn't ask you to. I thought I'd ask you just in case you did.
MR. WILLIAMS: Well, there is a production of the resolution for expenditures for, I think, the past two years, yeah.
MR. BLACKBURN: I saw that.
THE WITNESS: Uh-huh.
Q. (BY MR. BLACKBURN) Is this anything in addition -- let's actually look at those, and we'll identify the Bates range so that we know what we're talking about.
Oh, man, Ms. Creech, you're going to be a lot faster at this than me.
Would you flip through there and see if you can find -- they're all consolidated together. I think there was a police vehicle and several different things with the accompanying documentation showing what those expenses were.
A. Yeah. But -- and you have on 108 is where that's just a -- that's one of them.

Page 63

We're paying for police cars. But I think what Chris is talking about is the resolution we did for this, the expenditures.
Q. Yeah. These were all exhibits to your declaration, I believe.
MR. WILLIAMS: If you look at 206, 207, 208, 209 --
THE WITNESS: Uh-huh.
MR. WILLIAMS: I think that's some of what y'all are talking about.
A. Yeah. And on 206, this is what the Council approved to spend for '25.
Q. All right. Let me catch up with you. Just a second. 206. Okay.
So Fairhope 206, we have Resolution 5205, and what is this document?
A. This is the document that's proving the projects that for '25, that can be -- that will -- can be used for the impact fees.
Q. So looking at the next page of production, Fairhope 207, this resolution was adopted on September 30, 2024; right?
A. Uh-huh.

Page 64

Q. So this resolution, does this represent all of the items that could have potentially been funded with impact fee revenues for 2025?
A. Yes.
Q. Are you aware of any other items that were funded by impact fee revenues in 2025, other than what may be shown on this document?
MR. WILLIAMS: Object to the form. And I just want to make sure we're all clear, too -- Fiscal Year 2025 and Calendar Year 2025, and I'll shut up.
MR. BLACKBURN: Well, thank you. Good point of distinction.
Q. Ms. Creech, when is the City's fiscal year?
A. It's -- it is -- a fiscal year goes from October 1 through September 30.
Q. Hence, the date of this resolution --
A. Uh-huh.
Q. -- I suppose?
A. Yes.

Page 65

Q. So then, let's talk about the fiscal year.
A. Uh-huh.
Q. Okay. Let me re-ask the question from the beginning with the reference to the fiscal year so --
A. Uh-huh.
Q. -- that we're clear.
For fiscal year 2025, which would run from October 1, 2024 --
A. Uh-huh.
Q. -- through September 30, 2025, does this Resolution 5205-24 represent all of the stuff that the City of Fairhope could potentially have used impact fee revenues for during that fiscal year?
A. Yes.
Q. And are you aware of any instance where impact fee revenues were used to purchase anything in the fiscal year 2025, that does not appear on this document?
A. No. If we make any alterations to this, we go back to Council and we get

Page 66

Council to approve to spend it any other way.
Q. Great. And looks like, maybe, you guys did that in preceding fiscal year, or I could have misinterpreted the document.
But if you look over at Fairhope 208, this is Resolution 4852-23. And on Fairhope 209, we see that this resolution was adopted on September 25, 2023.
So tell me what this document is.
A. This is -- is a resolution that's authorizing us to spend impact fees for the next fiscal year.
Q. So that would be fiscal year 2024?
A. Yes.
Q. And if you turn over to Fairhope 210, we see another resolution dated August 14 of 2023.
A. Yes.
Q. So what is this document?
A. This is a document that -- asking the -- where the Council approved to spend impact fee money.
Q. Okay.

Page 67

A. Uh-huh.
Q. Are you aware of any circumstance or any time where impact fee funds were spent on something that was not approved by Council resolution?
A. Not that I'm aware of.
Q. Ms. Creech, I'm going to ask you just about some different kinds of conversations you may have had. And for purposes of these few questions, don't tell me anything you talked to your lawyer about. Everything that you talked about with Mr. Williams is privileged.
So other than that, over the last year, do you recall having had any conversations with anyone in your department that concerned whether the impact fee is considered a tax, as opposed to a fee?
A. I'm -- I'm not aware of any.
Q. Have there been any discussions within your department about changing the methodologies that you use to account for impact fee revenues?

Page 68

A. No.
Q. Do you recall any instance where you discussed whether a specific city expense was directly caused by some particular new development?
For example, it could be a development that required a substantial modification to the City sewer system -- I don't know.
But anything like that, do you recall any conversations within your department where you talked about a particular project causing the City significant expenses that would be related to the impact fee program?
A. Huh-uh. Not that I was included in, no.
Q. Okay.
A. Huh-uh. I -- I talk debits and credits.
Q. Are you involved with discussions within your department about how the City of Fairhope might analyze or deal with the impacts of the costs -- I'm sorry. Let me

strike that and ask it again.
Do you have any conversations within the finance department that concern basically -- what I'm trying to get at is this:
Do you guys, within your department, look at different expenses that are caused by new development within the City and try to formulate ways to combat that with other revenue sources, with accounting, with budgeting?
I mean, I'm assuming that at some level you guys -- and the city has been growing so fast. And I'm just trying to get my hands around, you know, to what extent are you involved with those conversations at the City level or --
A. Uh-huh.
Q. -- like you said a moment ago, do you stick to debits and credits?
A. By the time it gets to me -- the conversation gets to me, it's just projects. These -- these are projects. And so, at the



finance side, I'm just looking at the funding. How -- how to do I fund those projects.
Q. Do the mayor and Council seek your input on the fiscal management of the City, I would say, like, at a high level? For example, I know you do the day-to-day --
A. Yeah.
Q. -- the accounting --
A. Uh-huh.
Q. -- the debits and credits. And by the time they get to you, you're really dealing with individual projects.
Do they seek your counsel on a bigger level, I guess with regard to short-to-midrange planning for the City's finances?
MR. WILLIAMS: Object to the form.
You can answer.
A. Yes.
Q. Is that what you guys do at the annual budgetary meetings you were telling me about earlier?



A. Yes.
Q. Are the City's tax revenues adequate to offset the cost of new development?
MR. WILLIAMS: Object to the form.
A. There is not enough money.
Q. There's not?
Do you know what the City's --
A. There's more needs than money.
Q. More needs than money?
A. Uh-huh.
Q. Do you know what the City's tax revenues were for fiscal year 2024?
A. The total revenues were -- were like 40, 45 million. I -- I mean --
Q. You produced some of that stuff.
A. Uh-huh.
Q. And you produced documents that showed for several of the years in question --
A. Yeah.
Q. -- what the City's tax revenues were, what the City's impact fees revenue were, and then what the City's budget was.



And I noticed that the City's budget exceeded the revenues of both impact fees and general, other general revenues of the City.
A. Uh-huh.
Q. So how does the City make up the balance?
A. So we -- we've been using some fund balance for capital projects.
Q. Okay.
A. Uh-huh.
Q. Is fund balance cash on hand?
A. Yes.
Q. Okay. How much cash on hand does the City have?
A. It depends on if you're talking about reserved or non-reserved.
Q. Unrestricted.
A. What kind of -- unrestricted, ten million --
Q. Ten?
A. -- when we're talking general fund.
Q. Ten million?
A. Uh-huh.

Q. What about reserved?
A. We have another ten million in reserved.
Q. So 20 million dollars cash on hand about --
A. Uh-huh.
Q. -- equally split between --
A. Uh-huh.
Q. -- reserved and unrestricted?
A. Uh-huh.
Q. Any other sources of cash that the City has? Cash on hand, I mean.
MR. WILLIAMS: Object to the form.
A. No.
MR. WILLIAMS: And I was just unclear. Is that including the utilities and everything, too?
MR. BLACKBURN: Yeah, globally.
MR. WILLIAMS: Okay.
THE WITNESS: I was not counting the utilities.
MR. WILLIAMS: I know you weren't. That's why I was making sure the question



was --
MR. BLACKBURN: Okay. Thank you. Yeah.
Q. (BY MR. BLACKBURN) No. I'm talking --
A. No, I'm not --
Q. -- about when you -- so let ask it.
When you say "utilities," you're talking about funds maintained by the various utility departments --
A. Yeah.
Q. -- in the City of Fairhope?
A. Yes.
Q. Okay. Including all the utilities, let's go through the same analysis, if you know. And if you don't know, that's okay. We can get --
A. But --
Q. -- to it later.
A. But my answer is gonna be back to, you cannot use utility money for -- they're restricted so -- so we're talking -- we're talking restricted money. I'm not gonna



include that for paying for a park.
Q. Oh, sure. Yeah, yeah. No, no. I understand that. Well, what different utilities does the City of Fairhope maintain? What different utility departments are there? Is it one utility department --
A. Well, they're --
Q. -- that handles --
A. They're different, like, utility companies. They're --
Q. Okay.
A. -- separate funds. There's separate funds of it. So you have a gas, you have water, sewer, electric, sanitation.
Q. So those five?
A. Yes.
Q. We don't have to go one by one. But all together, do you know how much additional restricted and unrestricted cash --
A. Not off my head.
Q. Okay. Like I said, this is not a test of your memory.
A. Huh-uh.



Q. When you were showing me the City resolutions earlier, you testified about the fiscal year and how the various impact fee expense items are put to the City Council in a resolution that's adopted, and then those expenditures are authorized.
Does similar documentation exist for impact fee expenditures for the six years that you've been with the City of Fairhope? Has it been done, generally, the same way?
A. Yes.
Q. Has it been documented the same way?
A. Yes.
Q. And you testified earlier that there have not been any impact fee expenditures that were not authorized by resolution; is that correct?
A. That's correct.
Q. Okay.
A. Yeah.
Q. Does the City charge a lodging tax?
A. A what?
Q. A lodging tax?

A. Yes.
Q. Have you had any conversations, again, other than conversations with your lawyer, about whether and, if so, to what extent lodging tax receipts affect the impact fee program in any way?
A. No.
Q. Did Fairhope receive any money as a consequence of the BP oil spill, whether by settlement or through the Restore Act?
A. Yes.
Q. Was that during your employment, or did that happen before you came to work for the City?
A. The approval of it or --
Q. The receipt of the funds.
A. It's a grant fund --
Q. Okay.
A. -- so it's based on reimbursement.
Q. Okay. Have you guys been reimbursed to the extent that you're going to be reimbursed through the Restore Act, or do you still have some funding available?



A. We're -- we're working on projects, and as they finish, we'll get reimbursed.
Q. Has there ever been any discussion -- let me ask it differently.
Have you ever had discussions within your department about whether the receipt of those BP funds could affect the impact fee program in any way?
A. No.
Q. Okay. Same question, but for mayor or Council.
Have you discussed with the mayor or Council, whether the receipt of BP money could affect the impact fee program in any way?
A. No.
Q. Okay. And I take it there's been no changes made to the impact fee program as a consequence of receiving BP money?
A. No.
Q. Okay. Ms. Creech, I don't think this is on your list of areas of inquiry today, so I'll just say if you know.



Do you recall there being a specific reason or anything in particular that happened that caused the City to review its impact fee program through the 2024 TischlerBise study? Was there anything in particular to your knowledge that caused the City to contact TischlerBise and request an updated study in 2024?
A. No.
Q. And the same thing for Ordinance 1817, which was adopted the end of that year.
Are you aware of anything, any particular reason why the City revised its ordinance in late 2024 and replaced Ordinance 1625 with Ordinance 1817?
A. Just -- I mean, just based on the -- just based on the study would create -- that's the reason the new ordinance was done.
Q. Okay. So the new ordinance was a product of the study. And your testimony is that nothing -- to your knowledge, there was no specific triggering event that caused the City to go out and order the 2024 study?



A. No, not that I'm aware of.
Q. Okay.
A. No.
Q. Okay. Are you aware of any case where Fairhope's impact fee committee has heard an appeal by somebody who wasn't happy with the fee they were assessed?
A. Not that I'm aware of.
Q. Do you know if the impact fee review committee issues a report to the City Council on any kind of regular basis?
MR. WILLIAMS: Object to the form.
Q. (BY MR. BLACKBURN) Do you know if the --
A. Okay.
Q. Let me strike that. I'll ask it differently.
Do you know if the impact fee review committee has ever issued a written report to the City Council?
A. I -- I -- I'm not aware of. And, I mean, I don't know what they -- prior to me coming --

Q. But as far as --
A. -- or prior to 2019. No.
Q. But that's not something y'all do since you've been here in 2019?
A. Have a written report?
Q. Yeah.
A. No.
MR. BLACKBURN: We've covered a bunch of this stuff. I'm just going through and making sure I haven't missed anything. We can take a break if you want to. I don't know if you need to, but if you need --
MR. WILLIAMS: Do you want to take a break real quick?
THE WITNESS: Yeah.
MR. BLACKBURN: We've been going about an hour.

(The deposition of KIM CREECH was recessed at 1:00 p.m.)
(The deposition of KIM CREECH resumed at 1:08 p.m.)
///



Q. (BY MR. BLACKBURN) Ms. Creech, would you please turn to Fairhope 216, and I'll represent to you this is going to be within Ordinance 1625.
Looking at Section 15, Section 15 requires the impact fee committee to report to the Council every three years with various items. My first question is one of clarification, and I don't remember what you said.
Did you testify that you are on the impact fee committee?
A. Yes.
Q. And that's by virtue of your position with the City of Fairhope?
MR. WILLIAMS: Object to the form.
Go ahead.
A. Yeah. The treasurer is on the committee.
Q. Right. And I think we talked about this already, but I just wanted to direct your attention to Section 15.
Is there any formal process that the



impact fee committee observes to ensure that this report is delivered to the Council every three years?
MR. WILLIAMS: Object to the form.
A. So -- so we're choosing to do it annually as part of the budget process to look at those capital expenditures.
Q. Okay. That's what I wanted to clear up.
A. Yeah.
Q. Mr. Cortinas testified that there was an annual budgetary meeting.
A. Uh-huh.
Q. And it seemed to me like he was saying it was standing in for that, so --
A. Uh-huh.
Q. -- it's your testimony that the impact fee committee delivers this report mentioned in Section 15 of Ordinance 1625, effectively once a year?
A. Yes.
Q. You mentioned earlier that payment and that many payments that ultimately go



into the City's depository account, go through the Citizenserve portal.
Is that the only way that payments are made into the City's depository account, or do you guys accept other forms of payment?
A. For the building permits?
Q. Yes, ma'am.
A. Are you --
Q. For building permits?
A. That's a Erik -- that's a Erik question on --
Q. Okay.
A. -- those -- those, if -- if everything goes through the Citizenserve. I believe it does.
Q. I understand.
A. But I can't --
Q. Are you aware of any time where funds from one subcategory -- I'll say one of your four accounts, your line item accounts, that you maintain on your accounting software that separately account for the impact fee revenues.

Are you aware of ever transferring funds from one of those sub-accounts to another account due to an error or an oversight?
A. I'm not -- I'm not aware of any.
Q. Do you understand my question, though?
A. Yeah. You're thinking like it -- the police got put in the fire.
Q. Right. I'm asking that. Has that ever happened?
A. Not that I'm aware of. Part of that reconciliation, you know, on the bank records, they're looking at that every month.
Q. And who is looking at it every month?
A. We have a staff accountant that's looking at it every month.
Q. Okay. I think that's what you testified to previously also. I thought you said the banker.
A. No.
MR. WILLIAMS: Are you cold?
THE WITNESS: Uh-huh.



MR. BLACKBURN: I don't have a jacket.
Q. (BY MR. BLACKBURN) Let's go back to the process by which the City decides how to spend the impact fee revenues.
You testified before that you would meet with department heads and the mayor and various proposals would be put on the table.
Your testimony was then, as I recall, that you would review the law, make determinations about what types of expenditures are appropriate. You would determine if some expenditure would be inappropriate. Okay.
Is that a fair summary of your testimony from earlier?
A. Yes.
Q. Okay. And I'm not trying to catch you in a trap. I just want to --
A. Uh-huh. Yeah.
Q. I'm bouncing around a lot.
A. Yeah, yeah.
Q. So I want to get us to the right



frame of reference.
Are there any written policies that your department maintains that concern whether a certain type of expense qualifies to be paid for with impact fee revenues?
A. No, there's no written policy, other than the ordinance.
Q. Right.
A. Uh-huh.
Q. Are you aware of any such policy that exists in any other department of the City, like something that the mayor or staff might maintain?
A. Not -- not that I'm aware of.
Q. Okay.
A. Huh-uh.
Q. I would imagine it's not uncommon for there to be more requests for projects than there are funds available to be funded with impact fee revenues; is that --
A. Uh-huh.
Q. -- correct?
A. That's probably -- probably fair,



yes.
Q. Yeah.
A. Yeah.
Q. I'm just thinking --
A. Uh-huh. Yeah.
Q. -- there's more demands than money --
A. Uh-huh.
Q. -- it seems --
A. Yes.
Q. -- like always.
A. Uh-huh.
Q. Do you guys have any -- I don't know -- procedure that you follow to determine -- let me ask it this way. That was a bad question.
Is there a hierarchy of projects or any type of process that you guys use to determine first priority for certain impact fee revenues -- and I know that might be different within the four departments -- or do you guys just analyze it on a case-by-case basis?
A. I would say it's -- I -- I think of

it as a case-by-case basis. And -- I mean,
and there may be some projects that we
determine, like, oh, well, okay, this year,
but then next year, maybe, we want to add
that.
Q. So the people involved with making
that decision -- and, specifically, when I
say "that decision," I mean how the funds get
spent -- that decision is made collectively
by yourself; right?
A. Uh-huh.
Q. The mayor?
A. Yes.
Q. Okay. Who else?
A. It -- it would be, you know, the --
let's say the -- the Parks & Rec Director.
Q. Right.
A. So we're looking at that, and then
we're doing a recommendation with City
Council. So we're talking with City Council,
and then, ultimately, it goes to the City
Council for a vote.
Q. Okay. And there have been



disagreements among the departments about who
is getting impact fee money, or is it not
something that's ever become contentious?
A. I haven't ever seen that.
Q. Well, good.
A. Uh-huh.
Q. I'm going back to this because I'm
simple-minded and I don't understand it. But
would you just tell me again -- and I'm not
trying to -- I don't know that I understood
your last answer, and that's a me problem --
A. Uh-huh.
Q. -- not a you problem. But I'm trying
to understand how you know that impact fee
funds get spent within five years. And I
know it's probably self-evident because you
have more demand for those funds than funds
available.
But just tell me how you track that
because I didn't understand. When we talked
about it a minute ago, it went over my head.
A. So I'm -- I'm just looking at if we
collected -- let's say in -- in -- let's say



in fire, you collected 100,000. And so then,
I'm gonna look back to see how much we've
spent and look each year.
Q. Okay. So you're just taking -- in
any given year, let's just, hypothetically,
say fire receives 100,000 --
A. Uh-huh.
Q. -- in impact fee revenues. You're
just looking at the cumulative expenses over
the next five years. And as long as that
cumulative expense for fire exceeds $100,000,
that's how you know?
A. Yeah. Yeah. I'm just -- I'm just
looking at each -- each year and just making
sure, like, okay, if my balance is here, is
it five years' worth?
Q. I understand. Okay. And that's what
I thought. I just --
A. I mean, I'm just trying to do simple
math there, you know, by per year.
Q. Yeah. That's simple, and that's what
I thought you were saying you did.
A. Uh-huh.



Q. I just wanted to make sure I
understood you correctly, so thank you --
A. Uh-huh.
Q. -- for revisiting that.
Would you turn with me please to
Fairhope 105? And I'm going to mark Fairhope
105 and 106 together as Plaintiff's
Exhibit 5.
(Plaintiff's Exhibit 5 was
marked for identification, and
a copy thereof is attached
hereto.)
Q. (BY MR. BLACKBURN) Ms. Creech,
earlier you testified about a PNC interest
bearing account that holds all of the City's
impact fee revenues.
Does the account statement appearing
at Fairhope 105 depict that account?
A. Yes.
Q. And does that account statement
continue over onto what's labeled Fairhope
106?
A. Yes.

Page 93

Q. Do you know how long that PNC account has been the impact fee account?
A. I -- I do not know how long it has been.
Q. Safe to say, it predated your employment with Fairhope?
A. Predated my employment.
Q. I think we're almost done. I'm just checking over these to make sure I haven't missed anything.
Mr. Cortinas testified earlier that, other than when the ordinances were repealed and replaced with a later version of the impact fee ordinance, that the City had not changed the method by which it calculates impact fees; okay? And I know that's generally his area of inquiry.
But my question for you is, if -- let ask it this way:
Has anyone with the City of Fairhope ever consulted with you about potentially modifying the way impact fees are calculated?
A. No.

Page 94

Q. Okay.
A. Huh-uh.
MR. BLACKBURN: I think we're done. Let me give Chris a call real quick --
MR. WILLIAMS: Okay.
MR. BLACKBURN: -- and ask him one question, and then I think we'll be out of here.
MR. WILLIAMS: Okay.

(The deposition of KIM CREECH was recessed at 1:24 p.m.)
(The deposition of KIM CREECH resumed at 1:30 p.m.)

Q. (BY MR. BLACKBURN) Ms. Creech, I'd like to go back and talk about the deliberations that you guys go through when deciding whether a certain project qualifies for impact fee funding.
I don't want to know -- and your lawyer will object if he thinks I'm pushing here, but I don't want to know what you

Page 95

talked about with your lawyer.
MR. BLACKBURN: But I think the fact of whether they seek legal council --
MR. WILLIAMS: It's fair --
MR. BLACKBURN: -- is relevant.
MR. WILLIAMS: Yes.
Q. (BY MR. BLACKBURN) All right. When you guys are -- I'm sorry. I'm about to sneeze.
You testified previously about the people who would be in the room when you get the various requests from the four departments where impact fees can be allocated. You receive their various projects that they might want to have funded with impact fee revenues.
Do you consult with your attorneys or -- let me ask it this way:
Have you consulted with your attorneys in the course of any of those meetings to determine whether a certain expenditure qualifies?
A. I've -- I've gotten legal advice,

Page 96

yes.
Q. All right. Do you recall how many times?
A. Hand -- I don't know. I don't know. It -- I do not know how many times.
Q. Fair answer.
A. Uh-huh.
Q. Other than that you've testified to previously, do you consult any outside sources that you haven't mentioned in your deposition already in reaching your determination that a certain expenditure qualifies for impact fee funding?
A. No. Huh-uh.
Q. You mentioned earlier that you look at the law, and earlier you testified that that included the ordinance, and you testified that that included the enabling act.
Is there any other law that you've looked at in reaching any of your determinations as to whether a particular expenditure qualifies under the law for

impact fee funding?
A. No.
Q. Did you have a background in the law?
A. I -- I do -- I do not.
Q. Have you ever read any other cases or statutes -- I think you've answered this -- but have you ever referred to any cases or statutes to help you reach that determination?
A. I've -- I've read -- I've read statutes.
Q. The enabling act, but other than that, your testimony is that you haven't read any other statutes?
A. No, I have read other statutes. I mean, are you talking about reading different ones of the Code of Alabama?
Q. I'm talking about --
A. Yeah.
Q. I want to know any law --
A. Uh-huh.
Q. -- that you have referred to, that had played any part in helping you reach



those determinations about the propriety of funding certain things with impact fee money.
A. No, I haven't have not. Huh-uh.
Q. Okay. So your testimony would be that outside of the enabling act and the ordinance, you have not consulted any other law?
A. No.
Q. Okay. Are you familiar with the term "benefit area," as it's used in the enabling act or the ordinance?
A. No. No, it's not my expertise.
Q. Are you aware of any impact fees that have been used to fund salaries or maintenance on existing infrastructure?
A. No, it has not.
Q. Neither salaries nor --
A. Huh-uh.
Q. -- infrastructure, existing infrastructure?
A. No. No maintenance, no salaries.
Q. Are public hearing costs -- if you know, are the costs of public hearings in any



way incorporated into the fee schedule?
A. In the fee schedule? I'm not aware of court costs --
Q. Oh, no. Not --
A. I mean, the hearing cost -- the hearing cost is included into the fee schedule.
Q. Okay. There's obviously a distinction that you've recognized between using impact fee revenues to fund the new projects that are due to new development as opposed to using those fees for other things.
Does the finance department have any other processes in place to ensure that impact fee money doesn't get allocated to making up for existing infrastructure shortfalls, as opposed to spending it on new development or -- I'm sorry -- as opposed to spending it on things to offset the burdens caused by new development, or do you guys account for all of that at the time you decide simply what to spend the money on?
Do you understand what my question



is?
A. No. Could you repeat that?
Q. That was a real bad one. I'll ask it again.
Aside from the obvious, which is, you know, you guys sit down and decide -- and you've explained to me how you determine whether a certain expenditure qualifies to be funded with impact fee revenue.
Other that the obvious of making that determination at the time of the expenditure, is there any other process or procedure that your department adheres to, to analyze whether any certain expenditures are going to make up for existing infrastructure shortfalls or deficiencies?
A. If -- if you're wanting to consider impact fees, I'm trying to -- no, I mean, we're gonna to have -- if we're trying to balance the budget, it's gonna be that we've got to cut a -- we've got to cut something.
Q. Yeah. I'm only referring to the impact fees. And I'm just trying to make

sure that I understand the totality of what the City does, and you've been designated as the representative to talk about this.
A. Uh-huh.
Q. And so my understanding from your testimony so far is that, you know, as to that issue -- and this issue is, you know, is a certain item appropriate for impact fee expenditures? That all happens in the process and in the deliberations with the department heads and the mayor and yourself --
A. Uh-huh.
Q. -- that you've already explained to me; right?
A. Right.
Q. There's no other process, oversight or procedure that exists within the City to ensure that that's accurate or to ensure that y'all are correct.
Is there any kind of oversight from other department, from the mayor, from Council, anything like that?



MR. WILLIAMS: Object to the form.
Go ahead.
A. I still don't understand what the -- the question is, though.
Q. Okay.
A. You --
Q. I'll say it again. So you testified previously about how you make this determination.
A. Uh-huh.
Q. It's obviously kind of important in this lawsuit.
Are these expenditures appropriate? And I do understand, your testimony has been very clear so far. That you will sit down with the department heads and the mayor. You'll make the analysis.
And then I guess my first question should be, are you primarily responsible for making that determination?
A. I would say it's -- it's in a group. I mean, because I'm -- I'm meeting with the mayor. I'm meeting with department heads.



Department heads has -- has put in, this could potentially be impact fees.
Then we're looking at it. I'm trying to determine, okay, that's a new park, additional park, another ball field. Okay. Then that's -- you know, a new infrastructure is being done. And, you know, we're all looking at it and, like, okay, let's add that to the list.
Q. And I just want to make sure that after you guys go through that process, there's no additional layer of review?
A. It goes to the City Council.
Q. Okay.
A. And so the City -- so the -- it's gone over with the City Council and then the City Council votes on that resolution, authorizing to spend that money.
Q. Right. And those are the resolutions that we looked at earlier?
A. Yes.
Q. Okay. Does the City have any kind of process in place to able to know if a



particular project funded with impact fee revenues benefits any of the numerous individual fee payers? Does that make sense?
You may have, I think -- let's just use 2024, I think.
A. Uh-huh.
Q. It was something like a 155 impact fees were paid that year, thereabouts.
Is there any way that the City could determine -- take Mr. Benefield's fee for example.
A. Uh-huh.
Q. Could it track those funds from his payment to a final project?
A. I'm taking all those payments as a whole to take -- and it takes all those payments as a whole to -- let's say to purchase one police car.
Q. Yes, ma'am.
A. Uh-huh.
Q. And I --
A. So --
Q. -- totally understand that you can't

Page 105

buy a police car for the price of Mr. Benefield's payment.
A. No.
Q. But is there any way that the City could track that to determine, you know, what portion of that police car did Mr. Benefield pay for, for example?
A. No, we -- we're -- we do not track that.
Q. Okay. And would that be true for expenditures that are made to any of the four departments that receive impact fee money?
A. No. We're -- we're -- we're tracking it as -- you know, as a whole. This much was collected for police and was put in police's account, and then from that, as a whole, we can now buy one police car.
Q. Okay. I understand that, and I get it. I just don't know how -- like I said earlier, I have no background in finance so --
A. Uh-huh.
Q. -- I don't know if there's a way that

Page 106

the City can track that or if they do. But we were talking --
A. No.
Q. -- specifically about the police car. And I just wanted -- and I understand --
A. Yeah.
Q. -- that as to police and the police department --
A. Yeah. All those new residents benefit from that police car, yes.
Q. I just want to make sure that I understand, though, that that's going be the case for police, parks & rec, fire, each of the four --
A. Yes.
Q. -- subdepartments. You look at those receipts as a whole?
A. Yeah. I've got to look at how much -- how much do we have in police.
Q. Yes, ma'am.
A. You know, how much is fire. Because you -- you see the fee schedule, they're all different allocations.

Page 107

Q. Yes, ma'am. And you explained earlier --
A. Yeah.
Q. -- very clearly, the second time I got you to tell me --
A. Okay.
Q. -- how you track the five-year window to make sure that it all gets expended. That made sense to me.
A. Uh-huh.
Q. I just wanted to make sure that there wasn't anything in place that allowed the City to track, you know, each individual payer's dollar, you know, from the time it comes to the time it gets spent.
And the answer to that is no?
A. No.
Q. Okay. Did the police or fire chiefs have any special input -- that's not a very precise way of saying it, but for lack of a better phrase -- into how impact fee revenues are allocated? Do they get priority when you guys are deciding how to spend that money?

Page 108

A. Well, yeah, we meet -- we meet with the police chief and we meet with the fire chief.
Q. Does the mayor and -- well, I'll ask this:
In the past, has the mayor deferred to the requests of those departments or has there ever been disagreement about any certain expense that you can recall?
A. I -- I'm not aware of any disagreements, no.
Q. Other that what you have already explained to me --
A. Uh-huh.
Q. -- is there any other process that the finance department follows to ensure that it is complying with the enabling act?
And I know you've told me that you've read it. Obviously, you need to be aware of what's in there since you have some input into how the money is being spent.
But other than what we've covered already, are there any other procedures or

Page 109

policies in place at the City that you follow to ensure that you're meeting the requirements of the enabling legislation?
A. Huh-uh. No.
Q. Has the City ever been -- has it ever faced any legal challenges to any of its impact fee ordinances that you're aware of?
MR. WILLIAMS: Object to the form. Other than --
MR. BLACKBURN: If you are --
MR. WILLIAMS: -- your two clients?
MR. BLACKBURN: Yeah.
Q. (BY MR. BLACKBURN) Other than my two clients, are you aware of any other legal challenges to any aspect of the City's impact fee program?
A. No.
Q. Does the City audit its impact fee accounts?
A. Yes, we have an external auditor that audits the City annually.
Q. That occurs every year?
A. Uh-huh.

Page 110

Q. Who is the external auditor?
A. It's -- it's gonna be -- now my mind has gone blank, but you just asked me.
MR. WILLIAMS: Warren Averett.
THE WITNESS: Warren Averett. I just -- I was just on the phone with Lee earlier, our auditor.
MR. BLACKBURN: I have Counsel testifying, I'm done.
THE WITNESS: Yeah.
MR. BLACKBURN: But let's confirm, it's Warren Averett?
THE WITNESS: It's Warren Averett.
MR. BLACKBURN: Okay. I'm finished.
THE WITNESS: And Lee Parks is our --
MR. WILLIAMS: Sorry.
MR. BLACKBURN: No, it doesn't matter to me.
THE WITNESS: No.
MR. BLACKBURN: That's not a contentious one. We're finished.
(The deposition of KIM CREECH was concluded at 1:47 p.m.)

Page 111

C E R T I F I C A T E

STATE OF ALABAMA)
BALDWIN COUNTY )

I hereby certify that the above and foregoing proceedings were taken down by me in stenotype, and the questions and answers thereto were reduced to computer print under my supervision, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said proceedings.

I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I anywise interested in the result of said cause.

Signed the 26th day of September, 2025.

/s/ Susan C. Andrews
SUSAN C. ANDREWS,
Alabama ACCR #287
Expires 9/30/26

**A**
**a.m** 1:18 5:17
**able** 34:16 58:8 103:23
**accept** 84:5
**accepted** 12:3
**accident** 52:12
**accompanying** 62:20
**account** 18:19 19:3 19:8,9 20:8,9,10 20:10,11 20:21,23 20:23 21:7 21:13,16 21:17 23:7 23:8 31:12 32:1,2 34:2,4,11 35:6,16,19 36:1,2,4 36:16 38:11,23 39:18 40:10,17 41:1,18,18 44:12,13 44:22 48:17 50:5 52:6,11 56:23 61:5 61:17 67:22 84:1 84:4,22 85:3 92:15 92:17,18 92:20 93:1 93:2 99:21 105:16
**accountant** 9:2,16,20 10:12,15 10:19,21 11:15 20:3 21:6 37:6 37:7,14,23 85:16
**accounted** 52:7
**accounting** 9:4 17:16 17:17 25:4 34:3 37:1 38:5 40:4 40:6 47:17 59:16 69:10 70:9 84:21
**accounts** 10:23 23:4 33:22 34:13,13 34:18,20 35:5,21 36:6,17 37:21 38:20 39:20,23 40:1 84:20 84:20 109:19
**ACCR** 1:19 111:22
**accurate** 16:16,16 43:13 101:19
**accurately** 44:21
**ACH** 20:9
**act** 14:19 77:10,22 96:19 97:12 98:5 98:11 108:17
**action** 111:16
**add** 26:20 28:14 89:4 103:8
**added** 60:7,7
**adding** 28:16
**addition** 62:11
**additional** 28:15,16 29:21,22 60:7 75:18 103:5,12
**adequate** 71:2
**adheres** 100:13
**adopted** 46:6 47:15 63:22 66:7 76:5 79:11
**adoption** 47:14
**advice** 95:23
**affect** 77:5 78:7,14
**ago** 48:23 69:19 90:21
**agreed** 5:5
**agreement** 15:19
**ahead** 47:21 82:17 102:2
**Alabama** 1:2 1:13,20,23 2:7,16 4:10,13,22 5:8,11,16 14:17 97:17 111:3,22
**allocate** 21:1
**allocated** 27:19 44:22 61:11 95:14 99:15 107:22
**allocates** 22:19
**allocation** 22:8 43:18 44:1 45:1 47:3
**allocations** 44:16 45:5 46:1,7,12 46:15 106:23
**allowed** 107:12
**alterations** 65:22
**amount** 22:1 22:20 25:13 30:21 33:9 33:10
**analysis** 74:15 102:17
**analyze** 29:1 29:6 68:22 88:21 100:13
**Andrews** 1:19 4:5,15 5:9 111:20,21
**annual** 26:2 27:14 52:14 54:13 55:13,18 56:13,13 70:22 83:12
**annually** 54:8 55:17 57:8 83:6 109:21
**answer** 7:3 12:20 48:3 58:2 70:19 74:20 90:11 96:6 107:16
**answered** 31:10 52:8 97:6
**answering** 7:4
**answers** 34:9 111:9
**anticipation** 14:8
**anybody** 28:23
**anyway** 52:4
**anywise** 111:16
**appeal** 80:6
**appear** 34:19 65:21
**appearing** 92:17
**applicable** 4:9,12,21
**application** 49:8
**applied** 18:13
**appropriate** 86:12 101:8 102:13
**approval** 27:12 77:15

**approve** 66:1
**approved** 11:1 46:23 57:9 63:12 66:21 67:4
**area** 23:19 23:22 93:17 98:10
**areas** 15:19 16:18 78:22
**ARENDALL** 1:21 2:12 5:14
**arrangement** 35:6,8
**aside** 55:5 100:5
**asked** 4:20 13:3 32:18 110:3
**asking** 7:16 15:10 24:6 32:3,12 55:2 66:20 85:10
**aspect** 109:15
**assessed** 18:1 24:4 24:11 80:7
**assisting** 37:15
**assume** 53:9 59:22
**assuming** 18:7 46:4 61:3 69:12
**attached** 48:10 92:11
**attend** 56:5
**attention** 82:22
**attorney** 10:1 15:2
**attorneys** 4:3 14:3 95:17,20
**Auburn** 8:10
**audit** 109:18
**auditor** 109:20 110:1,7
**audits** 109:21
**August** 66:16
**authorized** 76:6,16
**authorizes** 14:21
**authorizing** 59:9 66:11 103:18
**automated** 40:13
**automatic...** 22:19 41:2 44:14
**available** 20:5 32:9 77:23 87:19 90:18
**Averett** 110:4,5,12 110:13
**aware** 27:17 31:7 33:16 33:19 34:23 35:3 45:9,10 48:12,14 49:15 51:15,18 52:13 57:16,19 64:6 65:18 67:2,6,19 79:12 80:1 80:4,8,21 84:18 85:1 85:5,12 87:10,14 98:13 99:2 108:10,19 109:7,14

**B**

**B** 2:15
**back** 14:9,10 29:19 47:10,11 48:17 49:6 50:5 61:18 65:23 74:20 86:3 90:7 91:2 94:17
**background** 9:3 97:3 105:20
**backing** 40:14
**bad** 88:15 100:3
**balance** 31:13 61:16 72:6 72:8,11 91:15 100:20
**balances** 56:15,15 56:18
**Baldwin** 1:10 8:18 9:12 9:13,15 111:4
**ball** 60:7 103:5
**ballpark** 48:22
**bank** 3:18 20:22,23 21:4,5,7 34:2,11,13 34:15,15 35:4 38:23 40:10 52:6 56:16,16 85:13
**banker** 85:20
**banking** 11:9
**banks** 20:11
**baseball** 28:10,15
**based** 19:15 19:17 20:14 28:18 41:10,12 47:1 77:19 79:16,17
**basically** 13:14 36:1 48:16 69:4
**basis** 12:16 20:4 26:2 37:8 40:20 56:14 80:11 88:22 89:1
**Bates** 3:15 3:21 62:12
**BAY** 2:7
**bear** 35:16
**bearing** 92:15
**beginning** 8:1 15:23 46:22 65:5
**behalf** 1:6
**believe** 52:16 53:21 63:5 84:15
**belong** 19:7
**belongs** 19:18 20:18
**beneath** 43:19
**Benefield** 1:5 6:15 17:4 25:11 31:17 105:6
**Benefield's** 104:10 105:2
**benefit** 25:17 98:10 106:10
**benefits** 104:2
**better** 7:9 107:21
**bigger** 70:14
**bill** 19:10
**bills** 19:10
**bit** 24:13 27:14 40:12 41:4
**Blackburn** 2:4,5 3:5 5:3 6:7,11 6:14 13:17 13:20 15:14 16:6 16:9,12 23:15,18 42:21 43:3 43:8,10 48:6,12 58:3 62:8 62:10 64:14 73:18 74:2 74:4 80:13 81:8,16 82:1 86:1 86:3 92:13 94:3,6,16

95:2,5,7 109:10,12 109:13 110:8,11 110:14,17 110:20
**blank** 110:3
**bookkeeping** 22:21
**bottom** 42:15
**bouncing** 57:15 86:21
**BOX** 2:6
**BP** 77:9 78:7 78:13,19
**break** 31:13 81:11,14
**briefly** 10:17
**bring** 37:10 53:23 61:22
**broken** 44:14
**budget** 30:20 54:19 56:14 71:23 72:1 83:6 100:20
**budgetary** 54:23 55:5 55:23 70:22 83:12
**budgeting** 69:11
**build** 49:7 50:7 60:20
**builder's** 32:14
**building** 18:5,8,13 18:15 21:23 30:14 36:5 84:6,9
**built** 29:23
**bunch** 81:8
**burdens** 99:19
**buy** 105:1,17

C

**C** 2:1 111:1 111:1,20 111:21
**calculated** 41:9 93:22
**calculates** 21:18 22:7 93:15
**calculating** 19:15
**calculation** 13:4 41:11
**Calendar** 64:12
**call** 21:13 94:4
**called** 8:15 19:8
**capacity** 9:14
**capital** 11:2 26:4,4 72:8 83:7
**car** 104:18 105:1,6,17 106:4,10
**cars** 59:5 63:1
**case** 1:8,12 6:16 17:2 17:6 36:18 62:3 80:4 106:13
**case-by-case** 88:21 89:1
**cases** 97:5,7
**cash** 39:18 39:18,19 72:11,13 73:4,11,12 75:19
**catch** 63:13 86:18
**categories** 41:9
**category** 41:10
**cause** 5:18 111:17
**caused** 26:1 68:4 69:7 79:3,6,22 99:20
**causing** 68:13
**CCR** 1:19
**Center** 60:8
**certain** 18:3 22:13,14 36:22 50:18 87:4 88:18 94:19 95:21 96:12 98:2 100:8,14 101:8 108:9
**certifica...** 4:14
**Certified** 4:6 5:10
**certify** 5:10 111:6,14
**cetera** 22:17
**challenges** 109:6,15
**change** 45:2 46:15 47:2
**changed** 46:7 47:7 49:8 93:15
**changes** 78:18
**changing** 45:5,5 67:21
**charge** 48:17 76:21
**charged** 43:15
**check** 13:3 18:7 19:5 19:5 36:9
**checking** 93:9
**checklist** 30:2
**chief** 9:16 9:19 10:12 10:15,19 10:21 11:15 108:2,3
**chiefs** 107:18
**choosing** 83:5
**Chris** 15:15 16:7 63:2 94:4
**CHRISTOPHER** 2:13
**Circuit** 1:11
**circumstance** 33:19 49:16 51:15 57:16 67:2
**Citizenserve** 19:12 20:16 40:15 84:2 84:14
**city** 1:12 3:11,20 7:17 8:20 12:6,14 13:6 14:16 14:21 17:4 17:14,18 17:23 18:3 23:23 24:7 24:22 25:1 27:15 28:18 30:23 33:22 35:7 35:21 36:3 40:15 43:15 45:12,16 51:11 53:19 55:10,19 57:20 65:14 68:3 68:8,13,21 69:8,13,17 70:5 72:3 72:5,14 73:12 74:12 75:4 76:1,4,9 76:21 77:14 79:3 79:7,13,23 80:10,20 82:15 86:4 87:11 89:19,20 89:21 93:14,20 101:2,18 103:13,15 103:16,17 103:22 104:9 105:4 106:1 107:13 109:1,5,18

109:21
City's 14:15 17:9,12 21:12 37:1 40:16 52:15 64:16 70:16 71:2 71:7,11,21 71:22,23 72:1 84:1 84:4 92:15 109:15
Civil 4:10 4:13,22 5:8,12
clarifica... 82:9
clarify 21:22 35:12,13
clear 6:23 7:6 54:11 64:11 65:8 83:8 102:15
clearing 36:2
clearly 107:4
client 25:10
client's 18:11 59:19
clients 109:11,14
Close 15:5
code 14:17 41:13,14 41:16,18 41:18 97:17
coded 41:17
cold 85:22
collected 90:23 91:1 105:15
collection 56:9
collectively 89:9
college 8:7 8:14
combat 69:9
come 28:18 36:3 46:20 53:22 54:3
comes 20:15 107:15
coming 11:3 29:13 80:23
commencing 5:17
Commission 8:18 9:12 9:13,15 11:2
Commissioner 5:9
committee 52:23 53:3 80:5,10,19 82:6,12,19 83:1,18
communica... 6:23
companies 9:1,7 75:10
company 8:15 39:3,5,7
compensated 61:11
complaint 17:2
complete 23:13
completely 54:11
complying 108:17
computer 52:1 111:9
concern 69:3 87:3
concerned 67:17
concluded 110:22
condition 18:4
conducted 53:20
confirm 16:15 110:11
Conner 2:4 10:1
consequence 77:9 78:19
consider 100:17
considered 67:18
consolidated 62:17
consult 95:17 96:9
consultant 53:22 56:4
consulted 93:21 95:19 98:6
contact 79:7
contentious 90:3 110:21
continue 92:21
convene 55:17
conversation 69:22
conversat... 14:1 15:1 67:8,16 68:11 69:2 69:16 77:2 77:3
copy 15:15 48:10 59:8 92:11
corporate 9:2 39:4
correct 16:2 17:20 22:9 31:4 34:22 46:9 76:17 76:18 87:22 101:20 111:11
correctly 92:2
correspond 34:19
correspon... 51:17
Cortinas 18:2 27:13 43:10 49:10 52:14 54:12 83:11 93:11
Cortinas's 58:11
cost 71:3 99:5,6
costs 24:2,9 26:1 68:23 98:22,23 99:3
council 26:23 27:1 27:6 47:15 51:3,11 63:12 65:23 66:1 66:21 67:4 70:4 76:4 78:11,13 80:10,20 82:7 83:2 89:20,20 89:22 95:3 101:23 103:13,16 103:17
counsel 5:13 70:14 110:8 111:15
counting 73:20
county 1:11 8:18 9:12 9:12,13,15 10:1,3,10 10:20 11:8 11:20,20 13:6 111:4
couple 42:19 48:23
course 33:10 46:5 59:20 95:20
court 1:1,11 4:6 5:4,10 6:5 58:15 60:7,22 99:3
cover 14:11
covered 50:22 81:8 108:22
create 19:20 40:23 79:17
credits 68:19 69:20 70:11

**Creech** 1:16 3:4 4:4 5:17 6:2 6:12 13:21 31:11 43:5 62:14 64:16 67:7 78:21 81:19,21 82:1 92:13 94:11,13 94:16 110:22
**criteria** 26:18,21
**cumulative** 25:14 91:9 91:11
**custodian** 5:3
**cut** 19:4,5 100:21,21
**cwilliams...** 2:18

**D**

**D** 3:1
**data** 43:18
**date** 5:11 46:23 47:1 47:4,13 48:2,21 61:13,13 61:15,17 64:20
**dated** 30:10 66:16
**David** 9:23
**day** 1:17 111:18
**day-to-day** 12:15,18 70:7
**deal** 68:22
**dealing** 70:13
**debits** 68:18 69:20 70:11
**December** 47:15,18
**decide** 99:22 100:6
**decided** 50:6
**decides** 86:4
**deciding** 94:19 107:23
**decision** 89:7,8,9
**declaration** 63:5
**Defendant** 1:14 2:11
**deferred** 108:6
**deficiencies** 100:16
**defined** 41:22
**deliberat...** 94:18 101:10
**delivered** 5:2 83:2
**delivers** 83:18
**Delta** 8:16
**demand** 90:17
**demands** 88:6
**department** 10:23 13:14 17:14 18:8 21:23 25:22 26:8 28:1 31:22 36:23 38:19 44:21 46:11 50:13 53:9 54:14 56:20 58:13,16 67:16,21 68:11,21 69:3,6 75:6 78:6 86:7 87:3 87:11 99:13 100:13 101:11,22 102:16,23 103:1 106:8 108:16
**departments** 26:3 27:18 53:10 74:10 75:5 88:20 90:1 95:13 105:12 108:7
**depends** 72:15
**depict** 92:18
**depicts** 45:21
**deposit** 21:13
**deposited** 35:1,19 40:16 52:10
**deposition** 1:15 4:4,8 4:18 5:7 6:17 13:22 15:13,17 16:1 23:20 81:19,21 94:11,13 96:11 110:22
**depositions** 42:3
**depository** 19:9 20:8 21:14,17 23:7 32:1 36:1,16 40:17 41:1 44:12 84:1 84:4
**deposits** 25:15
**DESCRIPTION** 3:9
**descriptions** 10:18
**designated** 101:2
**determina...** 29:10 96:12 97:9 100:11 102:9,20
**determina...** 86:11 96:22 98:1
**determine** 26:18 28:5 29:1,7 51:5 61:4 86:13 88:14,18 89:3 95:21 100:7 103:4 104:10 105:5
**determined** 50:17
**determines** 19:23
**determining** 19:17 22:1
**development** 26:1 28:19 68:5,7 69:8 71:3 99:11,18 99:20
**developments** 18:3
**difference** 10:21 13:5
**differences** 10:18
**different** 20:11 34:15 37:21 39:19,23 40:20 41:9 46:2 55:4 62:19 67:8 69:7 75:3 75:5,9 88:20 97:16 106:23
**differently** 78:4 80:17
**difficult** 59:14
**direct** 5:4 82:21
**directly** 24:3,9 68:4
**Director** 26:12 29:15 89:16
**disagreement** 108:8
**disagreem...** 90:1 108:11
**discuss** 27:5 50:14 53:22 54:2

55:17
**discussed** 68:3 78:12
**discussing** 55:12,13 55:14
**discussion** 13:19 23:17 27:18 50:12 56:1 78:3
**discussions** 67:20 68:20 78:5
**distinction** 30:8 64:15 99:9
**distributed** 44:15
**distribution** 36:13
**DISTRICT** 1:1 1:2
**division** 1:3 11:16
**document** 14:6 51:23 63:16,17 64:9 65:21 66:4,9,19 66:20
**documenta...** 58:5 59:3 59:11 62:20 76:7
**documented** 76:12
**documents** 18:20 42:12 71:17
**doing** 23:12 56:14 89:19
**dollar** 25:13 107:14
**dollars** 73:4
**door** 15:5
**due** 28:17 50:5 85:3 99:11
**duly** 6:3

**E**

**E** 2:1,1 3:1 111:1,1
**earlier** 29:5 30:22 43:11 70:23 76:2 76:14 83:22 86:16 92:14 93:11 96:15,16 103:20 105:20 107:2 110:7
**early** 49:2
**easier** 42:23
**easily** 60:11
**effect** 45:1
**effective** 46:21,23 47:1,4,13
**effectively** 13:13 83:20
**effort** 29:11
**either** 49:7
**electric** 75:14
**employed** 9:14 49:17
**employees** 12:22
**employment** 7:17 12:3
46:5 77:12 93:6,7
**enabling** 14:20 32:20 96:18 97:12 98:5 98:10 108:17 109:3
**ensure** 24:1 24:8 25:22 56:8 57:3 83:1 99:14 101:19,19 108:16 109:2
**entries** 19:22 41:19
**entry** 19:21
**equally** 73:7
**equipment** 26:5 29:21
**Erik** 84:10 84:10
**error** 85:3
**especially** 59:15
**ESQ** 5:3
**et** 22:17
**event** 79:22
**everybody** 37:4
**exact** 36:21 48:21 53:16,16
**examination** 3:5 5:18 6:10
**examined** 6:3
**example** 18:11 25:10 56:4 60:9 68:6
70:7 104:11 105:7
**exceeded** 72:2
**exceeds** 91:11
**Exhibit** 3:7 43:12 48:7 48:8 92:8 92:9
**exhibits** 63:4
**exist** 76:7
**existing** 30:10 98:15,19 99:16 100:15
**exists** 87:11 101:18
**expend** 33:14
**expended** 32:22 51:16 57:4 57:17 61:5 107:8
**expenditure** 24:16,17 24:18 58:4 58:18 59:13 86:13 95:22 96:12,23 100:8,11
**expenditures** 10:22 11:1 28:5 50:15 51:6,8,20 55:14 57:1 57:23 58:6 59:8 61:12 61:23 62:6 63:3 76:6
76:8,15 83:7 86:12 100:14 101:9 102:13 105:11
**expense** 25:19 29:6 40:1 68:3 76:4 87:4 91:11 108:9
**expenses** 17:19 30:4 50:11,18 59:23 61:20 62:21 68:13 69:7 91:9
**experience** 38:1
**expertise** 98:12
**Expires** 111:23
**explained** 49:11 100:7 101:14 107:1 108:13
**extent** 24:22 69:15 77:5 77:21
**external** 109:20 110:1

**F**

**F** 111:1
**faced** 109:6
**fact** 95:2
**failed** 33:14
**fair** 22:20 33:18 48:3

86:15 87:23 95:4 96:6
**Fairhope** 1:12,23 2:16 3:11 3:16,20,22 5:16 7:17 7:19 8:6 8:20 11:21 12:2,14 17:5 36:3 42:16 43:11 45:20,21 47:10 49:17 63:15,21 65:14 66:5 66:6,15 68:22 74:12 75:4 76:9 77:8 82:2,15 92:6,6,18 92:21 93:6 93:20
**Fairhope's** 80:5
**familiar** 10:9 16:23 32:23 52:20 98:9
**far** 81:1 101:6 102:15
**fast** 69:14
**faster** 62:15
**fee** 17:9,12 17:16 18:1 18:4,16 19:1,15,17 20:8,13,15 21:3 22:1 22:11 23:4 23:8 24:1 24:4,8,10 25:2,11,22 29:8 30:17 31:1,14,17 32:1,21 33:14,23 34:21 35:1 37:1,22 40:15,19 41:8,12 43:1,4 44:11,20 45:21 48:15 50:21 51:19 52:9 52:15,17 53:11 54:8 55:10,18 57:21,22 58:8,18 59:19 60:12 61:1 61:10,13 61:16,21 64:3,7 65:15,19 66:22 67:3 67:17,18 67:23 68:14 76:3 76:8,15 77:6 78:7 78:14,18 79:4 80:5 80:7,9,18 82:6,12 83:1,18 84:22 86:5 87:5,20 88:19 90:2 90:14 91:8 92:16 93:2 93:14 94:20 95:16 96:13 97:1 98:2 99:1 99:2,6,10 99:15 100:9 101:8 104:1,3,10 105:12 106:22 107:21 109:7,16 109:18
**fees** 3:21 14:22 18:12,14 18:16,19 19:6,8,13 19:15 20:1 20:2,6 21:19 22:7 27:3,7,8 28:21 29:17 35:10,11 35:15 37:9 39:8,9,14 43:12,14 44:13,14 44:22 47:7 47:7 51:9 51:16,20 55:15 56:8 57:17 60:15,18 61:4 63:19 66:11 71:22 72:2 93:16,22 95:13 98:13 99:12 100:18,23 103:2 104:8
**field** 103:5
**fields** 28:10
**file** 58:22
**files** 60:12
**filing** 4:17 5:3
**filings** 58:15
**final** 104:14
**finalize** 51:5
**finance** 13:14 17:14 25:21 31:21 56:20 59:16 69:3 70:1 99:13 105:20 108:16
**finances** 70:17
**financing** 11:9 17:11
**find** 32:19 62:17
**fine** 23:12
**finish** 7:2 78:2
**finished** 11:19 110:14,21
**fire** 19:18 20:18 22:14 32:5 32:9,10 34:17 43:23 85:9 91:1,6,11 106:13,21 107:18 108:2
**first** 6:3,19 9:16 10:10 23:19 24:22 82:8 88:18 102:18
**fiscal** 64:12 64:16,18 65:1,6,9 65:16,20 66:3,12,13 70:5 71:12 76:3
**five** 32:20 32:22 56:8 57:4 75:15 90:15 91:10,16
**five-year** 33:15 57:18 107:7
**flip** 62:16
**flow** 17:23 18:17,23
**follow** 88:13 109:1
**following** 5:19
**follows** 6:4 108:16
**foregoing** 5:12 111:7 111:11
**forgetting** 42:22
**form** 4:19 47:20 58:1 64:10 70:18 71:4 73:13 80:12 82:16 83:4 102:1 109:8
**formal** 51:1

82:23
**Formerly** 1:10
**forms** 84:5
**formulate** 69:9
**forward** 61:17
**four** 10:14 10:14 28:10,10 34:12,13 34:14,18 34:19,20 37:21 38:20 39:15,19 39:19,22 40:20 42:8 84:20 88:20 95:12 105:11 106:14
**fractionally** 60:23
**frame** 87:1
**front** 42:12
**fund** 3:21 17:18 19:7 30:20 35:2 38:11 39:5 70:2 72:7 72:11,21 77:17 98:14 99:10
**funded** 29:7 58:18 64:3 64:7 87:19 95:15 100:9 104:1
**funding** 70:2 77:23
94:20 96:13 97:1 98:2
**funds** 17:23 18:6,17,23 19:11 21:12 32:21 35:18 37:1 39:1 40:9 51:16 52:5 58:18 67:3 74:9 75:12 75:13 77:16 78:7 84:18 85:2 87:19 89:8 90:15,17 90:17 104:13
**further** 4:11 5:1,5 111:14

**G**

**gas** 75:13
**gblackbur...** 2:9
**general** 17:5 19:7,22,23 20:17 30:20 35:2 38:14,15 38:18 39:6 41:13,14 42:3 72:3 72:3,21
**generally** 17:8,22 27:20 50:14 55:16 76:10 93:17
**generate** 60:11
**getting** 20:12 90:2
**give** 7:13 41:7 42:14 94:4
**given** 6:17 25:15 91:5 111:12
**giving** 14:8
**global** 55:9
**globally** 73:18
**go** 6:21 8:7 8:11 18:7 19:2 21:12 25:23 26:23 27:1 32:4 43:5 45:2,20 47:21 51:2 61:21 65:23 74:15 75:17 79:23 82:17 83:23 84:1 86:3 94:17 94:18 102:2 103:11
**goes** 21:1 22:13,14 64:18 84:14 89:21 103:13
**going** 13:2 16:12 17:10 26:13 29:19 42:14,16 42:16 43:3 45:4 48:6
49:7 51:6 61:18 62:14 67:7 77:21 81:9 81:16 82:3 90:7 92:6 100:14 106:12
**gonna** 7:1 26:20 27:8 30:13,15 32:4,8,11 36:5 41:14 41:16 50:9 51:8 60:18 74:20,23 91:2 100:19,20 110:2
**good** 6:12 16:23 35:23 64:15 90:5
**gotten** 95:23
**governmen...** 38:10
**governmental** 24:2 40:6
**graduate** 8:2 8:5,11
**grant** 2:5 5:2 6:14 30:21 77:17
**Great** 66:2
**ground** 6:21
**group** 29:11 102:21
**growing** 69:14
**growth** 28:7 28:8,17
**guess** 7:23 9:23 11:10 11:14 17:1
36:12 45:15 47:19 48:16 51:2 52:23 55:18 59:14 60:23 61:9 61:15 70:15 102:18
**guy** 59:15
**guys** 23:6 27:20 38:7 55:16 61:20 66:3 69:6,13 70:21 77:20 84:5 88:12,17 88:21 94:18 95:8 99:20 100:6 103:11 107:23

**H**

**hand** 1:21 2:12 5:14 72:11,13 73:4,12 96:4
**handles** 75:8
**hands** 69:15
**hands-on** 13:7
**happen** 42:2 46:18 61:22 77:13
**happened** 31:6 54:18 79:3 85:11
**happens** 40:18 41:1

101:9
**happy** 80:6
**hard** 30:18
**HARRISON** 1:22 2:12 5:14
**he'll** 29:15
**head** 7:14,22 13:13 17:14 34:9 36:19 56:20 59:23 75:20 90:21
**heads** 28:2 50:13 53:9 54:14 86:7 101:11 102:16,23 103:1
**healthcare** 8:16,17 9:1,7
**heard** 80:6
**hearing** 98:22 99:5 99:6
**hearings** 98:23
**held** 18:19 40:10
**help** 18:10 18:18 97:8
**helping** 39:13 97:23
**hereinafter** 4:18
**hereto** 4:3 5:6 48:11 92:12
**hey** 6:13 15:4
**hierarchy** 88:16
**high** 8:2,6 70:6
**higher** 11:9
**hire** 54:3
**hold** 12:6,10 33:23
**holds** 17:18 38:23 92:15
**hone** 27:21
**hour** 81:17
**huh-uh** 7:13 30:7 32:17 50:8 56:6 68:15,18 75:23 87:16 94:2 96:14 98:3 98:18 109:4
**hypothetical** 39:11
**hypotheti...** 22:10 91:5

**I**

**identific...** 48:9 92:10
**identifies** 38:19
**identify** 58:17 62:12
**imagine** 40:22 87:17
**impact** 3:20 14:22 17:9 17:12,16 17:23 18:4 18:14,19 19:1,7,14 20:1,2,6,8 20:13 22:10 23:4 23:8 24:1 24:4,8 25:2,11,22 27:2,2,7,8 28:21 29:8 29:17 30:17 31:17 32:1 32:21 33:14,23 34:21 35:1 35:10,11 35:15 37:1 37:8,22 39:8,9,14 40:15,19 41:8,8 43:12,14 44:11,12 48:15 50:21 51:8 51:16,19 52:9,15,17 53:11 54:8 55:10,15 55:18 56:8 57:21,22 58:7,18 59:19 60:15,17 61:16 63:19 64:3 64:7 65:15 65:19 66:11,22 67:3,17,23 68:14 71:22 72:2 76:3,8,15 77:5 78:7 78:14,18 79:4 80:5 80:9,18 82:6,12 83:1,18 84:22 86:5 87:5,20 88:18 90:2 90:14 91:8 92:16 93:2 93:14,16 93:22 94:20 95:13,16 96:13 97:1 98:2,13 99:10,15 100:9,18 100:23 101:8 103:2 104:1,7 105:12 107:21 109:7,15 109:18
**impacts** 68:23
**import** 19:21
**important** 6:22 102:11
**imported** 41:15,20
**impose** 14:22 18:4
**improvements** 30:10
**inappropr...** 86:14
**include** 75:1
**included** 18:14,14 68:15 96:17,18 99:6
**including** 73:16 74:14
**income** 24:21 25:2 29:2 31:1,12 56:23 61:16
**incorporated** 99:1
**individual** 25:1,2,8 25:10,13 31:14,22 57:21 70:13 104:3 107:13
**individuals** 36:22
**information** 60:1
**infrastru...** 24:2 25:23 26:6 29:22 30:9,11 31:3 98:15 98:19,20 99:16 100:15 103:6
**input** 70:5 107:19 108:20
**inquiry** 16:18 23:19 78:22 93:17
**instance** 65:18 68:2
**intention...** 7:3
**interest** 35:16 92:14
**interested** 111:16
**interrupt**

7:4 24:19
**invoices** 59:10
**involved** 68:20 69:16 89:6
**issue** 50:9 101:7,7
**issued** 49:3 49:4,5 80:19
**issues** 80:10
**issuing** 18:5 49:6
**item** 34:3 84:20 101:8
**items** 64:2,6 76:4 82:8

**J**

**jacket** 86:2
**January** 46:21
**job** 7:9 10:18 12:14 45:7
**journal** 19:21,21

**K**

**keep** 42:21 51:19 52:5 58:5,20,22 59:12
**kids** 28:12
**KIM** 1:16 3:4 4:4 5:17 6:2 81:19 81:21 94:11,13 110:22
**kin** 111:15
**kind** 11:6 59:2 72:18 80:11 101:21 102:11 103:22
**kinds** 67:8
**knew** 47:22 54:18
**know** 7:1,11 11:7 14:4 14:5,6 15:10 16:17 18:20 19:6 20:5,6,16 20:19,22 20:22 24:5 25:12 26:3 26:5,10,13 26:20 27:7 27:11,23 28:9,9,11 29:13,14 29:15,16 29:22 30:14,17 31:14 32:4 32:8,10 34:15 37:3 41:3,14,16 41:19,21 42:2,7,10 45:3 47:17 47:21 48:2 48:5,5 49:3,4 50:3,3,4 52:9 53:13 53:19 55:15 56:13 58:3 59:3,8,10 59:15,21 60:2,17 61:1,3,7 61:18,20 62:13 68:9 69:15 70:7 71:7,11 73:22 74:16,16 75:18 78:23 80:9 80:13,18 80:22 81:12 85:13 88:13,19 89:15 90:10,14 90:16 91:12,20 93:1,3,16 94:21,23 96:4,4,5 97:20 98:23 100:6 101:6,7 103:6,7,23 105:5,14 105:19,23 106:21 107:13,14 108:18
**knowledge** 79:6,21
**knows** 19:14 41:16

**L**

**L** 4:1
**labeled** 3:15 3:21 92:21
**lack** 107:20
**Large** 4:7
**late** 79:14
**law** 4:4 14:9 14:10,14 26:18 27:22 28:4 50:17 86:10 96:16,20 96:23 97:3 97:20 98:7
**lawsuit** 102:12
**lawyer** 67:11 77:4 94:22 95:1
**layer** 103:12
**ledger** 19:22 19:23 20:17 34:12,14 34:19 37:20 38:14,15 38:18 39:6 39:22 41:13,14 41:20
**Lee** 110:6,15
**legal** 95:3 95:23 109:6,14
**legislation** 14:21 32:21 109:3
**let's** 7:23 8:21 15:14 17:22 22:10 24:21 25:18 26:8 27:21 31:16 42:11 48:6 50:10 62:11 65:1 74:15 86:3 89:16 90:23,23 91:5 103:8 104:4,17 110:11
**level** 11:9 69:13,17 70:6,15
**life** 43:16
**line** 34:3 84:20
**lines** 21:20
**list** 3:7 41:7 57:20 57:22 58:5 58:7 60:12 61:22 78:22 103:9
**listing** 39:19
**little** 24:13 34:6 40:12 41:4 53:18
**LLC** 1:22 2:12 5:15
**lodging** 76:21,23 77:5
**long** 7:18 9:6 91:10 93:1,3
**look** 13:4 15:12,23 23:3 30:19 31:11 32:6 32:8,11 42:11,15 56:15 58:21 60:5 62:11 63:6 66:5 69:7 83:7 91:2 91:3 96:15 106:16,18
**looked** 15:16 96:21 103:20
**looking** 25:5 25:14,16

28:6,7 29:19 33:6 33:9 45:17 56:14,18 61:17 63:20 70:1 82:5 85:14 85:15,17 89:18 90:22 91:9 91:14 103:3,8
**looks** 38:3 66:2
**lot** 12:20 13:7 26:10 30:16,17 38:1 42:5 42:23 49:23 62:15 86:21

M

**ma'am** 6:7,8 14:13 24:17 42:14 45:6 84:7 104:19 106:20 107:1
**machine** 1:20
**maintain** 33:23 35:22 57:20 75:4 84:21 87:13
**maintained** 74:9
**maintains** 87:3
**maintenance** 30:13 98:15,21
**making** 27:22 73:23 81:10 89:6 91:14 99:16 100:10 102:20
**man** 62:14
**manage** 12:21 12:21
**management** 70:5
**manager** 21:10
**manually** 23:6
**mark** 48:7 92:6
**marked** 48:9 92:10
**math** 91:20
**matter** 110:17
**mayor** 26:8 28:2 50:14 53:6 54:14 70:4 78:10 78:12 86:7 87:12 89:12 101:11,22 102:16,23 108:4,6
**mean** 30:12 30:18 31:21 38:7 40:22 47:23 50:19 53:21 58:4 58:21 61:18 69:12 71:14 73:12 79:16 80:22 89:1 89:8 91:19 97:16 99:5 100:18 102:22
**meet** 26:17 26:21,22 28:22 30:15 86:7 108:1,1,2
**meeting** 26:11,13 28:1 83:12 102:22,23 109:2
**meetings** 29:12 56:5 70:22 95:21
**meets** 29:20
**members** 26:23 27:1
**memory** 42:4 48:4 75:22
**mentioned** 21:18 37:20 83:19,22 96:10,15
**met** 10:7
**method** 93:15
**methodolo...** 67:22
**million** 71:14 72:19,22 73:2,4
**mind** 49:9 110:2
**MINETTE** 2:7
**minute** 15:6 90:21
**miscellan...** 18:16
**misinterp...** 66:4
**missed** 81:10 93:10
**mistake** 45:8
**mistakes** 45:10
**modification** 68:8
**modifying** 93:22
**moment** 69:19
**money** 11:8 12:21 20:12 27:19 30:17,21 40:16 59:11 66:22 71:5 71:8,9 74:21,23 77:8 78:13 78:19 88:6 90:2 98:2 99:15,22 103:18 105:12 107:23 108:21
**monies** 20:7
**Montgomery** 8:10
**month** 21:6 49:1,2 85:14,15 85:17
**monthly** 56:17
**morning** 6:12 18:2
**motion** 61:19
**mouthful** 24:5
**multiple** 19:11 36:8 49:21
**Munis** 20:16

N

**N** 2:1 3:1 4:1
**name** 6:14 10:6 37:16
**necessary** 23:3
**need** 28:14 28:20,21 37:10 52:4 81:12,12 108:19
**needed** 29:21
**needs** 29:23 30:9,16 71:8,9
**neither** 98:17 111:15
**new** 18:3 26:1 30:9 68:4 69:8 71:3 79:18 79:19 99:10,11 99:17,20 103:4,6 106:9
**nods** 7:22 36:19
**non-reserved** 72:16
**NORTH** 1:22 2:14 5:15
**Notary** 4:6
**notice** 15:12 15:17 16:1 23:20 45:23
**noticed** 72:1
**notices** 4:11
**number** 3:9

16:19,19 16:20,20 23:19 31:21 32:19 39:7 42:15
**numbered** 16:4
**numbers** 16:13
**numerous** 104:2

O

**O** 4:1
**object** 47:20 58:1 64:10 70:18 71:4 73:13 80:12 82:16 83:4 94:22 102:1 109:8
**objections** 4:19
**observes** 83:1
**obvious** 52:3 100:5,10
**obviously** 52:5 99:8 102:11 108:19
**occurred** 49:22
**occurs** 109:22
**October** 64:19 65:10
**Off-the-r...** 13:19 23:17
**office** 2:6 52:1
**offices** 1:21 5:14
**offset** 71:3 99:19
**oh** 13:10 43:7 62:14 75:2 89:3 99:4
**oil** 77:9
**okay** 6:21 8:19 9:6 9:18,22 10:13,17 11:17 12:2 12:13 13:17 14:18 15:1 15:18,21 16:23 17:8 18:10 19:4 21:9,17 22:4,6 23:6,10 24:13 25:18,20 27:10,13 28:14 29:18 30:6 31:8 32:7 32:18 33:7 33:21 34:3 34:6,23 36:20 37:12 38:7 38:12,15 39:8,10,17 39:21 40:2 40:9,12 41:23 42:11 43:8 44:6,18 45:15 46:4 46:16 47:6 48:1 50:1 50:10,21 51:10,23 52:3,22 53:3,7 55:16,21 56:3 57:6 57:11,20 61:7 63:14 65:4 66:23 68:17 72:9 72:13 73:19 74:2 74:14,16 75:11,21 76:19 77:18,20 78:10,17 78:21 79:19 80:2 80:4,15 83:8 84:12 85:18 86:14,18 87:15 89:3 89:14,23 91:4,15,17 93:16 94:1 94:5,9 98:4,9 99:8 102:5 103:4,5,8 103:14,22 105:10,18 107:6,18 110:14
**old** 31:2
**once** 19:1 23:1 45:3 83:20
**ones** 97:17
**opposed** 30:9 54:9 67:18 99:12,17 99:18
**oral** 5:18
**order** 79:23
**ordinance** 3:12,13,14 14:11,12 14:16 42:17 43:16 45:17,18 45:19,22 45:23 46:6 47:12 48:7 52:16,17 53:2 79:10 79:14,14 79:15,18 79:19 82:4 83:19 87:7 93:14 96:17 98:6 98:11
**ordinances** 14:15 93:12 109:7
**original** 5:1
**outside** 96:9 98:5
**overall** 22:1 30:20
**overarching** 38:22
**overseeing** 11:7
**oversight** 11:11 85:4 101:17,21
**owed** 20:1,2

P

**P** 2:1,1 4:1
**P.C** 2:4
**p.m** 1:18 81:20,22 94:12,14 110:23
**page** 3:3,9 16:1 42:22 43:2,4,7 47:11 63:20
**paid** 18:6 19:1 20:6 25:11 31:17,18 60:3,4,15 60:16 61:13 87:5 104:8
**paragraph** 16:13 23:18
**paragraphs** 16:4
**park** 28:17 75:1 103:4 103:5
**park's** 41:18
**parks** 19:19 22:14 26:9 28:13,15 29:15 44:8 53:8 89:16 106:13 110:15
**part** 45:7 47:11 52:22 54:16,19 55:8 83:6 85:12 97:23
**partially** 59:20 61:10,10
**particular** 68:4,12 79:2,6,13 96:22 104:1
**parties** 4:3 111:15
**partner** 9:23

**pay** 18:12 19:13 24:2 24:9 25:23 31:2 50:20 59:19 60:13 61:10 105:7
**payable** 10:23
**payer** 25:3 48:18 50:6
**payer's** 107:14
**payers** 104:3
**paying** 19:6 36:8 63:1 75:1
**payment** 18:12 32:4 32:15 34:21 48:15 49:18 50:5 83:22 84:5 104:14 105:2
**payments** 31:22 36:14 58:8 83:23 84:3 104:15,17
**payroll** 13:2
**pays** 40:14 61:1
**people** 13:8 13:8,12 37:3 89:6 95:11
**percent** 44:3 44:8,9
**percentage** 19:18 22:8 22:13,14 40:20 41:11 43:18,23 44:15,23 46:1,7,12 47:3
**percentages** 42:8,10
**perform** 56:19
**performed** 38:4 40:4
**period** 3:19 10:4 33:15 57:18
**permit** 18:5 18:13,15 19:6 49:6 50:9
**permits** 36:6 84:6,9
**person** 25:14
**person's** 37:16
**pertain** 17:11
**phone** 110:6
**phrase** 107:21
**picking** 45:6
**pickle** 60:6 60:7
**piece** 29:21
**pinpoint** 32:13
**pitch** 37:4
**place** 24:7 36:13 46:11 53:14 56:7 99:14 103:23 107:12 109:1
**plaintiff** 1:9 2:3 3:7 6:15
**Plaintiff's** 3:11,18 48:8 92:7 92:9
**planning** 53:6 70:16
**played** 97:23
**please** 6:23 7:13 45:20 82:2 92:5
**PNC** 3:18 20:8 34:11 35:5,16,19 38:22 40:10 44:13,22 48:17 52:11 92:14 93:1
**point** 46:5 64:15
**police** 19:18 20:18 32:5 32:11 34:16 44:3 59:4 62:18 63:1 85:9 104:18 105:1,6,15 105:17 106:4,7,7 106:10,13 106:19 107:18 108:2
**police's** 41:17 105:15
**policies** 23:22 87:2 109:1
**policy** 87:6 87:10
**portal** 84:2
**portion** 105:6
**position** 12:5,10 55:18 82:14
**possible** 61:4
**POST** 2:6
**potential** 50:15
**potentially** 29:16 64:3 65:15 93:21 103:2
**practices** 23:23
**preceding** 66:3
**precise** 107:20
**predated** 93:5,7
**prepare** 13:21 52:1
**previously** 85:19 95:10 96:9 102:8
**price** 105:1
**primarily** 55:23 102:19
**print** 111:10
**prior** 80:22 81:2
**priority** 88:18 107:22
**privileged** 67:13
**probably** 58:10 59:22 87:23,23 90:16
**problem** 90:11,13
**procedure** 4:10,13,23 5:8,12 56:7 88:13 100:12 101:18
**procedures** 23:23 108:23
**proceedings** 5:19 111:7 111:13
**process** 27:12,14 30:19 36:13 38:2 40:13,18 48:15 51:1 54:7,13,20 82:23 83:6 86:4 88:17 100:12 101:10,17 103:11,23 108:15
**processes** 24:7 25:21 99:14
**produced** 18:21 71:15,17
**product** 79:20
**production** 51:14 62:6 63:21
**program** 17:9 17:12 38:8 52:15 54:8 55:10,19 59:2 68:14

77:6 78:8 78:14,18 79:4 109:16
**programmed** 41:6 44:19
**programmer** 41:7 46:14 46:14
**programming** 45:3
**project** 24:10 60:18 68:12 94:19 104:1,14
**projects** 11:4 26:19 26:23 57:10 60:12 63:18 69:22,23 70:3,13 72:8 78:1 87:18 88:16 89:2 95:15 99:11
**promoted** 11:12
**proper** 46:11 50:20
**property** 24:3
**proposals** 86:8
**proposed** 30:3
**propriety** 50:17,19 98:1
**provided** 4:12 5:7 5:11 37:21
**proving** 63:17
**provisions** 4:9,22
**public** 4:6 26:12 29:14 53:6 98:22,23
**purchase** 65:20 104:18
**purchased** 59:4
**purchasing** 12:23
**purposes** 13:23 67:9
**pushing** 94:22
**put** 27:5 29:15 76:4 85:9 86:8 103:1 105:15

**Q**

**qualifies** 87:4 94:19 95:22 96:13,23 100:8
**qualify** 28:6 29:2,7 30:4
**question** 7:2 7:5,7 13:23 23:13 33:18 44:10 52:4 65:4 71:19 73:23 78:10 82:8 84:11 85:6 88:15 93:18 94:7 99:23 102:4,18
**questions** 4:20 12:20 12:23 13:1 17:10 67:10 111:8
**quick** 81:14 94:4
**QuickBooks** 38:5,9,13
**quickly** 8:21

**R**

**R** 2:1 111:1
**R-3** 43:21
**range** 62:12
**re-ask** 65:4
**reach** 97:8 97:23
**reaching** 96:11,21
**read** 5:7 16:13 17:2 97:5,10,10 97:13,15 108:19
**reading** 47:12 97:16
**real** 81:14 94:4 100:3
**really** 6:19 22:7 53:15 55:14 70:12
**reason** 50:6 79:2,13,18
**rec** 22:15 44:9 89:16 106:13
**recall** 47:2 67:15 68:2 68:10 79:1 86:9 96:2 108:9
**receipt** 77:16 78:6 78:13
**receipts** 36:2 37:22 57:4,21 77:5 106:17
**receive** 53:10 77:8 95:14 105:12
**receives** 91:6
**receiving** 78:19
**recessed** 81:19 94:11
**recognized** 10:6 99:9
**recommend...** 89:19
**reconcile** 34:16
**reconcili...** 56:17 85:13
**reconcili...** 11:3
**reconciling** 21:7
**record** 13:17 23:16
**records** 20:17 51:19 58:20 85:14
**Recs** 26:9
**reduced** 111:9
**Redwine** 37:17,18
**reference** 60:11 65:5 87:1
**referenced** 40:7
**referred** 97:7,22
**referring** 22:7 100:22
**refund** 48:15 49:2 50:9
**refunding** 49:6
**regard** 70:15
**regarding** 4:17
**regular** 80:11
**reimbursed** 77:20,22 78:2
**reimburse...** 77:19
**related** 24:3 24:10 68:14
**relevant** 95:5
**Reliance** 8:16
**remember** 42:5 46:18 47:23 48:21 53:16 59:22 82:9
**repealed** 45:17 93:12
**Repealing** 3:13
**repeat** 100:2
**replaced**

45:18 79:14 93:13
**Replacing** 3:14
**report** 58:9 80:10,19 81:5 82:6 83:2,18
**reported** 1:20
**Reporter** 4:6 5:10 6:5
**represent** 64:2 65:13 82:3
**represent...** 43:14
**represent...** 101:3
**representing** 6:15
**represents** 111:11
**reprogrammed** 47:18
**request** 29:13,16 79:7
**requests** 26:4,7,15 26:17 29:1 29:6 87:18 95:12 108:7
**require** 36:18
**required** 68:7
**requirements** 4:16 109:3
**requires** 12:15 32:21 52:16 82:6
**reserved** 4:20 72:16 73:1,3,9
**residents** 106:9
**resolution** 27:6 51:7 51:10,17 59:9 62:6 63:2,15,21 64:1,20 65:13 66:6 66:7,10,16 67:5 76:5 76:16 103:17
**resolutions** 76:2 103:19
**respective** 4:3
**respond** 23:14
**responsib...** 11:11
**responsible** 17:15 21:23 36:23 102:19
**Restore** 77:10,22
**restricted** 74:22,23 75:19
**result** 111:17
**resumed** 81:21 94:13
**revenue** 20:18,21 39:23 41:17,18 69:10 71:22 100:9
**revenues** 17:16,17 17:20 24:1 24:8 25:3 25:23 29:8 31:2 33:15 33:23 35:1 50:15,21 52:9 53:11 61:21 64:4 64:7 65:15 65:19 67:23 71:2 71:12,13 71:21 72:2 72:3 84:23 86:5 87:5 87:20 88:19 91:8 92:16 95:16 99:10 104:2 107:21
**reverse** 48:16 49:18
**review** 11:1 14:6 22:21 27:14 52:17,22 52:23 55:3 55:5,9 56:12,16 56:19 79:3 80:9,18 86:10 103:12
**reviewed** 14:4,9,10 14:11,13 26:7 50:17 54:8
**reviewing** 15:5 21:6 21:10,11 27:22 28:4 37:7,13 57:8
**reviews** 20:3 52:15 53:14,20
**revised** 79:13
**revisiting** 92:4
**Ridge** 1:5 6:15
**right** 5:6 8:7 9:8 10:14 22:2 23:10 32:19 45:18 46:8 47:8 59:21 60:19,21 61:8 62:2 63:13,22 82:20 85:10 86:23 87:8 89:10,17 95:7 96:2 101:15,16 103:19
**room** 95:11
**round** 31:19
**row** 43:17
**rubric** 30:2
**rule** 40:23 42:3
**rules** 4:10 4:13,22 5:8,11 6:22
**run** 58:8 65:9

**S**

**S** 2:1,13 4:1
**s/** 111:20
**safe** 11:10 93:5
**salaries** 98:14,17 98:21
**SALE** 1:22 2:12 5:15
**sample** 59:4
**sanitation** 75:14
**save** 4:19
**saw** 62:8
**saying** 7:12 44:13 83:15 91:22 107:20
**says** 47:12 61:19
**schedule** 19:16,17 41:12 43:1 43:4,12 45:22 99:1 99:2,7 106:22
**schedules** 20:15 44:20
**school** 8:2,6 8:11
**second** 13:18 16:1 27:21 29:3 43:17 63:14 107:4
**Section** 1:22 2:14 5:15 47:11 82:5 82:5,22 83:19
**sections** 4:9 4:12

15:14 16:4 29:20 43:17 44:1 44:4 48:6 62:16 66:7 66:16 91:2 106:22
**seek** 70:4,14 95:3
**seen** 51:13 90:4
**segregated** 40:19
**self-evident** 90:16
**sense** 104:3 107:9
**sent** 36:17
**separate** 20:21,22 32:12 34:12,13 34:18 39:3 39:5,5 40:1 54:7 57:22 59:12 75:12,12
**separately** 32:6,6 52:6,7 84:22
**September** 1:17 5:16 63:22 64:19 65:12 66:8 111:19
**session** 27:5
**set** 4:18 36:7 45:3
**settlement** 77:10
**sewer** 68:8 75:14
**shake** 7:14 34:9
**short-to-...** 70:16
**shortfalls** 99:17 100:16
**show** 61:21
**showed** 71:18
**showing** 20:21,23 34:12 51:20 62:20 76:1
**shown** 64:8
**shut** 64:13
**sic** 31:1
**side** 17:11 24:16,17 24:18,21 25:4,19 39:4 58:4 70:1
**sign** 5:7
**Signed** 111:18
**significant** 68:13
**signing** 4:14
**similar** 36:13 38:6 38:8 76:7
**similarly** 1:7
**simple** 91:19 91:21
**simple-mi...** 90:8
**simply** 99:22
**single-fa...** 43:21
**sit** 100:6 102:15
**sitting** 42:7 59:21
**situated** 1:8
**situation** 49:20
**six** 7:20,21 33:17 45:12 49:16 53:17 76:8
**small** 30:21
**sneeze** 95:9
**software** 19:13,16 21:18 22:6 22:19 38:5 38:10,11 38:14,16 38:19 40:7 41:15 42:1 47:17 84:21
**software-...** 38:8
**somebody** 40:14,23 49:7 56:22 80:6
**somebody's** 13:3
**sophistic...** 58:23
**sorry** 10:10 24:19 25:2 34:10 43:5 48:13 52:8 68:23 95:8 99:18 110:16
**sort** 4:16
**sources** 35:19 69:10 73:11 96:10
**SOUTHERN** 1:2 1:3
**speak** 34:8
**special** 107:19
**specific** 24:8 25:12 30:1 68:3 79:1,22
**specifically** 23:4 58:17 60:15 89:7 106:4
**spend** 63:12 66:1,11,21 86:5 99:22 103:18 107:23
**spending** 99:17,19
**spent** 33:21 51:21 56:8 56:11 61:17 67:3 89:9 90:15 91:3 107:15 108:21
**spill** 77:9
**split** 19:11 73:7
**spreadsheet** 59:12
**staff** 13:9 22:22 85:16 87:12
**standing** 83:15
**start** 7:16 7:23 24:6
**started** 12:8 50:12
**State** 1:20 4:7 111:3
**stated** 61:19
**statement**
3:18 92:17 92:20
**STATES** 1:1
**statutes** 97:6,8,11 97:14,15
**stenography** 1:21
**stenotype** 111:8
**step** 11:6 27:4
**stick** 69:20
**stipulated** 4:2,11 5:5
**stipulation** 5:13
**stipulations** 6:6
**STREET** 1:22 2:14 5:15
**strike** 29:4 52:7 69:1 80:16
**study** 54:4 79:5,8,17 79:20,23
**stuff** 65:14 71:15 81:9
**sub-accounts** 39:15 85:2
**subcatego...** 34:20 37:22 40:21
**subcategory** 84:19
**subcompon...** 42:8
**subdepart...** 106:16
**subject** 22:21
**submit** 26:3
**submitted**

49:8
**substantial** 68:7
**succeeded** 45:22
**SUITE** 2:15
**summary** 86:15
**supervision** 111:10
**suppose** 11:19 64:22
**sure** 13:4 15:18 16:11 27:23 30:3 36:10 41:17 45:7 54:11 55:6 56:13 59:6 64:11 73:23 75:2 81:10 91:15 92:1 93:9 101:1 103:10 106:11 107:8,11
**Susan** 1:18 4:5,15 5:9 111:20,21
**sworn** 6:3
**system** 19:14 19:20 20:14,17 20:17 28:17 44:19 68:8

**T**

**T** 4:1,1 111:1,1
**table** 86:8
**take** 8:21 78:17 81:11,13 104:10,16
**taken** 1:17 4:5,8 111:7
**takes** 36:13 60:17,17 104:16
**talk** 16:19 17:22 24:21 25:18 50:10 65:1 68:18 94:17 101:3
**talked** 67:11 67:12 68:12 82:20 90:20 95:1
**talking** 17:8 24:15 56:3 62:13 63:2 63:10 72:15,21 74:5,9,22 74:23 89:20 97:16,18 106:2
**tax** 67:18 71:2,11,21 76:21,23 77:5
**taxpayer's** 32:14
**team** 37:3
**technical** 41:4
**technical...** 4:16
**tell** 7:8 10:17 12:13 14:1 19:1 24:13 34:6 40:12 46:10 53:13 59:18 66:9 67:10 90:9 90:19 107:5
**telling** 70:22
**tells** 20:1
**ten** 72:18,20 72:22 73:2
**tennis** 60:8 60:8,8,22
**term** 98:9
**test** 42:4 48:4 75:22
**testified** 6:4 18:2 27:13,23 29:5 31:11 43:11,13 50:13 52:14 54:12,15 57:12 58:19 76:2 76:14 83:11 85:19 86:6 92:14 93:11 95:10 96:8 96:16,18 102:7
**testify** 15:20 16:14 23:21 82:11
**testifying** 110:9
**testimony** 1:15 14:8 15:3 50:16 79:20 83:17 86:9 86:16 97:13 98:4 101:6 102:14 111:12
**thank** 35:14 64:14 74:2 92:2
**thereabouts** 104:8
**thereof** 48:10 92:11
**thereto** 111:9
**thing** 6:22 19:10 58:19 79:10
**things** 18:15 36:8 42:5 50:20 60:5 62:19 98:2 99:12,19
**think** 6:18 7:15 30:23 31:5,10 32:19 39:2 49:10 50:12 52:3 54:10 57:11 61:9 62:7,18 63:1,9 78:21 82:20 85:18 88:23 93:8 94:3,7 95:2 97:6 104:4,5
**thinking** 10:7 60:23 61:8 85:8 88:4
**thinks** 94:22
**thought** 27:20 62:3 85:19 91:18,22
**three** 52:18 53:1,20 54:9 55:11 82:7 83:3
**three-year** 55:3
**tie** 25:3
**tied** 25:13
**time** 4:20 8:22 10:4 12:6 16:10 25:15 29:3 31:5 33:13 34:23 45:1 47:22 53:16 59:11 67:3 69:21 70:12 84:18 99:21 100:11 107:4,14 107:15
**times** 49:21 96:3,5
**TischlerBise** 53:23 56:4 79:5,7
**today** 6:16 12:11 13:22 14:8 15:3,22 17:9 61:23 78:22
**told** 28:11 50:11

**top** 46:1 59:23
**total** 33:9 33:10 35:22 71:13
**totality** 57:3 101:1
**totally** 104:23
**track** 24:22 25:1 26:20 26:21 31:14,22 33:3,5 61:20 90:19 104:13 105:5,8 106:1 107:7,13
**tracking** 17:17,19 25:6,9,12 50:10 105:13
**Tracy** 37:17
**transcript** 5:2 7:12 111:12
**transfer** 20:7 23:7 46:10 59:11
**transferred** 21:4 31:23 44:11
**transferring** 85:1
**transfers** 37:10
**transport...** 19:19 20:19 44:9
**trap** 86:19
**treasurer** 9:17,21 10:16,19 11:5,12 12:7,8,15 17:15 82:18
**Treasury** 58:16
**treat** 39:3
**trial** 4:21
**tricky** 53:18
**triggering** 79:22
**true** 105:10 111:11
**try** 7:8 69:8
**trying** 32:13 32:18 41:3 69:4,14 86:18 90:10,13 91:19 100:18,19 100:23 103:3
**turn** 20:4 66:15 82:2 92:5
**two** 8:23 20:11 62:7 109:11,13
**type** 14:5 26:19 40:1 51:1 87:4 88:17
**types** 86:11
**typically** 31:1

**U**

**U** 4:1
**uh-huh** 6:20 7:13,15 9:10 11:18 12:9 13:11 15:11 16:5 22:12 23:11 27:16 28:3 31:9 33:8 34:5 36:11 37:19 38:17 40:3 43:20,22 44:5 46:3 47:9 49:12 49:14 50:2 50:23 51:4 54:6,17 55:1,7,22 57:13 61:2 61:6,14 62:9 63:8 63:23 64:21 65:3 65:7,11 67:1 69:18 70:10 71:10,16 72:4,10,23 73:6,8,10 83:13,16 85:23 86:20 87:9 87:21 88:5 88:7,11 89:11 90:6 90:12 91:7 91:23 92:3 96:7 97:21 101:4,13 102:10 104:6,12 104:20 105:22 107:10 108:14 109:23
**ultimately** 17:19 18:18 83:23 89:21
**unclear** 73:16
**uncommon** 87:17
**understand** 7:7 18:10 18:11,18 38:2 39:13 41:5 75:3 84:16 85:6 90:8,14,20 91:17 99:23 101:1 102:3,14 104:23 105:18 106:5,12
**understan...** 16:14 17:6 17:13 101:5
**understood** 30:23 90:10 92:2
**undertakes** 27:17 53:1 55:10
**UNITED** 1:1
**unrestricted** 72:17,18 73:9 75:19
**update** 46:11
**updated** 79:8
**updates** 31:2
**use** 25:22 27:8 30:3 30:13 31:1 31:19 32:9 32:10 38:7 38:10 51:8 67:22 74:21 88:17 104:5
**uses** 23:23
**Usual** 6:5
**utilities** 73:16,21 74:8,14 75:4
**utility** 19:10,10 36:6 74:10 74:21 75:5 75:6,9

**V**

**various** 29:1 29:6 37:22 43:14 74:9 76:3 82:7 86:8 95:12 95:14
**vehicle** 62:18
**verbal** 7:12 7:13
**version** 93:13
**versus** 17:4 33:10
**videotaped** 7:11
**virtue** 82:14
**vote** 51:2 89:22
**votes** 27:6,7 103:17
**vs** 1:10

**W**

**waive** 5:6
**waived** 4:14
**walk** 18:17 18:22
**want** 14:4 15:18 16:6

18:23 21:22 32:20 46:20 48:5 59:17 64:11 81:11,13 86:19,23 89:4 94:21 94:23 95:15 97:20 103:10 106:11
**wanted** 58:7 82:21 83:8 92:1 106:5 107:11
**wanting** 100:17
**warehouse** 13:1,2
**Warren** 110:4 110:5,12 110:13
**wasn't** 54:15 80:6 107:12
**watch** 56:23
**water** 75:14
**way** 16:7 31:23 34:16 36:21 43:5 50:9 61:8 66:1 76:10 76:12 77:6 78:8,15 84:3 88:14 93:19,22 95:18 99:1 104:9 105:4,23 107:20
**ways** 69:9
**we'll** 62:12 78:2 94:7
**we're** 6:16 16:12 17:8 20:21,22 26:13,19 27:8 28:16 29:12,19 29:19 30:13 34:12,16 36:5,5 42:15 43:3 45:4,4,17 51:8 55:12 55:13,14 56:14,17 62:13 63:1 64:11 65:8 72:21 74:22,22 78:1,1 83:5 89:18 89:19,20 93:8 94:3 100:19,19 103:3,7 105:8,13 105:13,13 110:21
**we've** 50:21 72:7 81:8 81:16 91:2 100:20,21 108:22
**week** 20:7 23:1 48:23
**weekly** 20:3 20:4 37:8
**went** 9:11 11:20 14:9 14:10 59:19 90:21
**weren't** 73:22
**Williams** 2:13 6:8 14:2 16:8 16:11,21 23:12 34:8 35:10,12 42:18 43:1 47:20 58:1 62:5 63:6 63:9 64:10 67:12 70:18 71:4 73:13,15 73:19,22 80:12 81:13 82:16 83:4 85:22 94:5 94:9 95:4 95:6 102:1 109:8,11 110:4,16
**window** 107:7
**witness** 3:3 5:6,17 7:22 34:10 35:11 36:19 42:20 43:7 43:9 62:9 63:8 73:20 81:15 85:23 110:5,10 110:13,15 110:19 111:13
**Word** 58:22
**words** 12:14
**work** 8:14 9:6 11:20 13:9 27:5 28:23 35:7 53:1 77:13
**worked** 7:18 8:15,17 38:13
**working** 78:1
**works** 26:12 29:9,14 34:7 41:5 53:6
**worry** 56:10
**worth** 91:16
**wow** 13:10
**writing** 37:9
**written** 18:7 41:22 80:19 81:5 87:2,6
**wrong** 15:7

**X**

**X** 3:1

**Y**

**y'all** 32:16 46:18 56:1 56:3 63:10 81:3 101:20
**yeah** 10:8 12:5,19 14:16 16:3 21:15,21 22:16 23:15 25:9 27:13,16 31:20 36:12 38:21 39:12 42:20,21 43:3,9 54:22 58:14 62:7 62:22 63:4 63:11 70:8 71:20 73:18 74:3 74:11 75:2 75:2 76:20 81:6,15 82:18 83:10 85:8 86:20,22 86:22 88:2 88:3,5 91:13,13 91:21 97:19 100:22 106:6,9,18 107:3 108:1 109:12 110:10
**year** 11:23 33:6,6 46:22 47:22 57:9 59:13 60:6 64:12,12 64:17,18 65:2,6,9 65:16,20 66:3,12,13 67:15 71:12 76:3 79:11 83:20 89:3 89:4 91:3 91:5,14,20 104:8 109:22
**years** 7:20 7:21 9:8 9:18 10:13 10:14 32:19,20 32:22 33:11,17 45:13 48:23 49:16

52:18 53:1 53:18,20 54:9 55:11 56:9 57:4 62:7 71:18 76:8 82:7 83:3 90:15 91:10
**years'** 91:16

**Z**

**0**

**0088-0095** 3:16
**0105-0106** 3:22
**05-CV-202...** 1:13

**1**

**1** 46:21 64:19 65:10
**1:00** 81:20
**1:08** 81:22
**1:24** 94:12
**1:25-cv-0...** 1:9
**1:30** 94:14
**1:47** 1:18 110:23
**10** 9:20 16:20
**100,000** 91:1 91:6,11
**105** 39:7,14 92:6,7,18
**106** 92:7,22
**108** 62:22
**11** 5:16 16:20
**11:45** 1:18 5:17
**11th** 1:17
**12** 9:8 16:20
**12.8** 44:3
**13** 9:8 16:20
**14** 66:16
**15** 43:23 82:5,5,22 83:19
**155** 104:7
**16** 16:20
**1625** 3:15 42:17 43:16 45:18,23 52:16 79:15 82:4 83:19
**1817** 3:12 45:19 48:7 79:11,15
**19** 9:20 47:11,15 47:18

**2**

**2** 16:19 23:19
**20** 73:4
**20.8** 44:9
**2006** 9:19
**2010** 9:19 10:15
**2019** 10:16 12:1,3 81:2,4
**2023** 66:8,17
**2024** 45:16 45:16 47:16,18 60:4 61:1 61:5 63:22 65:10 66:13 71:12 79:4 79:8,14,23 104:5
**2025** 1:17 5:16 64:4 64:7,12,13 65:9,12,20 111:19
**206** 63:6,11 63:14,15
**207** 63:7,21
**208** 63:7 66:5
**209** 63:7 66:7
**210** 66:15
**211** 42:16
**216** 82:2
**218** 43:9,11
**24** 60:3
**25** 35:23 63:12,18 66:8
**251-401-4630** 2:8
**251-694-6233** 2:17
**26th** 111:18
**284** 1:19
**287** 111:22

**3**

**30** 63:22 64:19 65:12
**36507** 2:7
**36532** 2:16

**4**

**4** 3:11 48:7 48:8
**40** 12:22 13:12 71:14
**45** 71:14
**458** 2:6
**48** 3:16
**4852-23** 66:6

**5**

**5** 92:8,9
**5-** 3:18
**5,000** 21:3 22:11 31:17 60:18
**500** 28:12
**51.4** 44:8
**5205** 63:16
**5205-24** 65:13

**6**

**6** 3:5 16:19

**7**

**71** 1:22 2:14 5:15

**8**

**9**

**9** 16:20
**9/1/23-9/...** 3:19
**9/30/26** 111:23
**92** 3:23
**94** 47:10
**95** 45:20,21